# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

**FILED**

FEB 2 8 2005

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

INTERNATIONAL CODE COUNCIL, )
INC., and BUILDING OFFICIALS AND )
CODE ADMINISTRATORS )
INTERNATIONAL, INC., )
                    )
           Plaintiffs, )
                    )
v.                   )     **NO. 02C 5610**
                    )
                    )     Judge Rebecca R. Pallmeyer
                    )
NATIONAL FIRE PROTECTION )
ASSOCIATION, INC., )
                    )
           Defendant. )

## NOTICE OF FILING and CERTIFICATE OF SERVICE

**TO:**   Alan S. Wernick, Esq., Querrey & Harrow, 175 West Jackson Boulevard, Suite 1600, Chicago, IL    60604

James Hamilton, Esq., Swidler Berlin Shereff Friedman, 3000 K Street, NW, Suite 300, Washington DC   20007

**PLEASE TAKE NOTICE** that on February 28, 2005 there was filed with the Clerk of the United States District Court for the Northern District of Illinois, Eastern Division, Defendant National Fire Protection Association's Memorandum in Support of Defendant's Motion for Summary Judgment, a copy of which is attached hereto and was served upon counsel.

_____
Peter C. John, Esq.

Williams Montgomery & John Ltd.
2100 Civic Opera Building
Twenty North Wacker Drive
Chicago, IL 60606
(312) 443-3200

Thomas F. Holt, Jr.
Tara C. Clancy
Christopher Centurelli
Kirkpatrick & Lockhart LLP
75 State Street
Boston, MA 02109
(617) 261-3100

## CERTIFICATE OF SERVICE

Karen M. Begg being first duly sworn on oath states that on February 28, 2005 a true copy of the foregoing Notice of Filing and Memorandum were served on the following via hand delivery:

> Alan S. Wernick, Esq.
> Quarles & Brady LLC
> 500 West Madison Street
> Suite 3700
> Chicago, IL 60661-2511

and to the following via regular U.S. Mail

> kramer@swidlaw.com
> jhamilton@swidlaw.com
> Kevin R. Amer
> James Hamilton, Esq.
> Swidler Berlin Shereff Friedman
> 3000 K Street, NW
> Suite 300
> Washington, D.C. 20007

_____
Karen M. Begg

Subscribed and sworn to before me
this 28th day of February, 2005.

_____
NOTARY PUBLIC

```
••••••••••••••••••••••••••
•    "OFFICIAL SEAL"       •
•  DENISE E. MATHAUSER     •
•  Notary Public, State of Illinois •
•  My Commission Expires 8/30/07   •
••••••••••••••••••••••••••
```



**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

**F I L E D**

FEB 9 ■ 2005
FEB 28 2005
MICHAEL W DOBBINS
CLERK, U.S. DISTRICT COURT

|  |
|---|
| INTERNATIONAL CODE COUNCIL, INC., |
| Plaintiff, |
| v. |
| NATIONAL FIRE PROTECTION ASSOCIATION, INC., |
| Defendant. |

**CIVIL ACTION NO. 02C 5610**

Judge Rebecca R. Pallmeyer

### MEMORANDUM IN SUPPORT OF DEFENDANT'S
### MOTION FOR SUMMARY JUDGMENT

Both the plaintiff, International Code Council, Inc. ("ICC"), and the defendant, National Fire Protection Association, Inc. ("NFPA"), produce model building codes for private self regulation as well as government use and adoption. In this copyright infringement action, ICC alleges that NFPA copied certain provisions from its model building code, the IBC 2000. ICC, however, cannot prove any of the elements of copyright infringement.

First, ICC does not own the code language it asserts against NFPA. The ICC's model code, like the accused NFPA code, was prepared by committees of volunteer public officials and *not* by employees of the ICC. The asserted code provisions were either drafted by the committee members, extracted from pre-existing standards and code, or adopted from proposals submitted by the public. ICC received no assignments from the committee members or from the contributing public for the text they created. It therefore has no right to claim ownership of the code provisions and assert them against NFPA.

BOS-727071 v1

Second, NFPA did not copy ICC's code. NFPA developed its own building code independently, and the works are not substantially similar. In fact, ICC recently reduced its allegations considerably, and now alleges that NFPA copied only portions of 5% of the provisions in its building code.

Finally, even if ICC could prove that it owned the asserted code provisions and that NFPA copied language from them, the allegedly copied material is not protectible subject matter. The allegedly copied language is merely statements of facts and ideas, following mandatory conventions, and is therefore precluded from copyright protection under the merger doctrine.

For each of these three reasons, NFPA is entitled to summary judgment.

## I. FACTS

### A. The Parties

Plaintiff ICC was formed in 1994 from three regional code-writing organizations: Building Officials and Code Administrators International, Inc. ("BOCA"), International Conference of Building Officials ("ICBO"), and Southern Building Code Congress International, Inc. ("SBCCI"). Each of these regional organizations had developed their own model building codes ("the legacy codes"), and these codes had grown similar over the decades due to development of common code formats. (Ex. A at 24.)[1] In 1994, the regional organizations formed the ICC to jointly prepare a single model code. (Ex. A at 24-25.) In 2000, ICC released the International Building Code 2000 ("IBC 2000"), its first joint model building code.

Defendant NFPA has been developing model fire codes and other building safety codes for more than 100 years. In 1999, NFPA began a project to integrate and expand its existing

---

[1] Ex. ___ refers to the exhibits to the Declaration of Christopher Centurelli, filed herewith.

safety codes into a comprehensive set of building related codes. (Ex. B at Attachment A.) This project led to the NFPA's Building Construction and Safety Code ("NFPA 5000"), the code accused of infringement in this case.

