**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

FILED
FEB 28 2005
FEB 2 8 2005

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

INTERNATIONAL CODE COUNCIL, )
INC., and BUILDING OFFICIALS AND )
CODE ADMINISTRATORS )
INTERNATIONAL, INC., )
           )
      Plaintiffs, )
           )
v. )   **NO. 02C 5610**
           )
           )   Judge Rebecca R. Pallmeyer
           )
NATIONAL FIRE PROTECTION )
ASSOCIATION, INC., )
      Defendant. )

**NOTICE OF FILING and CERTIFICATE OF SERVICE**

**TO:**  Alan S. Wernick, Esq., Querrey & Harrow, 175 West Jackson Boulevard, Suite 1600, Chicago, IL  60604
James Hamilton, Esq., Swidler Berlin Shereff Friedman, 3000 K Street, NW, Suite 300, Washington DC  20007

**PLEASE TAKE NOTICE** that on February 28, 2005 there was filed with the Clerk of the United States District Court for the Northern District of Illinois, Eastern Division, Defendant National Fire Protection Association's Statement of Material Facts Pursuant to LR 56.1(a)(3) in Support of Defendant's Motion for Summary Judgment, a copy of which is attached hereto and served upon counsel.

_____
Peter C. John, Esq.

Williams Montgomery & John Ltd.
2100 Civic Opera Building
Twenty North Wacker Drive
Chicago, IL 60606
(312) 443-3200

Thomas F. Holt, Jr.
Tara C. Clancy
Christopher Centurelli
Kirkpatrick & Lockhart LLP
75 State Street
Boston, MA 02109
(617) 261-3100

## CERTIFICATE OF SERVICE

Karen M. Begg being first duly sworn on oath states that on February 28, 2005 a true copy of the foregoing Notice of Filing and Statement of Material Facts Pursuant to LR 56.1(a)(3) in Support of Defendant's Motion for Summary Judgment were served on the following via hand delivery:

Alan S. Wernick, Esq.
Quarles & Brady LLC
500 West Madison Street
Suite 3700
Chicago, IL   60661-2511

and to the following via regular U.S. Mail

kramer@swidlaw.com
jhamilton@swidlaw.com
Kevin R. Amer
James Hamilton, Esq.
Swidler Berlin Shereff Friedman
3000 K Street, NW
Suite 300
Washington, D.C.   20007

_____
Karen M. Begg

Subscribed and sworn to before me
this 28th day of February, 2005.

_____
NOTARY PUBLIC

"OFFICIAL SEAL"
DENISE E. MATHAUSER
Notary Public, State of Illinois
My Commission Expires 8/30/07





UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

---

INTERNATIONAL CODE COUNCIL,
INC.,

               Plaintiff,

v.

NATIONAL FIRE PROTECTION
ASSOCIATION, INC.,

               Defendant.

CIVIL ACTION NO. 02C 5610

Judge Rebecca R. Pallmeyer

---

## STATEMENT OF MATERIAL FACTS PURSUANT TO LR 56.1(a)(3) IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Local Rule 56.1(a)(3), Defendant National Fire Protection Association, Inc. ("NFPA") submits the following statement of material facts to which NFPA contends there is no genuine issue and that entitle NFPA to a judgment as a matter of law.

### I.    Parties

1. Plaintiff International Code Council ("ICC") is a not-for-profit corporation organized under the laws of California with its principal place of business at 5203 Leesburg Pike, Suite 708, Falls Church, Virginia 22041. (Plaintiff's Amended Complaint, ¶ 3.)

2. ICC was formed in 1994 from three regional code-writing organizations: Building Officials and Code Administrators International, Inc. ("BOCA"), International Conference of Building Officials ("ICBO"), and Southern Building Code Congress International, Inc. ("SBCCI"). (Plaintiff's Amended Complaint, ¶ 6; Ex. A[1] at 24-25.)

---

[1] Ex. ___ refers to the exhibits to the Declaration of Christopher Centurelli, filed herewith.

3.     Defendant NFPA is a not-for-profit corporation organized under the laws of Massachusetts with its principal place of business at 1 Batterymarch Park, Quincy, Massachusetts 02269-9101. (Plaintiff's Amended Complaint, ¶ 4.)

## II.     Jurisdiction and Venue

4.     This Court has jurisdiction under 28 U.S.C. §§ 1331. (Plaintiff's Amended Complaint, ¶ 1.) Jurisdiction is not disputed by NFPA.

5.     Venue is proper in this district under 28 U.S.C. § 1391. (Plaintiff's Amended Complaint, ¶ 2.) Venue is not disputed by NFPA.

## III.     Material Facts Relevant to Ownership

6.     The IBC 2000 was developed by six committees: a steering committee that set the procedures for creating the code and five technical subcommittees that developed the specific code language. (Ex. D at 33-34.)

7.     The members of the technical subcommittees were either public employees responsible for enforcement of building regulations in their jurisdiction or, in some cases, industry representatives. (Ex. D at 19-20; Ex. F at 37-38; Ex. A at 136.)

8.     The members of the technical subcommittees were not paid by the ICC for their work; all volunteered their time. (Ex. C at 43.)

