IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

KC **FILED**

APR 0 5 2005

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

INTERNATIONAL CODE COUNCIL
INC.,

       Plaintiffs,

       v.

NATIONAL FIRE PROTECTION
ASSOCIATION, INC.,

       Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

No. 02C-5610

Judge Rebecca R. Pallmeyer

## ICC'S RESPONSES TO NFPA'S STATEMENT OF MATERIAL FACTS AND ICC'S STATEMENT OF ADDITIONAL MATERIAL FACTS

### Responses to NFPA's Factual Statements

Pursuant to Fed. R. Civ. P. 56 and Local Rule 56.1, Plaintiff International Code Council,

Inc. ("ICC") hereby responds to Defendant National Fire Protection Association, Inc.'s

("NFPA") Statement of Material Facts as follows:

**I.    Parties**

1.    ICC admits the statement in paragraph 1.

2.    ICC admits the statement in paragraph 2.

3.    Upon information and belief, ICC admits the statement in paragraph 3.

**II.    Jurisdiction and Venue**

4.    ICC admits the statement in paragraph 4.

5.    ICC admits the statement in paragraph 5.

### III. Material Facts Relevant to Ownership

6.      ICC denies the statements in paragraph 6. The IBC 2000 was not developed solely by six committees. Rather, it was developed jointly by committees of legacy code organization members, staff members of ICC's member organizations, and the ICC Board of Directors. Declaration of Michael J. Pfeiffer ("Pfeiffer Decl.") ¶¶ 4-30. The steering committee by itself did not set the procedures for creating the code. These procedures were developed by staff and steering committee members, and consented to by the ICC Board. Pfeiffer Decl. ¶¶ 13-15. The members of the technical subcommittees developed specific code language in collaboration with staff. Pfeiffer Decl. ¶¶ 20-30.

7.      ICC admits the statements in paragraph 7 as far as they go, but asserts that the statements are misleading because the members of the subcommittees were members of one of the legacy code organizations, and the large majority were voting members of one of those organizations. Declaration of Paul K. Heilstedt ("Heilstedt Decl.") ¶ 9.

8.      ICC denies the statements in paragraph 8. The model code organizations paid subcommittee members' expenses in connection with their attendance at drafting and development meetings. Deposition of Michael J. Pfeiffer (attached as exh. E to Declaration of Wendy C. McGraw ("McGraw Decl.")) at 185.

9.      ICC admits that the quoted exchange set forth in paragraph 9 took place. However, ICC asserts that Mr. Sims, a non-lawyer, was not competent to conclude as a matter of law who is or who is not an employee under the extant work for hire test, and thus his statements are not controlling or probative as to this motion.

10.      ICC admits that the quoted exchanges set forth in paragraph 10 took place. However, ICC asserts that Mr. Battles, a non-lawyer, was not competent to conclude as a matter

of law who is or who is not an employee under the extant work for hire test, and thus his statements are not controlling or probative as to this motion.

11.     ICC admits the statements in paragraph 11 as far as they go, but asserts that the statements are misleading (1) because technical subcommittee members also were selected because they were members of the legacy code organizations, and most of them were voting members of a legacy code organization and (2) because staff members of the committees generally had greater familiarity with the code development process than members of the technical subcommittees. Pfeiffer Decl. ¶¶ 6, 22.

12.     ICC admits the statement in paragraph 12 as far as it goes, but asserts that it is misleading because the venues for meetings were chosen jointly by subcommittee members and staff. Heilstedt Decl., exh. A at 3, § 5.1.

13.     The statement in paragraph 13 is immaterial to NFPA's motion for summary judgment because committee members and staff were employees for purposes of the work for hire doctrine. Without conceding materiality, ICC admits this statement.

14.     ICC denies the statements in paragraph 14. NFPA is flatly wrong in its assertion that committee members working on the IBC 2000 were asked to give and/or gave non-exclusive licenses as to material they provided to a committee. Pfeiffer Decl. ¶ 7.

15.     ICC admits the statements in paragraph 15 as far as they go, but asserts that the statements are misleading because they do not describe the role of the members of the technical subcommittees and their staffs in editing and revising many proposed changes that were ultimately adopted. Pfeiffer Decl. ¶ 28.

