

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| INTERNATIONAL CODE COUNCIL, INC., and BUILDING OFFICIALS AND CODE ADMINISTRATORS INTERNATIONAL, INC., | ) ) ) ) ) | **FILED** APR 2 0 2005 *rq* APR 26 2005 MICHAEL W. DOBBINS CLERK, U.S. DISTRICT COURT |
| Plaintiffs, | ) ) |  |
| v. | ) ) ) | **NO. 02C 5610** Judge Rebecca R. Pallmeyer |
| NATIONAL FIRE PROTECTION ASSOCIATION, INC., | ) ) ) ) |  |
| Defendant. | ) |  |

## NOTICE OF FILING and CERTIFICATE OF SERVICE

**TO:** Alan S. Wernick, Esq., Querrey & Harrow, 175 West Jackson Boulevard, Suite 1600, Chicago, IL   60604

James Hamilton, Esq., Swidler Berlin Shereff Friedman, 3000 K Street, NW, Suite 300, Washington DC   20007

**PLEASE TAKE NOTICE** that on April 26, 2005 there was filed with the Clerk of the United States District Court for the Northern District of Illinois, Eastern Division, Defendant National Fire Protection Association's Reply in Support of Defendant's Motion for Summary Judgment, a copy of which is attached hereto and served upon counsel.

Peter C. John, Esq

Williams Montgomery & John Ltd.
2100 Civic Opera Building
Twenty North Wacker Drive
Chicago, IL 60606
(312) 443-3200

Thomas F. Holt, Jr.
Tara C. Clancy
Christopher Centurelli
Kirkpatrick & Lockhart LLP
75 State Street
Boston, MA 02109
(617) 261-3100

## CERTIFICATE OF SERVICE

Karen M. Begg being first duly sworn on oath states that on April 26, 2005 a true copy of the foregoing Notice of Filing and Reply in Support of Defendant's Motion for Summary Judgment were served on the following via hand delivery:

> Alan S. Wernick, Esq.
> Querrey & Harrow
> 175 West Jackson Boulevard
> Suite 1600,
> Chicago, IL     60604

and to the following via overnight courier:

> Kevin R. Amer
> James Hamilton, Esq.
> Swidler Berlin Shereff Friedman
> 3000 K Street, NW
> Suite 300
> Washington, D.C.    20007

_____
Karen M. Begg

Subscribed and sworn to before me
this 26th day of April, 2005.

NOTARY PUBLIC

"OFFICIAL SEAL"
DENISE E. MATHAUSER
Notary Public, State of Illinois
My Commission Expires 8/30/07



**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

**FILED**

APR 2 6 2005 *rq*
APR 26 2005
**MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT**

INTERNATIONAL CODE COUNCIL,
INC.,

        Plaintiff,

v.

NATIONAL FIRE PROTECTION
ASSOCIATION, INC.,

        Defendant.

**CIVIL ACTION NO. 02C 5610**

Judge Rebecca R. Pallmeyer

**REPLY IN SUPPORT OF DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

In its Opposition, plaintiff International Code Council, Inc. ("ICC") desperately tries to create a factual dispute, any factual dispute, to stave off summary judgment and prolong this litigation. It fails to do so.

National Fire Protection Association's ("NFPA's") summary judgment motion placed three issues before the Court: (1) whether ICC owns the asserted sections of its building code; (2) whether ICC has presented sufficient evidence that NFPA copied the asserted sections; and (3) whether the material allegedly copied is protectible subject matter. On all three issues, ICC bears the burden of proof.

Regarding ownership, the central issue is whether the volunteer committee members are "employees" of the ICC under 17 U.S.C. § 101(1). There are no factual disputes regarding the role, responsibilities, and status of the committee members—the parties only disagree over the characterization of these facts, which is a question of law. Applying the Supreme Court's multi-

factor test described in *Reid* (which the parties agree is the correct standard), it is clear that the committee members were not employees of the ICC, and ICC therefore does not own their work.

ICC also cannot prove ownership of the asserted text based on work performed by its staff. Indeed, ICC fails to provide any evidence that its employee staff drafted independent copyrightable subject matter contained within the IBC 2000. Mr. Pfeiffer's lengthy declaration only confirms NFPA's position. The "assistance" provided by ICC's employee staff was logistical and secretarial, and did not involve drafting protectible expression. Absent clear evidence that the staff contributed independently copyrightable subject matter, they cannot be joint authors, and their "assistance" is irrelevant.

Regarding copying, NFPA's motion presented extensive evidence that it derived its accused code sections from sources other than the IBC 2000, such as third party standards, public submissions, and its own prior codes and standards. ICC's Opposition does not counter any of this specific evidence. Instead, ICC puts forward only a few generic quotations from mostly third parties, which it misrepresents or takes out of context, and asks the Court to infer, from these few quotations, that NFPA copied the specific asserted sections of the IBC 2000. This "evidence" is insufficient to avoid summary judgment on an issue for which ICC bears the burden of proof. *See Mid America Title Co. v. Kirk*, 59 F.3d 719, 721 (7th Cir. 1995).

Regarding protectibility, the central question is purely legal: whether allegedly copied portions of the asserted code are themselves copyrightable "expression" or uncopyrightable facts and ideas. In this case, given the limited number of ways to express certain facts and ideas in the accused provisions, any purportedly copied portions of the asserted code are uncopyrightable under the merger doctrine and summary judgment is appropriate on this ground as well.

2

For any of these reasons, the Court should grant NFPA's Motion and dismiss ICC's Amended Complaint.

## I.  ICC HAS THE BURDEN OF PROOF

ICC attempts to rely on its copyright registration as evidence, or even proof, that it owns a valid copyright in the asserted code sections.  The registration, however, only creates a "rebuttable presumption" of ownership.  *Mid Atlantic Title Co. v. Kirk*, 59 F.3d 719, 721 (7th Cir. 1995).  Once the defendant rebuts the presumption, the burden shifts back to plaintiff to prove its case. *See id.*

Had NFPA not challenged ownership, then ICC's registration would be sufficient to satisfy its burden.  But now that NFPA has put forth specific arguments and evidence showing that the drafters of the IBC 2000 were not employees and did not sign the required work for hire agreements, and that NFPA did not misappropriate protectible expression, ICC must put forward sufficient evidence to prove ownership of a valid copyright or face summary judgment.  The registration certificate and ICC's mere conclusory allegations are insufficient.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (The party bearing the burden of proof at trial "may not rest on the pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial."); see also *Pickett v. Prince*, 52 F. Supp.2d 893, 900-01 (N.D. Ill. 1999) ("To establish a prima facie of copyright infringement, a plaintiff must prove two essential elements: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original."… "Plaintiff's copyright registration will not be sufficient to demonstrate a valid copyright in light of contrary evidence.")