**B.    The IBC 2000 Model Code**

The IBC 2000 model code was developed between 1996 and 2000 in a complex iterative process involving a large number of people. The process was run by committees of volunteer public officials. The committees selected language for the code provisions by: (a) adopting language from existing legacy codes; (b) adopting language submitted by industry groups or other members of the public; or (c) drafting or revising language themselves. (*See* Ex. A at 36-37.) Staff employees of the ICC assisted the committees in a "secretariat" role, but did not author or select code language. (Ex. A at 65; Ex. C at 39, 49-50; Ex. D. at 67-68.)

        1.    The Committees

The IBC 2000 was developed by six committees: a steering committee that set the procedures for creating the code and five technical subcommittees that developed the specific code language. (Ex. D at 33-34.) The technical subcommittees each had nine members, (Ex. P at vii.), all of whom were either public employees responsible for enforcement of building regulations in their jurisdiction or, in some cases, industry representatives. (Ex. D at 19-20; Ex. F at 37-38; Ex. A at 136.) None were employees of the ICC, (Ex. A at 16-17, 26-28; Ex. D at 19-20), and all volunteered their time (Ex. C at 43). The technical subcommittee members were selected to serve based on their expertise in an area, their familiarity with the code development process, and their willingness to devote time to the project. (Ex. C at 45-46.)

- 3 -

The committee members who developed the IBC 2000 did not assign their copyright rights to ICC, nor did they enter into any work-for-hire contracts with ICC.[2] The only grant ICC requested from the Committee members was a ***nonexclusive license*** to use the materials:

> I agree that ICC shall have nonexclusive, royalty-free license to use any material that I may provide to or develop for the Committee. I hereby grant ICC a nonexclusive, royalty-free license to all rights in copyright that I may have as an author of the materials produced by an ICC Committee.

(Ex. H at 4.)[3] Thus, ICC never acquired any ownership rights to the code language contributed by the committees.[4]

### 2.    The Code Drafting Procedure and Contributions from the Public

The IBC 2000 was developed through an iterative process to allow contributions from the public. In each iteration, the subcommittees would prepare a draft of the code and release it to the public for comment. Industry groups and other members of the public would then submit suggested code revisions. After a hearing, the subcommittees would adopt or reject the suggestions and prepare a revised draft for further public comment. (Ex. A at 36-37; Ex. J.)

---

[2] There was one exception. Three members of the fire safety subcommittee, William R. Bryant, Michael McReynolds, and Donald R. Mercer, signed explicit work for hire agreements with ICC in June and July 1997. (Ex. G.) However, these agreements were all signed after completion of the first working draft of the IBC 2000. (Ex. F at 190-92.) The agreements are therefore irrelevant unless the ICC can demonstrate that one of these individuals contributed code language after completion of the first working draft. *Respect Inc. v. Committee on Status of Women*, 815 F. Supp. 1112, 1117 n.10 (N.D. Ill. 1993). ICC's Rule 30(b)(6) witness could not identify any specific sections drafted by these three committee members. (Ex. F at 198.)

[3] Ex. H, which contains the nonexclusive license grant, is an ICC Committee Application dated May 31, 2001. (Ex. H, at 3.) One of ICC's Rule 30(b)(6) witnesses, Dominic Sims, testified that similar applications were likely used for the members of technical subcommittees which developed the IBC 2000. (Ex. A at 139-40.)

[4] After NFPA pointed out ICC's lack of ownership during this litigation, the ICC began asking all the volunteers to sign work for hire agreements as part of their application to serve on a committee. (Ex. I at 4.) This 2004 change, however, is too late to help ICC in this case.

There were a total of four iterations. A first Working Draft was published in May 1997. (Ex: D at 46.) Industry groups and other members of the public then submitted hundreds, perhaps thousands of comments and proposed code language. (Ex. F at 56-57.) The technical subcommittees held a public hearing at which they adopted, rejected, or took submissions under consideration for further review. (Ex. D at 47-49.) A subsequent "First Draft" was completed in November 1997, followed by another round of submissions of proposed code changes. (Ex. D at 51-54.) In this second round, more than 600 proposed changes were received by the fire safety subcommittee alone, and the other four subcommittees likely received a similar volume. (Ex. F at 139.) After a second public hearing, a "Final Draft" was published in July 1998. (Ex. D at 55-56.) The Final Draft was followed by another round of submissions and a final hearing. The resulting text was then approved by the constituent members of the ICC (BOCA, SBCCI, and ICBO) and published as the IBC 2000. (Ex. D at 57-61.)

When members of the public submitted proposed code language, they did *not* assign any copyright in the language to the ICC. Rather, like the committee membership application, the comment submission form granted the ICC only a nonexclusive license to use the proposed language in its model code:

> I hereby grant the International Code Council the nonexclusive, royalty-free rights, including nonexclusive, royalty-free rights in copyright, in this proposal and I understand that I acquire no rights in any publication of the International Code Council in which this proposal in this or another similar analogous form is used.

(Ex. J; Ex. K; Ex. L.) The purpose of this provision was simply to give the ICC "authority to utilize [the] material," not to gain full ownership rights. (Ex. F at 42.) Thus, ICC has no right to exclude others from using the code language submitted by the public.[5]

### 3. The BCMC Reports

In addition to contributions from legacy codes, committee members, and the public, a fourth source of material for the IBC 2000 was reports created by the Board for the Coordination of Model Codes. During the 1980's and early 1990's, the four major model code organizations—the predecessors of ICC (BOCA, SBCCI, and ICBO) and the defendant, NFPA— participated in a program to harmonize provisions in their model codes. The four organizations sent representatives to meetings of a board, called the Board for the Coordination of Model Codes ("BCMC"). (Ex. N at 29.) The BCMC prepared reports which recommended model code provisions for all four member organizations. (Ex. O at 3.) Importantly, all four organizations agreed "to waive copyright protection for the benefit of the other participating organizations with respect to any code language developed from a code or standard copyright by such participating organization." (Ex. O at 2.) In other words, any model code language in the BCMC reports was fair game for all four organizations.