9.     One of ICC's Rule 30(b)(6) witnesses, Dominic Sims, testified as follows regarding the status of the members of the ICC committees:

Q.     Now, of course, none of those individuals were employees of ICC, correct?
A.     Correct.

> They would have all been employees either of some public authority or agency, government entity, third-party company, or some fire safety or fire fighting organization; correct?
> A.    Correct.

(Ex. A at 16-17, 26-28.)

10.    Another ICC Rule 30(b)(6) witness, John Battles, testified as follows regarding the status of the ICC technical subcommittee members:

> Q.    Now, who served on these—one, two, three, four—five drafting committees?
> A.    Code officials.
>
> * * *
>
> Q.    Are these individuals public employees?
> A.    Yes.
>
> * * *
>
> Q.    Were any of the code officials employed by the model code organizations?
> A.    No.

(Ex. D at 19-20.)

11.    The technical subcommittee members were selected to serve based on their expertise in an area, their familiarity with the code development process, and their willingness to devote time to the project.  (Ex. C at 45-46.)

12.    The committee meetings largely took place at public venues, such as hotels.  (*See* Exhibits 2-4 to the Koffel Declaration.)

13.    With the possible exception of William R. Bryant, Michael McReynolds, and Donald R. Mercer, the committee members who developed the IBC 2000 did not assign their copyright rights to ICC and did not enter into any work-for-hire contracts with ICC.  (Ex. H.)

14. ICC requested that committee members grant a nonexclusive license to use any material that they provided to or developed for their Committee. (Ex. H at 3-4; Ex. A at 139-40.)

15. Several drafts of the IBC 2000 were published before the final version, including a Working Draft, a First Draft, and a Final Draft. Industry groups and members of the public submitted comments and/or proposed changes to the technical subcommittees for consideration after publication of each draft. The technical subcommittees adopted or rejected the proposed changes. (Ex. A at 36-37; Ex. J; Ex. D at 46-61.)

16. When members of the public submitted proposed code language to the ICC committees, they did not assign any copyright in the language to the ICC. Rather, the comment submission form granted the ICC a nonexclusive license to use the proposed language in its model code. (Ex. J; Ex. K; Ex. L.)

17. During the 1980's and early 1990's, four model code organizations—the predecessors of ICC (BOCA, SBCCI, and ICBO) and the defendant, NFPA—participated in a program to harmonize provisions in their model codes. The four organizations sent representatives to meetings of a board, called the Board for the Coordination of Model Codes ("BCMC"). (Ex. N at 29.) The BCMC prepared reports which recommended model code provisions for all four member organizations. (Ex. O at 3.) All four organizations agreed "to waive copyright protection for the benefit of the other participating organizations with respect to any code language developed from a code or standard copyright by such participating organization." (Ex. O at 2.)

18. The ICC assigned staff employees to assist each of the technical subcommittees. (Ex. P at 5.)

19. ICC Rule 30(b)(6) witnesses Paul Armstrong and Dominic Sims testified that staff served in a supporting, "secretariat" role. (Ex. C at 39; Ex. A at 65.)

20. ICC staff member Paul Armstrong testified as follows regarding the role of staff:

> We were secretariats, took notes. We facilitated the meetings again. If there was a procedural question or some other type of question that they [the subcommittee members] felt staff could answer, they would ask us it seemed, that kind of thing. We had to maintain the temperature in the room, you know, all that fun stuff.

(Ex. C at 49-50.)

21. The ICC staff liaisons were not members of the committees and did not have a vote in any committee decisions. (Ex. C at 39, 54; Ex. D at 22; Ex. A at 63, 76, 102.)

22. ICC's Rules and Procedures defined the role of "staff liaisons" in sections 2.2 and 3.1. (Ex. Q at 1, 2.)

23. IBC Scope, Objectives and Process Statement from 1996 stated that "[s]taff serves only in a supporting capacity." (Ex. R at 1.) Dominic Sims, an ICC staff member and Rule 30(b)(6) witness testified that this was how the process worked in practice. (Ex. A at 63.)

24. An ICC 30(b)(6) witness, John Battles, testified as follows:

> Q. In your support role on the occupancy subcommittee, did you write any chapters of the IBC 2000?
> A. No.
> Q. Did Mr. Frost [another staff member] write any chapters?
> A. Not that I'm aware of, no.
> Q. Did Mr. McCreary [another staff member] write any chapters?
> A. No.
> Q. Did any of the staff members listed on this technical subcommittee rosters, did any of the staff members write any chapters?
> A. No, sir, not that I'm aware of. We may have assisted in clarification, putting together the—the information that somebody had given us.
> Q. And who's that somebody that would have given it to you?
> A. It would be the—the subcommittee would have given us an assignment to do a certain thing for them.
> Q. And when you state subcommittee, you're referring to the code officials?
> A. The code officials, yes, sir.

(Ex. D at 67-68.)

25.  In its Supplemental Response to Interrogatory No. 3, ICC states that the "actual process of drafting the IBC was undertaken by several committees," and that "[e]ach committee drafted its assigned sections of the IBC." (Ex. S at 4.)