16. ICC admits the statements in paragraph 16 as far as they go, but asserts that they are misleading in understating the role of committee members and staff in editing and revising the proposed language submitted on public comment forms. Pfeiffer Decl. ¶ 28.

17. The statements in paragraph 17 are immaterial to NFPA's motion for summary judgment, because no infringement of IBC sections originating in the BCMC process is asserted in this lawsuit. Without conceding materiality, ICC admits these statements.

18. ICC admits the statement in paragraph 18.

19. ICC admits the statement in paragraph 19 as far as it goes, but asserts that the statement is misleading because it understates the role of the staff in the code development process. In addition, only one staff member per committee served as the secretariat. Pfeiffer Decl. ¶ 8.

20. ICC admits that the quoted exchange set forth in paragraph 20 took place, but asserts that it does not reflect the full scope of the testimony and other record evidence regarding the role of staff during the various stages of the code development process. Pfeiffer Decl. ¶¶ 20-30.

21. ICC admits the statements in paragraph 21 as far as they go, but asserts that they are misleading because they understate the role of staff in the code development process. Pfeiffer Decl. ¶¶ 20-30.

22. ICC admits the statements in paragraph 22.

23. ICC admits the statements in paragraph 23, but asserts that they do not reflect the full scope of the testimony and other record evidence regarding the role of staff during the various stages of the code development process. Pfeiffer Decl. ¶¶ 20-30.

4

24. ICC admits that the quoted exchange set forth in paragraph 24 took place, but asserts that it does not reflect the full scope of the testimony and other record evidence regarding the role of staff during the various stages of the code development process. Pfeiffer Decl. ¶¶ 20-30.

25. ICC admits the statements set forth in paragraph 25 as far as they go, but asserts that they do not reflect the full scope of the testimony and other record evidence regarding the role of staff during the various stages of the code development process. Pfeiffer Decl. ¶¶ 20-30.

26. ICC admits the statement in paragraph 26.

27. ICC admits the statement in paragraph 27.

28. ICC denies the statement in paragraph 28, because it does not fully reflect the role of staff in the development of Table 503. Pfeiffer Decl. ¶¶ 25-26.

29. ICC admits the first sentence of paragraph 29 as far as it goes, but asserts that it does not fully reflect the process used to develop these sections. ICC denies the second sentence in paragraph 29 to the extent it asserts that staff did not draft any language contained in these sections. Pfeiffer Decl. ¶ 27.

30. ICC admits that the quoted statements in paragraph 30 were made.

31. ICC admits the statements in paragraph 31.

## IV. Material Facts Relevant to Allegations of Illicit Copying

32. ICC admits the statement in paragraph 32 as far as it goes, but asserts that it is misleading because it does not reveal the extent that NFPA, in preparing the NFPA 5000, copied provisions of the IBC 2000.

33. ICC admits the statement in paragraph 33 as far as it goes, but asserts that it is misleading because it does not reveal the extent that NFPA, in preparing the NFPA 5000, copied provisions of the IBC 2000.

34. ICC admits the statement in paragraph 34 as far as it goes, but asserts that it is misleading because it does not reveal the extent that NFPA, in preparing the NFPA 5000, copied provisions of the IBC 2000.

35. ICC admits the statement in paragraph 35 as far as it goes, but asserts that it is misleading because it does not reveal the extent that NFPA, in preparing the NFPA 5000, copied provisions of the IBC 2000.

36. ICC admits the statement in paragraph 36.

37. ICC admits the statement in paragraph 37 as far as it goes, but asserts that it is misleading because it does not reveal the extent that NFPA, in preparing the NFPA 5000, copied provisions of the IBC 2000.

38. ICC admits the statement in paragraph 38 as far as it goes, but asserts that it is misleading because it does not reveal the extent that NFPA, in preparing the NFPA 5000, copied provisions of the IBC 2000.

39. ICC admits the statement in paragraph 39.

40. The statements in paragraph 40 are immaterial to NFPA's motion for summary judgment because the salient issue is whether the infringement is qualitatively substantial. Without conceding materiality, ICC admits these statements and further asserts that some 370 provisions of the NFPA 5000 infringe approximately 250 sections of the IBC 2000.

41. The statements in paragraph 40 are immaterial to NFPA's motion for summary judgment because the salient issue is whether the infringement is qualitatively substantial.