3

## II. ICC DOES NOT OWN THE ASSERTED CODE SECTIONS

The central questions on ownership are: (a) whether the volunteer committee members were employees of the ICC or its legacy organizations under § 101(1); and (b) whether ICC has demonstrated that its staff employees were joint authors of any of the asserted code. The answer to both questions, as a matter of law, is no.

### A. The Committee Members Were Not Employees

There are no disputed material facts as to the status, responsibilities, and role of the volunteer committee members. (*See* NFPA's Statement of Material Facts, ¶¶ 7-13 and 25, and ICC's Responses.) The parties agree that the committee members were all government employees or industry representatives, that ICC did not pay them for their time, and that they were selected to serve based on their expertise in an area, their familiarity with the code development process, and their willingness to devote time to the project. (Facts ¶¶ 7, 8, 11.) The parties also agree that the "actual process of drafting the IBC 2000 was undertaken by [the] committees", and that the committee meetings largely took place at public venues, such as hotels. (Facts ¶¶ 12 and 25.) Finally, ICC does not dispute that two of its Rule 30(b)(6) witnesses testified that the committee members were not employees of the ICC. (Facts ¶¶ 9, 10.)[1]

Applying these facts to the test enunciated in *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 737 (1989), it is clear that the committee members were not employees under 17 U.S.C. § 101(1).

---

[1] ICC attempts to dismiss this Rule 30(b)(6) testimony by stating that each witness was "a non-lawyer, and was not competent to conclude as a matter of law who is or who is not an employee under the work for hire test." (ICC's Responses to NFPA's Statement of Material Facts, ¶¶ 9-10.) Notably, however, ICC made no effort to cross-examine its witnesses on the issue or to qualify their Rule 30(b)(6) testimony on errata sheets.

1.   "Membership" Is Irrelevant

In its Opposition, ICC places great weight on its contention that some of the volunteer committee members were "members" of the ICC or its constituent organizations. This is completely irrelevant. The question under the work for hire statute is whether the committee members were "employees," not whether they were "members."

For example, if a member of the Democratic Party writes an op-ed article, espousing party positions, at the request of the party, that does not give the DNC ownership rights to the article absent an express written agreement. If, however, the writer were a full-time staff employee of the DNC, and the op-ed piece was part of his job responsibilities, then the DNC likely would own the article under the work-for-hire doctrine.

ICC's argument regarding "membership" appears even more specious when one considers that many of ICC's volunteer "members" were also, simultaneously, "members" of the NFPA. Indeed, roughly *one-third* of the volunteer government officials serving on the IBC 2000 steering and technical subcommittees were also "members" of the NFPA.[2]

"Membership" in an organization, whatever that might mean, is simply irrelevant to the employee test under *Reid*.

2.   The Committee Members' Volunteer Status

ICC states, at page 18 of its Opposition, that "NFPA's principal argument is that volunteer committee members, who receive no compensation and who are not treated as employees for tax purposes, cannot be employees under the work for hire doctrine as a matter of law." NFPA made

---

[2] For example, Emory Rodgers, James Ryan, Wally Bailey, Gregory Revels, Stanley Wheeler, Jerry Woolridge, Robert Foote, Kenneth Andrews, John Barrios, Harry Burd, Ron Ivie, Greg Wheeler, David Wismer, Grover Sawyer, William Chambless, Kenneth Greene, Fred Herman, James Langhorn, Betts Barbier, John Tunstall, Michael Redifer, Jimmie Deer, David Frable, Hugh McCurley, Dale Smith, Loren Kohnen, Andrea Lanier, and Christ Sanidas were all also members of the NFPA when they served on various ICC committees developing the IBC 2000.

5

no such argument. The parties agree that the *Reid* test controls the determination, and no one fact is necessarily dispositive.

As a practical matter, however, it may very well be impossible for an unpaid volunteer to be an "employee" under *Reid*, since volunteer status cuts across a number of the most important *Reid* factors. The Supreme Court opinion in *Reid* seems to assume that the work is for pay when it introduces the test as follows:

> In determining whether a ***hired party*** is an employee under the general common law of agency, we consider...

*Reid*, 490 U.S. at 751 (emphasis added). Indeed, ICC's Opposition does not cite a ***single case*** in which an unpaid volunteer was found to be an employee. We performed our own research, and also could not find a single case, anywhere in the country, in which an unpaid volunteer was found to be an employee under *Reid*.

Thus, while the committee members' volunteer status may not be automatically dispositive as a matter of law, it is a critically important fact.

3.      The *Reid* Factors

The *Reid* factors are:

> [1] the hiring party's right to control the manner and means by which the product is accomplished.... [2] the skill required; [3] the source of the instrumentalities and tools; [4] the location of the work; [5] the duration of the relationship between the parties; [6] whether the hiring party has the right to assign additional projects to the hired party; [7] the extent of the hired party's discretion over when and how long to work; [8] the method of payment; [9] the hired party's role in hiring and paying assistants; [10] whether the work is part of the regular business of the hiring party; [11] whether the hiring party is in business; [12] the provision of employee benefits; [13] and the tax treatment of the hired party.

*Reid*, 490 U.S. at 751-52 (numbers added).[3]

---

[3] ICC's Opposition numbered the factors differently than NFPA's Opening Brief. To avoid confusion, we adopt ICC's numbering scheme for this Reply.