In preparing the IBC 2000 model code, the ICC committees used provisions from the BCMC reports "as often as possible." (Ex. F at 94.) Because the BCMC reports "included almost every subject addressed by a building code," (Ex. D at 115-16; Ex. N), BCMC language

---

[5] Notably, after this lawsuit began, ICC tried to change its comment submission form to require copyright assignments from members of the public submitting proposed code language. However, this change met with resistance from some industry groups, who wanted to retain their copyright rights. ICC backed off and presented an alternative form to submitters who objected to assignment. (*See* Ex. M.)

is found in a number of the code provisions ICC now accuses NFPA of infringing. (*See, e.g.*, Koffel Decl., ¶ 22.)

> 4.      Role of ICC Staff in Preparing the IBC 2000

The ICC assigned three staff employees to assist each of the technical subcommittees. (Ex. P at 5.) The staff served only in a supporting, "secretariat" role. (Ex. C at 39; Ex. A at 65.) They were *not* members of the committees, did not select code language, and did not have a vote in any committee decisions. (Ex. C at 39, 54; Ex. D at 22; Ex. A at 63, 76, 102.) One of the ICC staff members described staff's role as follows:

> We were secretariats, took notes. We facilitated the meetings again. If there was a procedural question or some other type of question that they [the subcommittee members] felt staff could answer, they would ask us it seemed, that kind of thing. We had to maintain the temperature in the room, you know, all that fun stuff.

(Ex. C at 49-50.)

Most importantly for purposes of this motion, the ICC staff employees did *not* draft the asserted code language. This fact is established by the ICC's Rules and Procedures documents, the Rule 30(b)(6) testimony of ICC witnesses, and ICC's interrogatory answers.

First, the ICC's Rules and Procedures define the role of "staff liaisons" in sections 2.2 and 3.1. These duties do not include drafting of code provisions. (Ex. Q at 1, 2.) Similarly, an IBC Scope, Objectives and Process Statement from 1996 makes clear that "[s]taff serves only in a supporting capacity." (Ex. R at 1.) Dominic Sims, an ICC staff member and Rule 30(b)(6) witness confirmed that this was how the process worked in practice. (Ex. A at 63.)

Second, in addition to the above Rule 30(b)(6) testimony of Mr. Sims and Mr. Armstrong, a third ICC 30(b)(6) witness, John Battles, testified explicitly that staff members did not draft any of the IBC 2000 chapters:

> Q.      In your support role on the occupancy subcommittee, did you write any chapters of the IBC 2000?

- 7 -

A. No.

Q. Did Mr. Frost [another staff member] write any chapters?

A. Not that I'm aware of, no.

Q. Did Mr. McCreary [another staff member] write any chapters?

A. No.

Q. Did any of the staff members listed on this technical subcommittee rosters, did any of the staff members write any chapters?

A. No, sir, not that I'm aware of. We may have assisted in clarification, putting together the—the information that somebody had given us.

Q. And who's that somebody that would have given it to you?

A. It would be the—the subcommittee would have given us an assignment to do a certain thing for them.

Q. And when you state subcommittee, you're referring to the code officials?

A. The code officials, yes, sir.

(Ex. D at 67-68.)[6]

Finally, in its Supplemental Response to Interrogatory No. 3, ICC states explicitly that the "actual process of drafting the IBC was undertaken by several *committees*," and that "[e]ach *committee* drafted its assigned sections of the IBC." (Ex. S at 4, emphasis added.) As discussed above, staff were not members of the committees. (Ex. C at 39.)

Thus, the only sources of code language in the IBC 2000 were: (a) the government official committee members; (b) submissions from the public; (c) BCMC reports; and (d) the legacy codes. No employees of the ICC authored any of the asserted sections of the IBC 2000.

5.    Development of the Legacy Codes

At a December 10, 2004 hearing, ICC stipulated that its legacy codes (the codes of its predecessor organizations, BOCA, ICBO, and SBCCI) were developed using the same process as the IBC 2000. (Ex. T at 18.) ICC's counsel agreed that "the Court's ruling with respect to the IBC-2000 would have the same force and effect with respect to the legacy codes," and that "whatever findings the Court makes with respect to the IBC-2000 will cover the universe for

---

[6] A fourth ICC 30(b)(6) witness, Michael Pfeiffer, contradicted the testimony of the other three, and stated that staff did draft a few of the asserted provisions of the IBC 2000. (Ex. F at 89, 95-96, 100.) Mr. Pfeiffer's contentions are discussed in detail in the Argument section below.

legacy codes as well." (Ex. T at 17, 20.) ICC also stipulated that it would not identify any "authors" of the legacy codes other than the individuals it has already disclosed as authors of the IBC-2000. (Ex. T at 30-31.) The Court memorialized the stipulation as follows in its December 10, 2004 Minute Order:

> Plaintiff has stipulated in court that the process for creating the "legacy codes" was the same as the process for creating the IBC 2000 and its three preliminary drafts. Accordingly, the court will not require production by Plaintiff of the names of individuals involved in the drafting of the legacy codes or source documents, to the extent they have not already been identified.

(Ex. U.) This means that, for purposes of this motion, the legacy codes: (a) were drafted by committees of volunteer government officials; (b) the government officials and contributing members of the public did not assign or exclusively license their copyright rights to the ICC; and (c) ICC will not identify any previously undisclosed staff members as drafters of the legacy codes.