26.  The IBC committee responsible for Table 503, the "Heights and Area Table," was the Occupancy Subcommittee. (Koffel Decl. Exs. 2-4.)

27.  One of the staff members who assisted the subcommittee with calculations for Table 503 was John Battles.

28.  The role played by staff in preparing Table 503 was to calculate values for inclusion in the table using methodologies from the legacy codes and the BCMC Report. (Koffel Decl. Exs. 2-4.)

29.  Sections 903.2.2, 903.2.3, 903.2.5, and 903.2.10 of the IBC 2000 were derived from either the legacy codes or from public submissions. None were drafted by ICC staff. (Koffel Decl., ¶ 24.)

30.  At a December 10, 2004 hearing, ICC's counsel stipulated that "the Court's ruling with respect to the IBC-2000 would have the same force and effect with respect to the legacy codes," and that "whatever findings the Court makes with respect to the IBC-2000 will cover the universe for legacy codes as well." (Ex. T at 17, 20.)

31.  The Court memorialized the December 10 stipulation as follows in its December 10, 2004 Minute Order:

> Plaintiff has stipulated in court that the process for creating the "legacy codes" was the same as the process for creating the IBC 2000 and its three preliminary drafts. Accordingly, the court will not require production by Plaintiff of the names of individuals involved in the drafting of the legacy codes or source documents, to the extent they have not already been identified.

(Ex. U.)

## IV. Material Facts Relevant to Allegations of Illicit Copying

32. In 1999, before the IBC 2000 was published, NFPA began working on developing a complete building code from existing NFPA codes and standards. (Koffel Decl. ¶ 10.)

33. NFPA tasked a consultant, Wayne "Chip" Carson, with preparing a first draft. (Carson Decl. ¶ 1.)

34. As resources for his first draft, Mr. Carson used existing NFPA code and the EPCOT building code. (Carson Decl. ¶¶ 1-2.) He did not base any of his draft on the IBC 2000 or any of the ICC legacy codes. (Carson Decl. ¶ 3.)

35. Mr. Carson completed a first draft in January 2000 and a second draft in February 2000, and then turned it over to NFPA. (Carson Decl. ¶ 4. )

36. After receiving a draft from Mr. Carson, NFPA began its formal process for developing and ratifying its building code. (Koffel Decl. ¶ 11.)

37. NFPA set up sixteen technical committees to develop code and a technical correlating committee to oversee the technical committees to ensure consistency. The committee members included some of the same code officials who served on the ICC's committees, as well as numerous other government officials, special experts, insurers, manufacturers, and other interested parties. (Koffel Decl. ¶ 11.)

38. Drafts of the NFPA code were twice released for public review, and proposed revisions submitted by the public were incorporated into the working drafts. (Koffel Decl. ¶ 12.)

39. NFPA released its final version, the NFPA 5000, in July 2002. (Koffel Decl. ¶ 12.)

40. ICC's February 17, 2005 list of allegations, attached as Ex. W, accuses NFPA of infringing less than 300 code sections and less than 20 tables of the IBC 2000. (Ex. W.)

41.     ICC accuses NFPA of infringing less than 6 percent of the provisions of the IBC 2000 code. (Ex. W.)

42.     ICC has not accused NFPA of infringing the arrangement or presentation of the IBC 2000. (Ex. W.)

43.     The sources for NFPA's accused code sections were: (i) The Code of Federal Regulations; (ii) pre-existing NFPA codes and standards; (iii) ASCE 7 (a third party standards document); (iv) the EPCOT Building Code; (v) other industry standards; (vi) the Uniform Fire Code; (vii) the BCMC Reports; (viii) public proposals and comments; and (ix) proposals from NFPA committee members. (Koffel Decl. ¶ 18 & Ex. 1.)

44.     ICC's Rule 30(b)(6) witness Mike Pfeiffer testified as follows:

> Q.      ...What's an example of mandatory language versus—would there be—
> A.      Yeah. Let's say, for example, it is preferred that the bottom of that window sill be not less than 12 inches in height. The word "preferred" does not make it mandatory. It makes it effectively a suggestion.
> Q.      Sure.
> A.      --versus a text that says the bottom of that sill height shall not be less than 12 inches. That's a definitive, enforceable statement.
> Q.      Okay. So codes are typically written in definitive, enforceable statements?
> A.      That's correct.
>
> * * *
>
> Q.      Okay. Is this—this mandatory language, is that language that's common throughout all codes, regardless of whether or not they are limited to building?
> A.      I believe so.

(Ex. F at 123-24.)

NATIONAL FIRE PROTECTION
ASSOCIATION, INC.,

By its attorneys,

Dated:    February 25, 2005

Thomas F. Holt, Jr., Esq.
Tara C. Clancy, Esq.
Christopher Centurelli, Esq.
Kirkpatrick & Lockhart Nicholson Graham LLP
75 State Street
Boston, MA 02109
(617) 261-3100

Peter C. John, Esq.
Williams Montgomery & John Ltd.
2100 Civic Opera Building
Twenty North Wacker Drive
Chicago, IL 60606
(312) 443-3200

- 9 -