42.    ICC denies the statement in paragraph 42, to extent "presentation" includes "selection." ICC further states that ICC does assert that NFPA's selection of many of the same passages that ICC has included in the IBC 2000 violates ICC's compilation copyright.

43.    ICC denies the statements in paragraph 43 as incomplete and misleading in that they do not describe the extensive copying of the IBC 2000 by NFPA. McGraw Decl., exhs. H-O (deposition testimony and other documents produced in discovery).

44.    The statements in paragraph 44 are immaterial to NFPA's motion for summary judgment because mandatory language or enforceable statements and provisions can contain original copyrightable expression. Without conceding materiality, ICC admits that the quoted exchanges took place.

## Statement of Additional Facts

Pursuant to Fed. R. Civ. P. 56 and Local Rule 56.1, ICC asserts the following additional facts that require denial of NFPA's motion for summary judgment:

### A.    The Parties

1.    Plaintiff International Code Council, Inc. ("ICC") is a non-profit corporation whose principal activities consist of developing and publishing national model codes, which are used by states, municipalities, architects, engineers, designers, contractors, and others. These codes protect the public health, safety, and welfare by establishing national standards. Heilstedt Decl. ¶ 4.

2.    ICC was formed in 1994 to facilitate cooperation among three existing national code writing organizations: Building Officials and Code Administrators, International, Inc. ("BOCA"), the International Conference of Building Officials ("ICBO"), and the Southern Building Code Congress International, Inc. ("SBCCI"). Id. ¶ 5. BOCA, ICBO, and SBCCI

7

(collectively, the "legacy organizations") all have a long history of creating model codes, although each organization focused on different regions of the country. Id.

3.     In 1994, through their cooperative efforts -- and with assistance from ICC -- BOCA, ICBO, and SBCCI began developing a single set of comprehensive national codes for the built environment. Id. ¶ 6. The first model building code produced by these efforts was the "International Building Code 2000," which was published in March 2000. Id.

4.     The IBC 2000 is based in substantial part on various versions of the building codes published by the legacy organizations: the National Building Code (BOCA); the Standard Building Code (SBCCI), and the Uniform Building Code (ICBO). Pfeiffer Decl. ¶ 6.

5.     ICC (like the legacy organizations) is a membership organization that operates under a Board of Directors and frequently through the actions of its members. Heilstedt Decl. ¶ 7. As a membership organization, ICC often acts through the decisions and actions of its members. The membership and operating assets of BOCA, ICBO, SBCCI have been merged into ICC. Id. ¶ 5.

6.     NFPA is also a nonprofit membership organization that publishes model codes and standards. NFPA traditionally has focused on fire safety and electrical issues. In April 2000, NFPA began a formal process to develop a building code. Koffel Decl. ¶ 3.1.2. This "building code project" culminated in the publication of NFPA's Building Construction and Safety Code ("NFPA 5000").

**B.     Development of the IBC**

7.     To develop the IBC, the ICC Board formed a steering committee and five technical subcommittees. The steering committee oversaw the development effort and provided direction to the staff and subcommittees. Deposition of Dominic Sims (attached as exh. A to

8

McGraw Decl.) at 38.

8. The five technical subcommittees were responsible for developing the particular chapters of the IBC assigned to them by ICC. The five technical subcommittees were Fire Safety, Structural, Occupancies, Means of Egress, and General. Pfeiffer Decl. ¶ 5.

9. Each legacy code organization appointed three representatives of member governmental jurisdictions to serve on each technical subcommittee. Heilstedt Decl. ¶ 9. Those appointments were ratified by the ICC Board. Id. Ten or more of the subcommittee members also were members of the Boards of Directors of BOCA, SBCCI, and or ICBO, and others were past members of the Boards of one of these organizations. Pfeiffer Decl. ¶ 6. During the IBC development process, the subcommittee members were members of one of the legacy organizations, and the large majority of them were voting members of one of those organizations. Heilstedt Decl. ¶ 9.

10. Each subcommittee member was appointed for a one-year term, and many of the subcommittee members were reappointed, remaining in their positions for several years. Pfeiffer Decl. ¶ 7. Service on the subcommittees entailed a substantial time commitment and was considered prestigious. Id.; Deposition of Jon Traw (attached as exh. B to McGraw Decl.) at 126; Deposition of Paul Armstrong (attached as exh. C to McGraw Decl.) at 45.