6

a)      Factor 1

Regarding factor 1, it is clear that the volunteer committee members, not ICC staff, controlled the manner and means for creating the IBC 2000. According to ICC's Rule 30(b)(6) witness, John Battles, the IBC 2000 steering committee set the procedures for developing the model code:

> Q.      What is the steering committee?
>
> A.      The steering committee was the committee that developed the process of developing the building code.
>
> Q.      And when you say developed the process for developing the building code, what do you mean by that?
>
> A.      Public hearings, type of public hearings, the committee make-ups, the breakup of the committees, the procedures.
>
> Q.      So essentially the ground rules that the five drafting committees you discussed earlier were to follow to develop the IBC 2000?
>
> A.      Procedures, yes, sir.

(Ex. AA at 25.)[4] ICC staff employees did *not* have a vote on decisions of the steering committee. (Ex. A at 63.) The role of staff, described in ICC's Opposition at 21, was to provide support and logistics. Recommendations of the staff (e.g., timetables) had to be ratified by the steering committee. (*See, e.g.*, Heilstedt Decl., filed by ICC, at ¶ 12.) Thus, staff did not have *control* over the procedures used to develop the code—the steering committee did.

Moreover, as discussed in detail in our Opening Memorandum, ICC staff also did not have voting authority on the technical subcommittees which actually selected the code language. (Ex. C at 39, 54; Ex. D at 22; Ex. A at 63, 76, 102.) Thus, ICC staff also had no *control* over the substance of the product.

---

[4] Exhibits A-Z refer to the Exhibits to the Declaration of Christopher Centurelli, filed with NFPA's Opening Memorandum. Exhibits AA-FF refer to the Exhibits to the Second Declaration of Christopher Centurelli, filed with this Reply.

ICC appears to have given control over their model building code to the volunteer government officials for two principle reasons: (a) to give the officials control over its substance, so they would be more likely to recommend the IBC 2000 for adoption in their jurisdictions once the project was completed; and (b) because ICC believes that these government officials, in their capacity as independent officials, were in the best position to make unbiased decisions regarding the content of the IBC 2000. Having given this authority to the government officials, ICC cannot claim ownership over their work, absent work-for-hire agreements or assignments. Indeed, as discussed in our Opening Memorandum at page 4, ICC did not obtain work-for-hire agreements, and until recently, did not even attempt to secure assignments from the volunteer committee members.

Thus, since ICC gave control over the manner and means by which IBC 2000 was created to the government officials volunteering as committee members, factor 1 favors non-employee status.

### b)    Factor 2

The parties agree that subcommittee members were highly skilled. (ICC Opp. at 25.) This factor, therefore, weighs in favor of non-employee status. *See Natkin v. Winfrey*, 111 F. Supp.2d 1003, 1008 (N.D. Ill. 2000).

### c)    Factor 4

Factor 4 (the location of the work) favors non-employment, because the committee meetings took place in hotel conference rooms, rather than at ICC's offices.

ICC responds that since it paid for the hotel conference rooms, the "location" factor actually favors its position. Renting meeting halls, however, does not create an inference that the

8

meeting attendees are all employees. The question is whether the "hired party" worked at the hiring party's offices, like an employee, or elsewhere.

        d)      Factors 5, 6 and 7

Because the committee members were unpaid volunteers, and not under any contractual obligation to complete their work or take on new assignments, factors 5, 6, and 7 all favor non-employee status.

Regarding factor 5 (the duration of the relationship between the parties), the committee members' appointments were for one year terms. (Pfeiffer Decl. at ¶ 7.) A finite term of engagement, defined in terms of a single project, is characteristic of non-employee status. *See* 132 A.L.R. Fed. 301 § 2[b](5). Moreover, as discussed in our Opening Brief at page 17, where an individual continues to work for others while generating the disputed product, the relationship "lack[s] the hallmarks of common law employment." *Respect Inc. v. Committee on the Status of Women*, 815 F. Supp. 1112, 1118 (N.D. Ill. 1993). *See also Aymes*, 980 F.2d at 864. ICC ignores this point in its Opposition.

Regarding factor 6 (right to assign additional projects to the hired party ), ICC argues that because the ICC Board could "alter the scope of each subcommittee's work", ICC retained the right to assign additional projects. This ignores, however, that the committee members were "volunteer[s]." (Heilstedt Decl. Ex. A at 1.) The individual members were therefore under no obligation to accept any additional assignments, or even complete existing ones. ICC therefore had no *right* to assign additional projects to members of the committees.[5] This is quite different from, e.g., a photographer whose contract calls for her to complete a specified assignment, plus any other projects requested during the term of employment, in order to get paid.

---

[5] Moreover, it was the steering committee and the volunteer government officials serving on that committee, not the Board, which actually set the tasks for the five technical subcommittees. (*See* Heilstedt Decl. at ¶ 11.)

Regarding factor 7 (extent of the hired party's discretion over when and how long to work), ICC argues that it had such "discretion" because the committees were following a staff recommended timetable. First, the staff only recommended the timetable—it was the steering committee which ratified the timetable, (Heilstedt Decl. ¶ 12), and it was the steering committee which was ultimately responsible for procedures. (Ex. AA.) Moreover, since the committee members were volunteers, they always retained "discretion" over whether and when to work. They were under no contractual obligation to complete any assignments.

e)    Factors 8, 12 and 13

These factors concern payment, employee benefits, and tax treatment. Since the committee members were not paid for their time, these three factors all strongly favor non-employment. As noted in our Opening Memorandum, one court in this district has found method of compensation, benefits, and tax treatment to be the most important factors. *See Natkin*, 111 F. Supp.2d at 1008-09. *See also Aymes v. Bonelli*, 980 F.2d 857, 861 (2nd Cir. 1992) (identifying benefits and tax treatment as two of the four most important factors); *Respect*, 815 F. Supp. at 1117 (N.D. Illinois case favorably citing *Aymes*).

f)    Remaining Factors

The remaining factors are either neutral or of little importance. Regarding factor 3, no special "instrumentalities or tools" are used for code drafting. Regarding factor 9, the hired party's role in hiring and paying assistants, there is no evidence that any additional assistants were hired. Regarding factors 10 and 11, ICC is admittedly "in business," and model code preparation is arguably part of its "regular business." However, as explained in *Aymes*, this factor is rarely important, since nearly all work done by a company will be part of its "regular business." 980 F.2d at 863.