## C.    The Defendant's NFPA 5000 Code

In 1999, before the IBC 2000 was published, NFPA began working on developing a complete building code from existing NFPA codes and standards. (Koffel Decl. ¶ 10.) As its first step, NFPA hired a consultant, Wayne "Chip" Carson, to prepare a first draft using existing NFPA code and the EPCOT building code.[7] (Carson Decl. ¶¶ 1-2.) He did not base any of his draft on the IBC 2000 or any of the ICC legacy codes. (Carson Decl. ¶ 3.) Mr. Carson completed a first draft in January 2000 and a second draft in February 2000, and then turned it over to NFPA. (Carson Decl. ¶ 4. )

---

[7] Disney developed its own building code for the EPCOT center, which NFPA licensed. (Ex. V.)

In April 2000, NFPA began its formal process for developing and ratifying its building code. (Koffel Decl. ¶ 11.) Beginning from the Carson draft, NFPA developed the NFPA 5000 using the same time tested consensus process, accredited by the American National Standards Institute, that it has used to develop and maintain all of its approximately 300 model codes and standards. NFPA set up sixteen technical committees to develop code and a technical correlating committee to oversee the technical committees to ensure consistency. The committee members included some of the same code officials who served on the ICC's committees, as well as numerous other government officials, special experts, insurers, manufacturers, and other interested parties. (*Id.*)

Drafts of the NFPA code were twice released for public review, and many proposed revisions submitted by the public were incorporated into the working drafts. (Koffel Decl. ¶ 12.) NFPA released its final version, the NFPA 5000, in July 2002. (*Id.*)

**D.     ICC's Shrinking Copyright Infringement Allegations**

The IBC 2000 has 5,290 numbered code sections, 246 tables, and 60 figures. (Koffel Decl. ¶ 19.) The NFPA 5000 has 8,532 code provisions, 128 tables, and 73 figures. (Koffel Decl. ¶ 13.)

In its original interrogatory answers, ICC recited 460 numbered allegations, accusing NFPA of copying roughly 560 code provisions, tables, and figures from the IBC 2000. At the December 10 hearing, NFPA pointed out that these allegedly infringed IBC code provisions included, e.g.: (a) language ICC (and NFPA) copied from the Code of Federal Regulations; (b) code provisions taken from third party sources, such as the American Society of Civil Engineers; and (c) language ICC adopted from pre-existing *NFPA* codes. In many cases, ICC's own code provisions identified these sources. (Ex. T at 6-13.)

- 10 -

On February 9, 2005, less than three weeks before the deadline for this motion, ICC served a new list of allegations, withdrawing about half of its previous contentions. And then on February 17, ICC served yet another revised list of allegations, deleting more code provisions and adding others. ICC's (presumably) final allegations, attached as Ex. W, accuse NFPA of infringing about 270 sections and 14 tables of the IBC 2000. This is roughly 5% of the provisions in the IBC 2000 code.

Notably, ICC has not accused NFPA of infringing the arrangement or presentation of the IBC 2000. Nor can it. The NFPA code is organized according to occupancy, rather than building structure, and therefore has a very different organizational format and numbering system. (Koffel Decl. ¶ 14; Ex. X at 98.) ICC accuses NFPA *only* of copying some language from 5% of its code provisions.

ICC did not reduce its allegations far enough. As demonstrated below, ICC has no ownership interest in these remaining provisions either, no evidence that NFPA copied from ICC materials, and the allegedly copied material, in any event, is not protectible subject matter. This lawsuit should never have been filed in the first place, and should now be dismissed on summary judgment.

## II.  ARGUMENT

### A.  Legal Standards

#### 1.  Summary Judgment

Summary judgment is warranted when "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "Summary judgment must be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will

bear the burden at trial." *Mid America Title Co. v. Kirk*, 59 F.3d 719, 721 (7th Cir. 1995). The party that bears the burden of proof at trial "may not rest on the pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Pickett v. Prince*, 52 F. Supp.2d 893, 898 (N.D. Ill. 1999) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). On factual issues, the Court should view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

    2.    Copyright Infringement

To establish a claim of copyright infringement, ICC must prove two elements: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original. *Feist Publications, Inc. v. Rural Telephone Service Co., Inc.*, 499 U.S. 340, 361 (1991); *Publications Int'l, Inc. v. Meredith Corp.*, 88 F.3d 473, 479 (7th Cir. 1996).

    (a)    Ownership—The Work for Hire Doctrine

Copyright ownership vests initially in the author of a work. 17 U.S.C. § 201(a). An organization, like ICC, will own a copyright only if: (a) the author assigns his or her copyright to the organization; or (b) the work is made for hire. *See Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 737 (1989); *Billy-Bob Teeth, Inc. v. Novelty, Inc.*, 329 F.3d 586, 591 (7th Cir. 2003).

Under 17 U.S.C. § 101, a work is "made for hire" if: (1) the work is "prepared by an employee within the scope of his or her employment;" or (2) "if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire," and the work falls within one of the categories set forth in 17 U.S.C. § 101(2). *Respect Inc. v. Committee on the Status of Women*, 815 F. Supp. 1112, 1116-17 (N.D. Ill. 1993).

- 12 -

Copyright ownership, including the question of whether an author is an "employee" under 17 U.S.C. § 101(1), is a question of law. *Kirk v. Harter*, 188 F.3d 1005, 1007 (8th Cir. 1999); *Nimmer on Copyright*, § 13.01(B) (2004).