11. ICC did not obtain non-exclusive licenses from subcommittee members during the IBC 2000 development process. Pfeiffer Decl. ¶ 7.

12. The legacy code organizations also assigned three paid staff members (one from each organization) to each subcommittee, one of whom was designated the secretariat. Id. ¶ 8. The secretariat served as a liaison between the subcommittee and the organizations, and oversaw logistical matters in connection with subcommittee meetings. Id.

9

13.     The code development process was subject to a strict timetable established by staff members, ratified in turn by the steering committee, then approved by the ICC Board. Heilstedt Decl. ¶ 12; Pfeiffer Decl., exh. B(1). The secretariat assigned to each subcommittee was responsible for monitoring and implementing the subcommittee's work to ensure that it was completed before the scheduled public hearings. Pfeiffer Decl. ¶ 10; Deposition of Michael J. Pfeiffer (attached as exh. E to McGraw Decl.) at 102. The secretariat also was responsible for meeting notices, development of the agenda, distribution of the agenda with associated meeting working materials, and preparation, publication, and dissemination of the work products. Pfeiffer Decl. ¶ 10.

14.     Another primary function of the staff was to ensure that the technical requirements agreed upon by the subcommittees were drafted in a manner consistent with ICC's linguistic requirements. Although the code officials appointed to the subcommittees had technical expertise, for the most part they were not experts in drafting building codes. Id. ¶ 22.

15.     Staff members possessed greater expertise than did subcommittee members as to the history and development of the legacy organizations' own building codes. Id. ¶ 30; Deposition of Michael J. Pfeiffer (attached as exh. E to McGraw Decl.) at 97-98.

16.     ICC determined the chapters of the IBC on which each subcommittee worked, and was free to change chapter assignments during the course of the code development process. Heilstedt Decl., exh. A at 4, §§ 8.1, 8.3. The ICC Board, through the steering committee, in fact exercised this authority, shifting the responsibilities between the various subcommittees as necessary. Heilstedt Decl. ¶ 11 & exh. D.

17.     At ICC's direction, and as the first stage of the drafting process, staff members assigned to the subcommittees created a series of matrices to be used to compile an initial draft

of the IBC. Pfeiffer Decl. ¶ 21. The matrices set forth corresponding sections from the legacy organizations' previously-published building codes and other sources, and allowed a comparison of the requirements in these three preexisting works. Id.

18.     Using these matrices, staff and subcommittee members reviewed and compared the requirements, often with staff providing information to the subcommittee as to the pros and cons of a given section in the legacy code with which they were most familiar. The subcommittee then would do one of the following: select the "best" of those preexisting sections for inclusion in the IBC; modify one of the preexisting sections; or create new text instead of selecting a preexisting section. This process resulted in a series of preliminary draft chapters. Id.

19.     Beginning in August 1996, the subcommittees members and staff then held a series of drafting meetings that took place at various locations throughout the country over approximately nine months.   Pfeiffer Decl. ¶ 11. These meetings all took place at locations determined through consultations between the subcommittees members and staff. Heilstedt Decl., exh. A at 3, § 5.1. These locations were secured and paid for by the legacy code organizations. Pfeiffer Decl. ¶ 11. The legacy code organizations paid the travel and other expenses for the subcommittee members and staff to attend the meetings. Id.

20.     This initial series of meetings resulted in the publication of the IBC 2000 Working Draft in May 1997. Id. at 12.

21.     Regarding the involvement of staff compared to that of subcommittee members in the creation of these preliminary working documents, one ICC witness testified as follows:

> What I do recall is the committees, they weren't in the
> weed[s] so to speak.
>      They did debate issues and look at some specifics in
> general, but the staff had the ultimate responsibility for pulling a

11

document together and producing a draft.

Deposition of Dominic Sims (attached as exh. A to McGraw Decl.) at 49-50.

22. After the publication of the Working Draft, ICC solicited written comments from members of the public. Staff members compiled these comments into five monographs. These volumes served as the "agenda" for a Public Comment Forum convened by the legacy code organizations in August 1997. The ICC Board approved the structure and the procedures for this meeting. Pfeiffer Decl. ¶ 13. The ICC procedures used established a uniform format under which the comments were to be debated and acted upon by the subcommittees. Id.