In conclusion, all of the *Reid* factors identified by Courts in this district as being most important strongly favor non-employee status. The remaining factors, to the extent they are pertinent, also mostly favor non-employee status.

### 4. Comparison with Other Cases

In our Opening Memorandum, we compared the facts of this case with several other cases from this District and elsewhere. In each of these cases, the court held that the hired party was not an employee, despite facts *far more favorable* to employment than the facts of this case. *See Respect*, 815 F. Supp. 1112; *Natkin v. Winfrey*, 111 F. Supp.2d 1003 (N.D. Ill. 2000); *Aymes*, 980 F.2d 857; *Marco v. Accent Publishing Co.*, 969 F.2d 1547 (3rd Cir. 1992); *Kirk v. Harter*, 188 F.3d 1005, 1008-09 (8th Cir. 1999). ICC's Opposition does not attempt to distinguish these cases or to discuss the facts of any other *Reid* analysis cases. Nor can it, since no court has ever found employment status on facts even remotely close to the facts here.

### 5. The ICC's Request for Licenses

ICC does not dispute that it asked volunteer committee members to provide it nonexclusive licenses, at least as early as May 2001, during the IBC code revision process. (*See* Ex. H, noting May 31, 2001 date at p. 3.) It only disputes the testimony of its 30(b)(6) witnesses, Mr. Dominic Sims, who stated that "similar" non-exclusive licenses were sought by ICC from committee members during the IBC 2000 development process. (*See* Opp. at 4.) Thus, regardless of when it first sought non-exclusive licenses from its committee members, ICC still must explain why, in 2001, a full year before commencing this action, if the committee members were employees under 17 U.S.C. § 101(1), did it ask them for a nonexclusive license to use materials they created?

11

**B.      The ICC Staff Were Not Joint Authors of the Asserted Code Language**

Because it is clear that the volunteer committee members are not employees under Reid, ICC attempts to elevate the role of its employee staff and expends considerable effort trying to prove that its staff "assisted" the committee members in drafting portions of the IBC 2000 code. Presumably, ICC makes this argument as a "backup" ground for ownership, in the event the Court finds that the volunteer committee members were not employees. What ICC never explains, however, is how "assistance" to the committee members would give ICC any ownership rights to the IBC 2000 code in the event the committee members are not themselves employees.

In fact, proving "assistance" is not enough. For ICC to possess any ownership interest based on staff contributions, ICC must prove that the staff members were not merely assistants, but were "joint authors" of the code. Notably, ICC makes no "joint authorship" allegation in its pleadings or interrogatory answers, did not register the works as "joint authorships" with the committee members, and makes no joint authorship argument in its summary judgment opposition. And for good reason. The undisputed facts demonstrate conclusively that the staff were not "joint authors" of the IBC 2000.

To prove joint authorship, ICC must demonstrate: (1) that the parties to the drafting intended staff to be joint authors at the time the IBC 2000 was created; and (2) that the contributions made by staff members were independently copyrightable. *Erickson v. Trinity Theatres, Inc.*, 13 F.3d 1061, 1071 (7th Cir. 1994). ICC cannot prove either prong.

1.      The Committee Members and Staff Did Not Intend to Be Joint Authors

There was no intent that the staff members be "joint authors" of the IBC 2000. The code was to be prepared by the committees, and the staff were not members of the committees. (Ex. C

12

at 39.) ICC's Rules and Procedures document made clear that "[s]taff serves only in a supporting capacity," (Ex. R at 1) and the IBC Scope, Objectives and Procedures statement did not identify "drafting" or "authorship" as among the staff's responsibilities. (Ex. Q at 1, 2.)

Moreover, an important factor in determining intent is whether one party had final say over the text. *See Erickson* at 1072. Here, it is undisputed that staff did not have a vote over the contents of the final product and, therefore, had no authority to control what copyrightable expression may have been included in the ICC's building code. (Ex. C at 54; Ex. D at 22; Ex. A at 63, 76, 102.) Thus, there is no evidence that the committee members and the staff intended to be joint authors of the IBC 2000.

### 2. Staff Did Not Contribute Any Independently Copyrightable Subject Matter

ICC also has offered no evidence that staff drafted *any* language in the IBC 2000, let alone independently copyrightable subject matter.

Three of ICC's Rule 30(b)(6) witnesses testified, unambiguously, that staff served in a "secretariat," supporting role, and did *not* draft code language. (Ex. C at 39, 49-50; Ex. A at 63, 65; Ex. D at 67-68.) Mr. Battles' testimony on the point could not be more explicit. (Ex. D at 67-68, reproduced in NFPA's Opening Memorandum at pp. 7-8.)[6]

ICC did not cross-examine these witnesses or modify their Rule 30(b)(6) testimony on these issues in errata sheets. Instead, ICC ignores it, and submits a declaration from a fourth witness, Michael Pfeiffer, which purports to disagree with its other witnesses' conclusions.

A close reading of Mr. Pfeiffer's declaration, however, shows that the *facts* he relies on are actually entirely consistent with ICC's Rule 30(b)(6) testimony. These facts confirm that

---

[6] ICC's interrogatory answers further confirm that staff did not draft code language. ICC's answers state clearly that the "actual process of drafting the IBC was undertaken by several *committees*," and that "[e]ach *committee* drafted its assigned sections of the IBC." (Ex. S at 4, emphasis added.) It is undisputed that the staff were not members of the committees. (Ex. C at 39.)

staffs' role was limited to providing logistical and secretarial support, presenting existing code to the committee in "matrix" form, performing some calculations, and (possibly) editorial comments on linguistic requirements. They did not contribute any independently copyrightable subject matter.

In paragraphs 21-24 of his declaration, Mr. Pfeiffer describes the process by which staff members "assisted" committee members in preparing the code. According to Mr. Pfeiffer:

> staff members created a series of matrices setting forth the corresponding sections of the legacy organizations' previously-published building codes and other sources. Using these matrices, staff and subcommittee members reviewed and compared the requirements, often with staff providing information to the subcommittee as to the pros and cons of a given section in the legacy code with which they were most familiar. This process often resulted in a staff recommendation to the subcommittee. The *subcommittee* would then do one of the following: select the "best" of the preexisting sections for inclusion in the IBC; modify one of the preexisting sections; or create new text instead of selecting a preexisting section.