### (b)    Illicit Copying

The second element of copyright infringement requires that the defendant prove "copying of constituent elements of the work that are original." *Feist*, 499 U.S. at 361. This element, sometimes called "illicit copying," requires proof that: (a) the defendant actually copied the plaintiff's work; and (b) that the material copied was "original," i.e., protected, copyrightable subject matter. *Wallace Computer Services, Inc. v. Adams Business Forms, Inc.*, 837 F. Supp. 1413, 1416 & n.7 (N.D. Ill. 1993); *Pampered Chef, Ltd. v. Magic Kitchen, Inc.*, 12 F. Supp.2d 785, 790-91 (N.D. Ill. 1998).

Absent direct evidence, actual copying "may be inferred where the defendant had access to the copyrighted work and the accused work is substantially similar to the copyrighted work." *Theotokatos v. Sara Lee Personal Products*, 971 F. Supp. 332, 340 (N.D. Ill. 1997). "If the similarities between works are insufficient to prove copying, or if it is established that the accused work was independently created without copying, the plaintiff cannot prevail." *Id.* Whether the defendant actually copied the plaintiff, i.e., "used the plaintiff's material as a model," is a question of fact. *Wallace*, 837 F. Supp. at 1416.

Even if a defendant is found to have copied the plaintiff, the copying will only be "illicit" (i.e., unlawful) if the material appropriated was copyrightable. *Id.* at 1417; *Pampered Chef*, 12 F. Supp.2d at 791-92. Copyrightability is a question of law. *Wallace*, 837 F. Supp. at 1417; *Nimmer on Copyright*, § 13.01(B) (2004).

- 13 -

### 3. Burden of Proof

The ICC, as plaintiff, has the burden of proof on both ownership and illicit copying. *See Feist*, 499 U.S. at 361.

The existence of a valid certificate of registration creates a prima facie presumption of the validity of a copyright. *Mid Atlantic Title Co. v. Kirk*, 59 F.3d 719, 721 (7th Cir. 1995). However, "this is simply a rebuttable presumption." *Id.* Once the defendant introduces evidence that disputes or rebuts the plaintiff's prima facie case, the burden shifts back to the plaintiff to prove the elements of its case. *See id.* ("the burden of proof in the sense of the risk of nonpersuasion ... remains throughout the trial upon the party on whom it was originally cast" (citing Fed. R. Evid. 301)); *Pickett v. Prince*, 52 F. Supp.2d 893, 901 (N.D. Ill. 1999) ("Plaintiff's copyright registration will not be sufficient to demonstrate a valid copyright in light of contrary evidence.")

Here, ICC cannot meet its burden as to ownership, cannot prove that NFPA copied from the plaintiff, and cannot prove that the material allegedly copied was protectible expression.

## B. ICC Does Not Own the Asserted Provisions of the IBC 2000

The authors of the asserted code language for the IBC 2000 were: (a) the members of the technical subcommittees; and (b) the members of the public who submitted proposed code language ultimately adopted into the code.

Here, ICC does not allege it has received any assignments for the asserted code language, or that it executed "work for hire" contracts with the authors of the IBC 2000. It received, at most, only nonexclusive licenses from the committee members and the public commentators. (Ex. H; Ex. A at 139-40; Ex. K; Ex. L.) Thus, ICC's ownership allegation turns entirely on whether the committee members and public commentators were "employees" of the ICC, acting

- 14 -

"within the scope of their employment," under 17 U.S.C. § 101(1). ICC's counsel conceded as much at the December 10 hearing, where he stated "our claim basically is going to rest upon provision 1 of 101, which is whether the people that created these codes were employees under the statutory interpretation." (Ex. T at 18-19.)

Neither the committee members nor the public commentators were "employees" of the ICC under 17 U.S.C. § 101(1), and consequently, ICC does not own the code.

### 1.    The Committee Members Were Not Employees

To determine if an author is an "employee" within the scope of 17 U.S.C. § 101(1), the question is whether the hiring party has the "right to control the manner and means by which the product is accomplished." *Reid*, 490 U.S. at 751. In *Reid*, the Supreme Court identified twelve factors potentially relevant to this analysis: (1) the skill required; (2) the source of the instrumentalities and tools; (3) the location of the work; (4) the duration of the relationship between the parties; (5) whether the hiring party has the right to assign additional projects to the hired party; (6) the extent of the hired party's discretion over when and how long to work; (7) the method of payment; (8) the hired party's role in hiring and paying assistants; (9) whether the work is part of the regular business of the hiring party; (10) whether the hiring party is in business; (11) the provision of employee benefits; and (12) and the tax treatment of the hired party. *Id.* at 751-52. These factors are nonexhaustive, and no one factor is determinative. *Id.* at 752; *Respect*, 815 F. Supp. at 1117.

The Second Circuit has held that, while some of the *Reid* factors will often have minimal significance, others "will be significant in virtually every situation." *Aymes v. Bonelli*, 980 F.2d 857, 861 (2nd Cir. 1992). The most significant factors, according to *Aymes*, are factors (1), (5), (11), and (12) above. The *Aymes* decision was cited favorably by a court in this district in *Respect*, 815 F. Supp. at 1117.

- 15 -

The ICC did not dictate "the manner and means by which" the volunteer committee members prepared the IBC 2000. In fact, it was exactly the opposite. The members of the steering committee set the procedures for creating the code, and the members of the technical subcommittees voted upon the actual language for the code. (Ex. D at 33-34.) The ICC staff liaisons assigned to assist the committees could not vote on any of these decisions. (Ex. C at 54; Ex. D at 22; Ex. A at 63, 76, 102.)