23. Following the Public Comment Forum, the legacy code organizations published the IBC 2000 First Draft in November 1997. ICC then solicited proposed revisions from members of the public. Pursuant to ICC regulations, these submissions were required to adhere to a specified format and to meet a number of substantive requirements. Id. ¶ 14 & exhs. D, E. Staff members worked with the proponents to ensure that the submissions conformed to these rules, as well as to the linguistic requirements applicable to model codes. Id. ¶ 28.

24. Staff members then compiled the proposals into a monograph, copies of which were provided to attendees of a Public Hearing held in April 1998. As was the case with the Public Forum, this meeting was regulated entirely by ICC procedures. These procedures were included in the staff-prepared monograph of code change proposals used by participants at the Public Hearing. Id. ¶ 15 & exh. D. These procedures set forth the rules governing, *inter alia*, the taking of testimony, the classification of proposals, the voting rights of subcommittee members and the assembled body, and the future action to be taken on each proposal. Id.

25. In July 1998, the revised code text was published as the IBC 2000 Final Draft. Members of the public again were given an opportunity to submit proposed changes in accordance with ICC rules. The staff compiled these proposals into a monograph that became

the subject of another Public Hearing in March 1999. This monograph included a copy of the ICC-established procedures that governed the hearing. These procedures governed the development not only of the IBC, but all of ICC's model codes. Pfeiffer Decl. ¶16 & exh. F.

26. Following this Public Hearing, the staff prepared another volume containing the actions taken by the subcommittees on the proposals and the reasons for those actions. The publication and distribution of this volume provided the public with an opportunity to provide further comments. All resulting public comments on code change proposals were compiled by staff and published with the original proposals, subcommittee actions, and reasons into another volume called the Final Action Agenda, which was published in August 1999. Pfeiffer Decl. ¶ 17.

27. The Final Action Agenda included, in addition to the code change proposals and subcommittee actions discussed above, a Consent Agenda, which listed committee actions upon which no additional public comments were received. The Final Action Agenda was then used in conjunction with a September 1999 meeting of all eligible voting members of the three legacy code organizations. Following additional testimony, the public official members of these organizations voted on the remaining code change proposals. Id. ¶ 18. Final actions on all of the proposals were then compiled by staff into the First Edition of the IBC 2000, which was published in March 2000. Id. ¶ 19.

28. Each of the public hearings and meetings discussed above took place at times and locations selected by the ICC Board with the advice and recommendations of the legacy code organizations' CEOs. Heilstedt Decl. ¶ 13. With the exception of the September 1999 meeting, the subcommittee members were required to attend these hearings. Pfeiffer Decl. ¶ 19.

28a. As the above facts demonstrate, from the beginning of the code development

process to the end, ICC and the legacy code organizations tightly controlled the manner and means of the development of the IBC. See generally Heilstedt Decl. and Pfeiffer Decl.

## C.    ICC's Copyright Registrations

29.    BOCA, ICBO, and SBCCI each applied for and received copyright registrations for various editions of their respective building codes. Pfeiffer Decl., exh. M.

30.    During the IBC 2000 development process, ICC applied for and received copyright registrations for the Working Draft, First Draft, Final Draft, and IBC 2000. Id., exhs. N, O. The registration certificates for these works list the authors as SBCCI, BOCA, and ICBO, and list the copyright claimant as ICC on the basis of transfers by agreements. The registration certificates for the three drafts of the IBC 2000 state that the legacy code organizations are the authors of the "entire work." Id.

31.    The three legacy organizations each formally have transferred all of their intellectual property rights and interests to ICC. Heilstedt Decl. ¶ 5.

## D.    Development Of The NFPA 5000

32.    In the spring of 2000, NFPA began the formal process of developing a building code. Koffel Decl., ¶ 3.1.2. The "preliminary working draft" of NFPA's code was prepared by a person named Chip Carson based on something known as the EPCOT Building Code. Deposition of Ronald G. Nickson (attached as exh. H to McGraw Decl.) at 20-21.