(Pfeiffer Decl. ¶ 21, emphasis added.) In other words, the staff members would collect the preexisting code sections—*which they had not drafted*—and present those to the committee, perhaps with a recommendation. But even Mr. Pfeiffer concedes that it was the volunteer committee members who selected particular code, and, when necessary, modified it or created new text.[7]

Mr. Pfeiffer's declaration also contends that staff members worked with committee members to ensure that the code language was "drafted in a manner consistent with ICC's linguistic requirements." (Pfeiffer Decl. ¶ 29.) Even if this is true (Mr. Pfeiffer offers no specific

---

[7] This staff role is similar to a law student performing background research for a professor writing a law review article on the work-for-hire doctrine. At the professor's request, the student gathers cases showing the different treatment of the doctrine in each of the federal circuits, and some different approaches suggested by other commentators. The student presents the research to the professor, along with her opinion on which approach is best. The professor then writes the article. The student's work, while labor intensive and important, does not make the student an author or a co-owner of the copyright to the professor's article. "Sweat of the brow" in gathering preexisting materials is not a basis for copyright ownership. *Feist Publications v. Rural Telephone Service*, 499 U.S. 340, 360-61 (1991).

14

examples), it does not make the staff members co-authors of the text. "Ideas, refinements, and suggestions, standing alone, are not the subjects of copyrights." *Erickson*, 13 F.3d at 1072. Editors frequently correct grammar or make stylistic suggestions to writers' manuscripts, but this does not make the editor a joint author of the work. *See Childress v. Taylor*, 945 F.2d 500, 507 (2nd Cir. 1991).

The case of *Rubloff Inc. v. Donahue*, No. 93 C 0457, 1994 WL 161098 (N.D. Ill. April 11, 1994) is instructive. (Ex. BB.) The company, Rubloff, Inc., hired independent contractors to prepare a training guide. *Id.* at *1. The company's employees then assisted the independent contractors in developing the guide by reviewing and editing draft chapters, suggesting changes, formatting and revising the text, and coordinating the guide's production. *Id.* at *1, *10. The court found that, as a matter of law, these contributions were insufficient to establish joint authorship in the company. *Id.* at *10.

What is perhaps most notable about Mr. Pfeiffer's declaration is what it does ***not*** say. Mr. Pfeiffer does not point to a ***single word*** in any of the asserted code provisions that was purportedly drafted by a staff member. He only makes conclusory allegations that staff members "assisted" in drafting the code. Since ICC has the burden of proof on ownership, such conclusory allegations are not sufficient to avoid summary judgment; especially where the conclusions contradict ICC's other witnesses' testimony. *Pickett*, 52 F. Supp.2d at 901; *Celotex*, 477 U.S. at 324. *See also Erickson*, 13 F.3d at 1072 (rejecting stage actors' assertion of joint authorship of a play, in part because "the actors, on the whole, could not identify specific contributions they had made to [the writer's] works").

The only two asserted code sections Mr. Pfeiffer discusses specifically in his Declaration are Table 503 (the Height and Area Table) and §§ 903.2.x. (Pfeiffer Decl. ¶¶ 25-27.) As

15

demonstrated below, Mr. Pfeiffer's Declaration, when read closely, does not support ICC's claims of staff authorship (joint or otherwise).[8]

> a)  The Height and Area Table

Mr. Pfeiffer's Declaration disputes that staff members' role in preparation of the Heights and Area Table 503 "was to calculate values for inclusion in the Table using methodologies from the legacy codes and the BCMC Report." (Koffel Decl. ¶ 23.) However, Mr. Pfeiffer's recitation of the facts shows this is exactly what staff did. In ¶ 25, Mr. Pfeiffer describes the role of staff in preparing Table 503 as follows:

> Item XI of Exhibit I [Minutes of the IBC Occupancy Subcommittee dated December 13-14, 1996] indicates that the staff was directed to **compute** "The respective maximum allowable areas…by each MCG [model code group] using IBC use groups and types of construction." The minutes further state: "This data is to be sent to the Secretariat from which a proposed IBC Table 503 will be developed…." This was followed by additional direction to the Occupancy Subcommittee reflected in Item VII of Exhibit J [January 24-25, 1997 minutes] to the staff to provide additional information germane to the development of Table 503. This process was initiated in December 1996 and not completed until March 1997. Since each of the legacy codes included a unique and different set of tabular values and different modifiers for the resulting allowable height and area of a building, staff was called upon to make the necessary judgments in how best to accomplish the directive from the subcommittee. ***Table 503, in total, is a comprehensive set of tabular values, formulated as noted above***, which are not just direct extractions from one of the legacy codes or the BCMC.

(Pfeiffer Decl. ¶ 25, emphasis added.) In other words, exactly what Mr. Koffel said: staff calculated the values for the Table using methodologies from the legacy codes and the BCMC Report. Calculations are not independently copyrightable subject matter. *See Gates Rubber Company v. Bando Chemical Indus. Ltd.*, 9 F.3d 823, 842-43 (8th Cir. 1993).

---

[8] In ¶ 23, Mr. Pfeiffer also makes some vague allegations that staff drafted parts of IBC chapter 8. However, ICC has withdrawn its infringement allegation for chapter 8, so these sections are not at issue in the case. Moreover, a cursory examination of the materials submitted by Mr. Pfeiffer reveals that Mr. Chubb identified only one section of the draft chapter 8 as containing "new material." (*See* Pfeiffer Ex H, at Section 801.1.) This single section, concerning the "scope" of chapter 8, does not establish Mr. Chubb as a "joint author" of the IBC 2000.

b)     Sections 903.2.x

Regarding §§ 903.2.2, 903.2.3, 903.2.5, and 903.2.10 of the IBC 2000, Mr. Pfeiffer states only as follows:

> The preliminary draft chapter containing these sections was the byproduct of a task force of 3 subcommittee members and staff, led by Mark Chubb. Mr. Chubb created the first draft for the subcommittee's consideration and sent it to the task force under a memo dated December 6, 1996 (attached as Exhibit K). This text has as its source the legacy codes but is not a direct extraction from any of the legacy codes. Mr. Chubb made *revisions* to the legacy code text in creating this preliminary draft. Thus, while it is true that these sections were "derived" from legacy codes or public submissions, the drafting process started with Mr. Chubb's first draft, which included his own revisions to the legacy code text.