Analysis of the twelve *Reid* factors bears this out. The four factors identified by *Aymes* as always significant—(1) the skill required; (5) whether the ICC had the right to assign additional projects; (11) the provision of employee benefits; and (12) and the tax treatment of the hired party—all demonstrate that the committee members were not employees. Regarding factor (1), the committee members were all highly skilled code officials. As explained by ICC's Rule 30(b)(6) witness, Paul Armstrong, the committee members were selected because they had "expertise," were "experienced in the code development process," and, for some of the technical subcommittees, "were...licensed engineers." (Ex. C at 45-46.) Regarding factors (5), (11), and (12), since the committee members were all unpaid volunteers, (Ex. C at 43), the ICC did not have the right to assign additional projects to them, did not provide employee benefits, and did not treat them as employees for tax purposes. At least one court in this District has found compensation and tax treatment to be the most important of all the *Reid* factors. *See Natkin v. Winfrey*, 111 F. Supp.2d 1003, 1008-09 (N.D. Ill. 2000) ("Most importantly, neither photographer was ever treated like an employee in terms of compensation, benefits, and taxes.")

The remaining eight *Reid* factors, to the extent they are relevant, also dictate that the committee members were not ICC employees. First, since the committee members were

volunteers, the ICC did not have "discretion over when and how long" the committee members would work.

Second, since the committee members continued to work for their government employers while serving on the committees, the "duration of the relationship between the parties" favors non-employee status. As explained in *Respect*, where an individual continues to work for others (or as an entrepreneur) while generating the disputed product, the relationship "lack[s] the hallmarks of common law employment." 815 F. Supp. at 1118. *See also Aymes*, 980 F.2d at 864 ("Although Aymes worked two years for Island, he did occasional work for others at the same time. Moreover, there were undisputed gaps in his employment, which suggests that he was not a full time employee.")

Third the "method of payment" factor favors non-employment, since the committee members were not paid.

Fourth, "the location of the work" also favors non-employment, since the committee meetings largely took place at public venues, such as hotels. (*See* Exhibits 2-4 to the Koffel Declaration.)

The remaining factors are of marginal relevance. There were no special "instrumentalities or tools" used for the work and no evidence that any assistants were hired. The fact that the ICC is "in business," and the work may have been part of the ICC's "regular business" is of little import, since nearly all work done by a company will generally be part of its "regular business." *See Aymes*, 980 F.2d at 863.

The facts of other cases from this District further confirm that the committee members were not "employees" of the ICC under § 101(1). In *Respect*, the Committee on Status of Women ("CSW") hired Coleen Mast to draft some educational workbooks on sexual abstinence.

815 F. Supp. at 1115. CSW paid Mast, paid for her typewriter, withheld payroll taxes from Mast's checks, and had some input into the workbooks, "for example, by suggesting revisions" *Id.* at 1118. Nevertheless, the Court found Mast to be an independent contractor, and not an employee, since Mast was "an experienced teacher" (i.e., high level of skill), continued to "act as an entrepreneur" while working for CSW, did not receive employee benefits, and worked from home using her own research materials. *Id.* at 1118-19.

In *Natkin*, photographers hired by Oprah Winfrey's company (Harpo) to photograph Ms. Winfrey at her television studio were held to be independent contractors, rather than employees, even though: (a) Harpo controlled the duration of the employment; (b) Harpo exercised some control over the manner and means of creating the disputed photographs; (c) "the location of the work" was Oprah's set; (d) the photographers were paid, and were identified as "staff photographers." 111 F. Supp.2d at 1008-10.

Numerous cases from other jurisdictions, with facts leaning considerably closer to employment than the facts of this case, have also found the hired party to be an independent contractor. *See Respect*, 815 F. Supp. at 1118, citing *Reid*, 490 U.S. 730, *Aymes*, 980 F.2d 857, and *Marco v. Accent Publishing Co.*, 969 F.2d 1547 (3rd Cir. 1992). *See also Kirk v. Harter*, 188 F.3d 1005, 1008-09 (8th Cir. 1999) (finding a computer programmer to be an independent contractor, since he received no employment benefits and was not treated as an employee for tax purposes, even though several of the *Reid* factors strongly favored employment).

Finally, ICC's contention that the committee members were employees is inconsistent with its own actions and the testimony of its own witnesses. First, at the time the IBC 2000 was drafted, ICC asked committee members to grant a ***nonexclusive license*** to use materials they created. (Ex. H; Ex. A at 139-40.) If they were employees, and ICC owned the rights under §

- 18 -

101(1), why would ICC need to request a nonexclusive license? Second, two of ICC's 30(b)(6) witnesses—in fact, the only two who were asked the question—both testified explicitly that the committee members were *not* employees of ICC. (Ex. A at 16; Ex. D at 20.) Given this testimony, given the request for a nonexclusive license, and given the above analysis of the *Reid* factors, it is difficult to see how ICC can now argue otherwise.

### 2. The Public Commentators Were Not Employees

In addition to the committee members, some industry representatives and other members of the public drafted code language in the IBC 2000, pursuant to the public comment and review procedures. These members of the public, as should be clear, were also not "employees" of ICC under § 101(1). They submitted comments and proposed code language voluntarily, subject to only a nonexclusive license, for their own purposes. The ICC maintained no control over "the manner and means" by which the third parties drafted the code language, and none of the twelve *Reid* factors remotely suggest they were ICC employees, acting within the scope of ICC employment.

### 3. The ICC Staff Members Did Not Draft the Asserted Code

The only ICC employees remotely connected to the code preparation process were the staff liaisons. As discussed in detail in the Facts section, these staff members served only in a supporting, "secretariat" role, and did not author the code. This fact is confirmed by ICC's interrogatory response, the ICC Rules and Procedures documents, and the testimony of three of ICC's Rule 30(b)(6) witnesses, John Battles, Dominic Sims, and Paul Armstrong. (See Part I.B.4 above.)