33.    NFPA held its first meeting of the Building Code Technical Correlating Committee on June 13-15, 2000. Minutes of the NFPA Building Code Technical Correlating Committee (attached as exh. I to McGraw Decl.). The "preliminary working draft" was distributed at that meeting. However, that draft was deemed so inadequate it was not released for publication. Deposition of Ronald G. Nickson (attached as exh. H to McGraw Decl.) at 47.

14

34. NFPA was not able to develop a comprehensive building code using the existing materials available to it. Rather, "the early discussions were that they were going to try to use a lot of the existing pieces they had . . . and they would have to fill the holes where there were holes." Deposition of Lawrence G. Perry (attached as exh. J to McGraw Decl.) at 16; see also, Deposition of Ronald G. Nickson (attached as exh. H to McGraw Decl.) at 21.

35. NFPA established an aggressive timetable to publish its building code, "which was basically an 18-month cycle to produce a whole new code." Id., exh. H at 33-34. Several participants in the process voiced concern over this timetable because it was "completely inadequate." Id. Nevertheless, NFPA kept to this schedule and published its building code in July 2002, 25 months after the first meeting of the Building Code Technical Correlating Committee. Koffel Decl. ¶ 13.

36. NFPA directed its drafting committees not to "reinvent the wheel." NFPA slide presentation (attached as exh. K to McGraw Decl.).

37. Ron G. Nickson, who served on several NFPA 5000 committees, testified that NFPA provided its committee members with no instructions about whether they could use the IBC 2000 as a source for provisions in the NFPA 5000. Deposition of Ronald G. Nickson (attached as exh. H to McGraw Decl.) at 39-41. He testified that the committee members discussed this issue among themselves, "because a lot of information that you needed was included in the IBC and it was an issue that we talked about, you know, what do we do with this stuff." Id. at 40-41.

38. Mr. Nickson further testified that "[g]enerally proposals came forward with, that were identified in some cases as being taken directly from the IBC, or documents of that type, they were processed through the procedure, the NFPA procedure." Id. at 41. When asked if

such proposals were incorporated into the NFPA 5000, Mr. Nickson responded that he "would have to go back and look for the specific cases, but my reaction to that is yes, that they were incorporated." Id. at 41-42.

39. In his deposition, Mr. Nickson could not recall any NFPA policy that would have required the rejection of proposals that copied language from the IBC. Id. at 42.

40. An appeal to the NFPA Standards Council states that the source of the subject sections is the IBC. McGraw Decl., exh. L.

41. A Public Comment submitted to NFPA states that the source of the subject provision is "not original material" and that its "reference/source" is the "UBC, SBC, NBC, IBC." McGraw Decl., exh. M.

42. A submission contained in the NFPA Report on Proposals, ROP 5000-1354, states that "[t]his proposal revises the draft of NFPA 5000 to bring it into agreement with the International Building Code...." McGraw Decl., exh. N.

43. NFPA's purported expert, William Koffel has admitted that NFPA copied the height and area table from the IBC. He testified before the City of Phoenix Development Advisory Board in March 2003: "And we had some public comments before us, and we chose the public comment that basically took the IBC height and area table and we passed and voted, and subsequently the committee voted to insert that in the NFPA 5000 with some modifications, primarily those that were different height limits that were in NFPA 101." Phoenix, AZ, Dev. Adv. Brd. Mtg. Min., Mar. 20, 2003 (excerpt attached as exh. O to McGraw Decl.) at 32.

44. In his deposition, Mr. Koffel testified that a building code's height and area requirements are "fundamental to the risk associated with [a] building." Deposition of William Koffel (attached as exh. S to McGraw Decl.) at 158.

16

Respectfully submitted,

Dated: April 4, 2005

_____

James Hamilton
Warren Anthony Fitch
Wendy C. McGraw
Swidler Berlin LLP
3000 K St., NW, Suite 300
Washington, DC 20007
(202) 424-7826 (T)
(202) 424-7643 (F)

Alan S. Wernick
Querrey & Harrow, Ltd.
175 West Jackson Blvd., Suite 1600
Chicago, IL 60604-2827
(312) 540-7070 (T)
(312) 540-0578 (F)

Counsel for Plaintiff

Of Counsel:

Kevin R. Amer
Swidler Berlin LLP
3000 K St., NW, Suite 300
Washington, DC 20007
(202) 424-7500 (T)
(202) 424-7643 (F)

17