(Pfeiffer Decl. ¶ 27, emphasis added.) There are at least three problems with Mr. Pfeiffer's conclusory assertions. First, "revisions" alone do not create joint authorship. *See Erickson*, 13 F.3d at 1072; *Rubloff*, 1994 WL 161098, at *10. Second, Mr. Pfeiffer does not identify what "revisions" Mr. Chubb supposedly made. The "revisions" in question may not even be language at issue in the case, or language NFPA is accused of copying. Finally, Mr. Pfeiffer was not a member of this task force, and does not attest to any personal knowledge of what Mr. Chubb actually did.[9] The exhibit he cites in support of his contention (Pfeiffer Ex. K) does not actually prove that Mr. Chubb actually made any revisions.[10]

ICC bears the burden of proof on ownership. It cannot satisfy that burden with conclusory, unsubstantiated allegations that a former staff member made unspecified "revisions" to unspecified text. Mr. Pfeiffer's speculative declaration, therefore, does not help it avoid summary judgment. *Celotex*, 477 U.S. at 324.

---

[9] We were informed by ICC that Mr. Chubb now lives in New Zealand. He therefore was not available for a deposition.

[10] Pfeiffer Exhibit K includes a cover memo from Mr. Chubb to the subcommittee members stating "The attached draft of Chapter 9 was prepared based upon our task group discussion at the 21/22 November meeting in Nashville." Thus, whatever changes were made could very well have come from the subcommittee members, not Mr. Chubb.

17

## III.     NFPA DID NOT COPY THE IBC 2000

The Court need not consider the issue of copying if it finds ICC has not established that it owns the asserted text.  Nevertheless, NFPA makes the arguments in Sections III and IV of this brief because NFPA ***did not copy*** the IBC 2000 to develop our model building code.  Instead, NFPA used its own ANSI accredited process, involving over 300 experts in matters related to the built environment, to independently develop its building code.  With our Opening Memorandum, NFPA filed a declaration from William Koffel which identified the source for every single accused provision in the NFPA 5000.  (Koffel Decl. Ex. 1.)  These sources include the EPCOT building code, for which NFPA has a license, prior NFPA codes, licensed or public third party codes, NFPA technical committees and public submissions.  (Koffel Decl. ¶ 18 & Ex. 1.)  This evidence shows that not a single accused provision was "copied" from the IBC 2000.  Independent creation is a complete defense to copyright infringement.  *Theotokatos v. Sara Lee Personal Products*, 971 F. Supp. 332, 340 (N.D. Ill. 1997).

ICC's Opposition completely ignores this evidence.  Instead, ICC purports to present "direct evidence and circumstantial evidence" of copying, (ICC Opp. at 29), but it presents neither.

### A.     ICC Presents No Direct Evidence of Copying

ICC's purported "direct evidence" of copying is a handful of quotations taken out of context.  None proves that NFPA copied anything, let alone the asserted provisions of the IBC 2000.

First, ICC emphasizes a slide presentation in which NFPA committees were told not to "reinvent the wheel." (McGraw Decl. Ex. K.)  This quotation, however followed nine slides that identified source codes which NFPA owned or licensed, such as the EPCOT code and existing

18

NFPA fire codes. This slide presentation ***nowhere mentions the IBC 2000*** or any other ICC code. The "reinvent the wheel" quotation, therefore, was encouraging NFPA committee members to use NFPA's own existing codes, not to "copy" its competitor's code. That ICC would lead with this quotation demonstrates just how thin its copying evidence is.

Second, ICC's Opposition quotes a passage from the deposition of Ronald G. Nickson. Mr. Nickson is an industry representative who was a member of both the ICC and the NFPA, and who served on NFPA 5000 committees. (Ex. CC at 7, 10.) Mr. Nickson ultimately became an opponent of the NFPA 5000, and was one of just two NFPA members who voted against its adoption, presumably because certain of its provisions were less favorable to his industry group than the IBC 2000.[11] In his deposition, Mr. Nickson only says that he did not know whether NFPA had a policy against adopting public comments which included language originating in the IBC. He did not testify that NFPA copied any portion of the IBC 2000.

Third, ICC quotes a statement by NFPA's expert, William Koffel, before the City of Phoenix Advisory Board regarding values in the Heights and Areas Table. Mr. Koffel stated only that NFPA accepted one public submission which included proposed heights and areas also found in the IBC.[12] Moreover, the style and format for both ICC's and NFPA's Heights and Area Tables is based upon the BCMC format, which the parties have previously agreed, by their mutual participation in the BCMC process, to waive all claims for copyright protection. (See Exs. N and O at p. 2, ¶G).

Finally, ICC cites to three public proposal documents (out of thousands) that request changes to the draft NFPA code, and which state, somewhere in the document, that part of the

---

[11] Specifically, the NFPA 5000 requires more fire sprinklers than the IBC 2000, and Mr. Nickson represents the National Mult Housing Council, a lobby group for owners of apartment housing. (Ex. CC at 88-90.)

[12] As discussed above, the calculated numbers in the Heights and Areas Table are not protectible subject matter. *Gates Rubber*, 9 F.3d at 842-43.

19

reason for the proposed change is consistency with the IBC. Even if, a handful of times, a public proposal that somewhere mentioned the IBC was adopted by a committee, this is hardly evidence that supports an inference that NFPA deliberately copied the IBC 2000. That ICC only cites three such documents, out of thousands, supports precisely the opposite inference.[13]

**B.      There Is No Circumstantial Evidence of Copying**

ICC also contends that the NFPA 5000 and IBC 2000 are "substantially similar" enough to infer copying. As pointed out in our Opening Memorandum, however, ICC accuses NFPA of copying portions of only 5% of the IBC 2000 code provisions, and many of these purportedly "copied" provisions use substantially different language. In the handful of instances where the codes use similar language, this is not because of "copying." It is because, in many cases, both the ICC and NFPA derived their code from the same sources (similar public submissions from the same sources, identical committee members, identical third party codes and standards, etc.) Also, given the similar ideas and issues any model building code must logically address, and the proscriptive style of code language itself, one would expect to see similarities between code provisions addressing similar ideas. Thus, the evidence ICC asserts hardly supports an "inference" that NFPA used the IBC 2000 "as a starting point" for its own code, which is required for infringement. *Stillman v. Leo Burnett Co., Inc.*, 720 F. Supp. 1353, 1357.