Despite this contrary evidence, late in discovery, a fourth ICC Rule 30(b)(6) witness, Mike Pfeiffer, testified that staff did indeed draft portions of the IBC 2000. (Ex. F at 89, 95-96, 100.) However, at his deposition, Mr. Pfeiffer could only identify five of the currently asserted

IBC code provisions as having been drafted by staff: Table 503 and four subparts of section 903.[8] (Provisions attached as Ex. Y, pp. 71, 156.) Mr. Pfeiffer could not state which staff member drafted table 503, and testified that section 903 was drafted by a former staff member named Mark Chubb, who now lives in New Zealand. (Ex. F at 89, 95, 101.)

Even assuming that ICC is allowed to contradict its own interrogatory answers, documents, and other 30(b)(6) testimony, Mr. Pfeiffer's allegations are easily refuted. The IBC committee responsible for Table 503, the "Heights and Area Table," was the Occupancy Subcommittee. (Koffel Decl., ¶ 20.) A review of the meeting minutes of this subcommittee shows that Table 503 was based on legacy codes and a BCMC Report,[9] and *not* on any new staff expression. (Koffel Decl., ¶¶ 21-22.) The only role played by staff was to calculate values for inclusion in the table using methodologies from the legacy codes and the BCMC Report.[10] At all points in the process, staff was acting under the direction of the subcommittee. (Koffel Decl., ¶ 22.) Notably, according to the minutes, one of the staff members who assisted the subcommittee with calculations for Table 503 was John Battles, who testified in his own deposition that he did *not* draft any chapters of the IBC 2000 code. (Koffel Decl., ¶ 23; Ex. D at 67-68.)

Regarding section 903, in its latest list of allegations, ICC accuses NFPA of copying four subparts of the section: 903.2.2, 903.2.3, 903.2.5, and 903.2.10. (Ex. W at 3.) These subparts, which concern sprinkler systems, were all derived from either the legacy codes or public submissions. None were drafted by ICC staff. (Koffel Decl., ¶ 24.)

---

[8] Mr. Pfeiffer identified other portions of the IBC 2000 as allegedly drafted by staff, but these portions are not at issue.

[9] See Part I.B.3 above for a description of the BCMC code harmonization process from the 1980's and early 1990's.

[10] Calculated mathematical values are facts, and are therefore not copyrightable expression. *See Feist*, 499 U.S. at 344.

Thus, ICC's Procedure documents, ICC's interrogatory response, and the testimony of the ICC's other Rule 30(b)(6) witnesses were all correct: ICC staff employees did not author any of the asserted IBC 2000 code.

ICC, therefore, does not own any of the asserted code language, and has no right to assert the code against NFPA.

## C.    NFPA Did Not Copy the Asserted Provisions of the IBC 2000

To prove NFPA copied the asserted IBC 2000 code provisions, ICC must show:  (a) that the NFPA drafters had access to the allegedly copied IBC provisions; and (b) that the NFPA 5000 and IBC 2000 are substantially similar enough to infer copying.  *Wallace*, 837 F. Supp. at 1416.

In the Seventh Circuit, substantial similarity is determined by the ordinary observer test: "whether the accused work is so similar to the plaintiff's work that an ordinary reasonable person would conclude that the defendant unlawfully appropriated the plaintiff's protectible expression by taking material of substance and value." *Atari, Inc. v. N. Am. Philips Consumer Electronics Corp.*, 672 F.2d 607, 614 (7th Cir. 1982).

Here, even applying the "ordinary observer" test in the light most favorable to ICC, it is impossible to conclude that the NFPA 5000 and the IBC 2000 are "substantially similar."  ICC has accused NFPA of copying from only 5% of its code provisions, and does not allege that NFPA copied the layout or presentation of the overall code.  And even within that 5%, the language of the two codes is far from identical.

Consider, for example, ICC's first allegation with respect to section 903, the sprinkler system code discussed above.  ICC alleges that NFPA's section 17.3.5.1 is copied from IBC 2000's section 903.2.2.  The two provisions are reproduced below:

- 21 -

| IBC 2000 Section 903.2.2 | NFPA 5000 Section 17.3.5.1 |
|---|---|
| **903.2.2 Group E.** An automatic sprinkler system shall be provided throughout all Group E fire areas greater than 20,000 square feet ($1858 \text{ m}^2$) in area. An automatic sprinkler system shall also be provided for every portion of educational buildings below the level of exit discharge. **Exception:** Where each classroom has at least one exterior exit door at ground level. | **17.3.5.1** Educational occupancy buildings with a fire compartment exceeding 20,000 $\text{ft}^2$ ($1860 \text{ m}^2$) shall be protected throughout by an approved, supervised automatic sprinkler system in accordance with Section 55.3. |

(Ex. Y at 156; Ex. Z at 179.) The only similarity between the two sections is the number 20,000 $\text{ft}^2$, which, as discussed below, is a fact, not copyrightable expression.

So that the Court can perform a complete "ordinary observer" test, we have submitted, with Exhibit 1 to Mr. Koffel's declaration, the text of each of the allegedly copied IBC 2000 code sections, next to the allegedly infringing sections of the NFPA 5000 code.

The two codes are dissimilar because NFPA did not use the IBC 2000 "as a starting point for" its own code, as required for infringement. *Stillman v. Leo Burnett Co., Inc.*, 720 F. Supp. 1353, 1357 (N.D. Ill. 1989). NFPA's consultant, Mr. Carson, prepared the first draft from existing NFPA codes and standards and from the EPCOT building code, which NFPA was licensed to use, without reviewing or considering the IBC or the legacy codes. (Carson Decl., ¶¶ 1-3; Ex. V.) After Mr. Carson finished his draft, the NFPA launched a committee/public review process to complete the code. If there are any similarities between specific code provisions, it is because: (a) both parties used language submitted by industry representatives during the comment processes (often the same industry representatives); (b) both parties used code officials on their drafting committees (in some cases, the same officials); (c) both parties made use of BCMC Reports, which were prepared jointly by the parties and cross-licensed; (d) both parties adopted code from pre-existing, third party codes and standards; and (e) as discussed in part D

below, the asserted code provisions are largely statements of facts, which can only be expressed in a limited number of ways.