---

[13] Even these three do not stand up to scrutiny. One of the proposals (Ex. N) concerned language drafted by an industry representative, Donald Belles. Mr. Belles first submitted his language to ICC for inclusion in the IBC 2000, on a nonexclusive basis. He then later submitted essentially the same language to NFPA, with an assignment. (Ex. DD at 133-140, 169-171, and 175-176.) Thus, NFPA received the material from Mr. Belles, who owned it, and did not copy it from the IBC. The second proposal (Ex. M) was Accepted in Principle only, and the code language adopted by the committee is not identical to that found in the IBC 2000. The third proposal (Ex. L) was merely a definition set required for the application of a public industry standard, ASCE 7.

## C.    NFPA Did Not Copy ICC's "Compilation"

In its Opposition, ICC also alleges that it owns a "compilation copyright" in the IBC 2000, and that NFPA copied the IBC 2000's "selection" of code sections. (ICC Opp. at 28.)[14]

This is a brand new allegation from ICC. In its interrogatory answers and Rule 30(b)(6) testimony, ICC never once alleged that it owns a "compilation" copyright, or that NFPA infringed by copying the IBC 2000's "selection," "coordination" or "arrangement" of materials, in addition to its allegations that NFPA copied specific sections of code. (*See* Exs. S and W.) This is yet another example of ICC changing its allegations, after close of discovery, in attempt to survive summary judgment and prolong this litigation.

In any event, this new allegation fails as a matter of law. To prove infringement of a compilation, it is not enough to show that some sections in the two works are in common. Since protection for compilations is "thin," *Feist*, 499 U.S. at 349, the works must be virtually identical for there to be infringement. *See Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1439 (9th Cir.1994) ("When the range of protectible and unauthorized expression is narrow, the appropriate standard for illicit copying is virtual identity."); 4 Melville B. Nimmer & David Nimmer, Nimmer on Copyright, § 13.03[A] at 13-28 (1997) ("supersubstantial" similarity required for infringement of thin works). Thus, as a threshold matter, to even state a claim for copying "selection," the overlap between the two compilations must be virtually complete. If the selection differs by more than a "trivial degree," there is no "selection" copying, and no infringement. *Kregos v. Associated Press*, 3 F.3d 656, 663 (2nd Cir. 1991). *See also BellSouth Adver. & Publ'g Corp. v. Donnelley Info. Publ'g, Inc.*, 999 F.2d 1436, 1445 (11th Cir. 1993) (en

---

[14] "A 'compilation' is a work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship." 17 U.S.C. § 101. ICC accuses NFPA of copying its "selection" of code sections, but has not alleged copying of "coordination" or "arrangement."

21

banc) (a competitor may copy "the bulk of the factual material from a preexisting compilation" without infringing the author's compilation copyright, since only the original elements of arrangement, appearance, or selection are protected); *Transwestern Publ'g Co. v. Multimedia Mktg. Assocs., Inc.*, 133 F.3d 773, 776-77 (10th Cir. 1998) ("extensive verbatim copying" required for infringement of a compilation) (citation omitted).[15]

Here, ICC alleges that NFPA selected portions of about 5% of the sections of the IBC 2000 for inclusion in the NFPA 5000. As a matter of law, this is plainly insufficient. *See, e.g., Key Publications v. Chinatown Today Publishing Enterprises, Inc.*, 945 F.2d 509, 515-16 (2nd Cir. 1991) (defendant copying 17% of the 9000 listings in plaintiff's telephone directory not enough, as a matter of law, to support infringement of a compilation copyright by selection); *Schoolhouse, Inc. v. Anderson*, 275 F.3d 726, 729-30 (8th Cir. 2002) (defendant including 74% of the topics from plaintiff's website on its own website insufficient to support a compilation copyright infringement, as a matter of law); *Kregos*, 3 F.3d at 663-64 (60% overlap insufficient as a matter of law).

Moreover, contrary to its new assertion, ICC did not register the IBC 2000, or any of the asserted legacy codes, as a compilation copyright. ICC states, at pp. 28-29 of its Opposition, that "The IBC 2000 registration certificate itself states that it is in part a compilation." This is simply false. The registration says nothing of the sort. The relevant portion of the registration is reproduced below:

---

[15] This is distinguished from copying from an ordinary copyright, where the importance of what is copied may matter more than the amount copied. When the allegation concerns *selection* copying from a *compilation*, however, the amount copied is the key inquiry. *See PLI, Substantial Similarity in Copyright Law*, § 13:3 (2003).

DERIVATIVE WORK OR COMPILATION
Preexisting Material Identify any preexisting work or works that this work is based on or incorporates. ▼ IBC Final Draft November 1997,
IBC Working Draft May 1997, IBC Final Draft July 1998, 1997 Standard Building
Code, BOCA National Building Code and the ICBO Uniform Building Code.

Material Added to This Work Give a brief general statement of the material that has been added to this work and in which copyright is claimed. ▼
All new textual material other than pre-existing works

b

(Ex. EE.) This registration never indicates that it is claiming a compilation. It simply lists several of the legacy codes, and then claims "All new *textual* material other than pre-existing works" (emphasis added). The word "textual" shows that this is not a claim to a selection, coordination, or arrangement of pre-existing works, as required for a compilation copyright. *See* 17 U.S.C. §§ 101, 103.

A plaintiff may not institute an action for infringement of a copyright "until registration of the copyright *claim* has been made in accordance with this title." 17 U.S.C. § 411(a) (2003) (emphasis added). Since ICC has not registered its compilation claim, it may not now assert infringement of a compilation copyright in the IBC 2000. *See Thron v. HarperCollins Publishers, Inc.*, 64 U.S.P.Q.2d 1221, 1221-22 (S.D.N.Y. 2002) (dismissing claim for infringement of "compilation copyright" under very similar facts). (Ex. FF.)