As evidence of NFPA's independent development, Mr. Koffel's Declaration identifies the source of each of the accused NFPA code sections. These sources were: (i) The Code of Federal Regulations; (ii) pre-existing NFPA codes and standards; (iii) ASCE 7 (a third party standards document); (iv) the EPCOT Building Code; (v) other industry standards; (vi) the Uniform Fire Code; (vii) the BCMC Reports; (viii) public proposals and comments; and (ix) proposals from NFPA committee members. (Koffel Decl. ¶ 18 & Ex. 1.) NFPA did not copy code from the IBC 2000 or the asserted legacy codes for any of these provisions. This independent creation precludes any finding of infringement. *Theotokatos*, 971 F. Supp. at 340.

## D.     The Asserted IBC Code Language Is Not Copyrightable

In addition to ownership and actual copying, ICC must show that any material appropriated is protectible under copyright law. *Wallace*, 837 F. Supp. at 1416. Here, the material ICC alleges NFPA copied is largely statements of facts, following mandatory code drafting conventions, and is therefore not protectible subject matter.

Two legal limitations on copyrightability apply here: (a) facts and ideas are not copyrightable, *Feist*, 499 U.S. at 344; and (b) the merger doctrine.

Much of the asserted language of the IBC 2000 code is recitations of numbers, limits, and data. (See, e.g., the 20,000 ft$^2$ data point in section 903, and the height and area data in the Heights and Area Table 503, attached as Ex. Y.) These data points are facts and ideas, and are therefore not copyrightable. Only original expression of the facts is protected by copyright. *Id.* at 1289.

- 23 -

One case from this circuit is particularly instructive. In *Publications International Limited v. Meredith Corp.*, 88 F.3d 473 (7th Cir. 1996), the Court held that a collection of recipes consisting of ingredients and basic instructions was not copyrightable. *Id.* at 480. The Court found that "there is no expressive element in each listing," and each author "was not giving literary expression to his individual creative labors. Instead he was writing down an idea...." *Id.* *See also Nash v. CBS*, 899 F.2d 1537, 1541 (7th Cir. 1990) (CBS's use of facts from a copyrighted book about John Dillinger was not infringement).

In the asserted IBC 2000, the standards and data are recited, not with "literary expression" or "creative labors." *Meredith*, 88 F.3d at 480. Rather, they are recited according to mandatory code drafting conventions. As explained by one of ICC's Rule 30(b)(6) witnesses, codes must be written "in enforceable, mandatory language":

> Q. ...What's an example of mandatory language versus—would there be—
> A. Yeah. Let's say, for example, it is preferred that the bottom of that window sill be not less than 12 inches in height. The word "preferred" does not make it mandatory. It makes it effectively a suggestion.
> Q. Sure.
> A. --versus a text that says the bottom of that sill height shall not be less than 12 inches. That's a definitive, enforceable statement.
> Q. Okay. So codes are typically written in definitive, enforceable statements?
> A. That's correct.
>
> * * *
>
> Q. Okay. Is this—this mandatory language, is that language that's common throughout all codes, regardless of whether or not they are limited to building?
> A. I believe so.

(Ex. F at 123-24.)

This "mandatory language" invokes the merger doctrine, which states that "where an idea is incapable of being expressed in more than one manner, there can be no copyright in the expression." *Mid America Title Co. v. Kirk*, 867 F. Supp 673, 683-684 (N.D. Ill. 1994), *aff'd*, 59

F.3d 719 (7th Cir. 1995). The doctrine also applies where there are only a limited number of ways to express a fact or idea. *See Morrissey v. Proctor & Gamble Co.*, 379 F.2d 675, 678 (1st Cir. 1967) ("When the uncopyrightable subject matter is very narrow, so that 'the topic necessarily requires,' if not only one form of expression, at best only a limited number, to permit copyrighting would mean that a party or parties, by copyrighting a mere handful of forms, could exhaust all possibilities of future use of the substance.") *See also Alberto-Culver Co. v. Andrew Dumon, Inc.*, 466 F.2d 705, 711 (7th Cir. 1972) (Stevens, J.) (descriptive "ordinary phrase" not subject to copyright protection). Here, given that the allegedly copied code language simply recites facts, following mandatory conventions, there is at best a limited number of ways to express the facts. The expression therefore "merges" into the idea, and the language is not copyrightable.

### III.    CONCLUSION

ICC cannot prove:  (a) that it owns the code language it asserts; (b) that NFPA copied the IBC 2000 code provisions as a factual matter; and (c) that the allegedly copied code language is protectible subject matter.  For the above reasons, the Court should grant summary judgment in favor of NFPA and dismiss ICC's complaint.

NATIONAL FIRE PROTECTION
ASSOCIATION, INC.,

By its attorneys,

Dated:    February 25, 2005

Thomas F. Holt, Jr., Esq.
Tara C. Clancy, Esq.
Christopher Centurelli, Esq.
Kirkpatrick & Lockhart Nicholson Graham LLP
75 State Street
Boston, MA 02109
(617) 261-3100

Peter C. John, Esq.
Williams Montgomery & John Ltd.
2100 Civic Opera Building
Twenty North Wacker Drive
Chicago, IL 60606
(312) 443-3200