## IV. THE ALLEGEDLY COPIED MATERIAL IS NOT PROTECTIBLE

ICC cannot prove the second prong of its infringement allegations because the material it alleges NFPA copied is simply not protectible. ICC begins part V of its Opposition by stating:

> In seeking summary judgment, NFPA argues that the IBC 2000 does not qualify for protection under the Copyright Act because it is comprised 'largely [of] statements of facts, following mandatory code language.'

(ICC Opp. at 34.) This is a straw man argument. NFPA does not argue that building codes generally are uncopyrightable. Rather, NFPA argues that the *portions* of the code which ICC alleges were copied—numerical limits expressed using mandatory linguistic conventions that may only be stated in a limited number of ways—are not protectible. *See Wallace Computer*

23

*Services, Inc. v. Adams Business Forms, Inc.*, 837 F. Supp. 1413, 1416-17 (N.D. Ill. 1993) (plaintiff must show that defendant copied protectible expression).

Both NFPA and ICC filed exhibits showing the asserted ICC code sections and the accused NFPA code sections side-by-side. (Koffel Decl. Ex. 1; Pfeiffer Decl. Ex. L.) A review of these exhibits shows that the only possible language in common in these sections are numerical limits expressed in the proscriptive style of code phrasing. As explained in our Opening Memorandum, such facts and ideas are not protectible. *See Morrissey v. Proctor & Gamble Co.*, 379 F.2d 675, 678 (1st Cir. 1967); *Alberto-Culver Co. v. Andrew Dumon, Inc.*, 466 F.2d 705, 711 (7th Cir. 1972).

The main dispute between the parties on protectibility is whether the allegedly copied numerical limits in the IBC code (e.g., some height and area limitations, square footage limitations, etc.) are themselves protectible. NFPA submits that they are not.

These numbers are guidelines and instructions for buildings, like the recipe ingredients of *Publications International Limited v. Meredith Corp.*, 88 F.3d 473 (7th Cir. 1996). The building code numbers were based on dimensions of existing buildings, existing codes and standards, industry group requests, and principles of physics and engineering. They are ideas, not expression. *See id.* at 480 (each recipe author "was not giving literary expression to his individual creative labors. Instead he was writing down an idea, namely, the ingredients necessary to the preparation of a particular dish.")

ICC attempts to dismiss *Publications* by arguing that it "was expressly decided on a provision of the Copyright Act denying protection to any 'procedure, process, [or] system.'" (ICC Opp. at 38.) This statement is incomplete and misleading. *Publications* first held that the "identification of ingredients necessary for the preparation of each dish [i.e., the numbers] is a

statement of facts." 88 F.3d at 480. It then held that the ***instructions*** for combining the ingredients is an uncopyrightable "procedure, process, [or] system." *Id.* at 481. Thus, *Publications* squarely held that the numerical portions of recipes are facts.

In support of its argument that the numbers themselves are copyrightability, ICC relies primarily on two cases, *American Dental Association v. Delta Dental Plans Association*, 126 F.3d 977 (7th Cir. 1997); and *CCC Information Services v. Maclean Hunter Market Reports*, 44 F.3d 61 (2nd Cir. 1994). Both are readily distinguishable.

In *American Dental*, the issue was whether taxonomies were copyrightable. Thus, the "numbers" at issue there were not numerical standards or limitations, they were classifications invented by the author.

In *CCC*, a Second Circuit case, the Court applied a *"selective* application of the merger doctrine" ***"in cases of wholesale takings of compilations"*** "withholding its application as to soft ideas infused with taste and opinion...." See *CCC* 44 F.2d at 72.[16] First, this is not a case of "wholesale taking" of a compilation. ICC accuses NFPA of taking only portions of 5% of its code text. Second, the numbers in a model building code are not "soft ideas infused with taste and opinion." They are safety limits based upon principles of physics and engineering akin to "building blocks of understanding" not protectible under copyright law. *Id.* at 72 n.22. Thus, *CCC* is distinguishable.

Once the Court concludes that the numbers themselves are not protectible, then the remainder of the allegedly copied material is unprotectible under the merger doctrine. If the Court examines the IBC and accused NFPA code provisions side-by-side, and isolates the language in common, it will be clear that this language is merely recitations of the numerical limits using proscriptive "mandatory language" (Ex. F at 123-24) and "ordinary phrasing" used

---

[16] Another case relied upon by ICC, *CDN, Inc. v. Kapes*, 197 F.3d 1256 (9th Cir. 1999), is similar to *CCC*.

by all model codes. When such non-expressive language merges with a fact or idea, it is not protectible. *Mid America Title Co. v. Kirk*, 867 F. Supp 673, 683-684 (N.D. Ill. 1994), *aff'd*, 59 F.3d 719 (7th Cir. 1995); *Morrissey*, 379 F.2d at 678; *Alberto-Culver*, 466 F.2d at 711.

Moreover, in the unlikely event that ICC was to present credible evidence that NFPA copied some protectible expression from the less than 5% of the IBC 2000 that is alleged to be infringed, the amount copied would be insufficient to make the works substantially similar. *Theotokatos v. Sara Lee Personal Products*, 971 F. Supp. 332, 340 (N.D. Ill. 1997) (substantial similarity required for finding of infringement).

## IV. CONCLUSION

For the above reasons, and the reasons given in our Opening Memorandum, the Court should grant summary judgment in favor of NFPA and dismiss ICC's Amended Complaint.

NATIONAL FIRE PROTECTION
ASSOCIATION, INC.,

By its attorneys,

Dated: April 26, 2005

Thomas F. Holt, Jr., Esq.
Tara C. Clancy, Esq.
Christopher Centurelli, Esq.
Kirkpatrick & Lockhart
 Nicholson Graham LLP
75 State Street
Boston, MA 02109
(617) 261-3100

Peter C. John, Esq.
Williams Montgomery & John Ltd.
2100 Civic Opera Building
Twenty North Wacker Drive
Chicago, IL 60606
(312) 443-3200