## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

**FILED**

APR 2 6 2005

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

| | | |
|---|---|---|
| INTERNATIONAL CODE COUNCIL, INC., and BUILDING OFFICIALS AND CODE ADMINISTRATORS INTERNATIONAL, INC., | ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) ) | **NO. 02C 5610**<br><br>Judge Rebecca R. Pallmeyer |
| NATIONAL FIRE PROTECTION ASSOCIATION, INC., | ) ) ) ) | |
| Defendant. | ) | |

### NOTICE OF FILING and CERTIFICATE OF SERVICE

**TO:**   Alan S. Wernick, Esq., Querrey & Harrow, 175 West Jackson Boulevard, Suite 1600, Chicago, IL   60604

James Hamilton, Esq., Swidler Berlin Shereff Friedman, 3000 K Street, NW, Suite 300, Washington DC   20007

**PLEASE TAKE NOTICE** that on April 26, 2005 there was filed with the Clerk of the United States District Court for the Northern District of Illinois, Eastern Division, Defendant National Fire Protection Association's Second Declaration of Christopher Centurelli attaching Exhibits in Support of Defendant's Motion for Summary Judgment, a copy of which is attached hereto and served upon counsel.

_____
Peter C. John, Esq.

Williams Montgomery & John Ltd.
2100 Civic Opera Building
Twenty North Wacker Drive
Chicago, IL 60606
(312) 443-3200

Thomas F. Holt, Jr.
Tara C. Clancy
Christopher Centurelli
Kirkpatrick & Lockhart LLP
75 State Street
Boston, MA 02109
(617) 261-3100

## CERTIFICATE OF SERVICE

Karen M. Begg being first duly sworn on oath states that on April 26, 2005 a true copy of the foregoing Notice of Filing and Second Declaration of Christopher Centurelli attaching Exhibits in Support of Defendant's Motion for Summary Judgment were served on the following via hand delivery:

> Alan S. Wernick, Esq.
> Querrey & Harrow
> 175 West Jackson Boulevard
> Suite 1600,
> Chicago, IL    60604

and to the following via overnight courier:

> Kevin R. Amer
> James Hamilton, Esq.
> Swidler Berlin Shereff Friedman
> 3000 K Street, NW
> Suite 300
> Washington, D.C.    20007

_____
Karen M. Begg

Subscribed and sworn to before me
this 26th day of April, 2005.

NOTARY PUBLIC

"OFFICIAL SEAL"
DENISE E. MATHAUSER
Notary Public, State of Illinois
My Commission Expires 8/30/07





**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

INTERNATIONAL CODE COUNCIL,
INC.,

            Plaintiff,

v.

NATIONAL FIRE PROTECTION
ASSOCIATION, INC.,

            Defendant.

**CIVIL ACTION NO. 02C 5610**

Judge Rebecca R. Pallmeyer

## SECOND DECLARATION OF CHRISTOPHER CENTURELLI ATTACHING EXHIBITS IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

I, Christopher Centurelli, am an associate at the law firm Kirkpatrick & Lockhart Nicholson Graham, counsel for Defendant National Fire Protection Association, Inc. ("NFPA"), in this action. I, declare, under penalty of perjury, that the following statements are true, to the best of my knowledge, information, and belief:

1. Attached as Exhibit AA are true and correct excerpts from the Deposition of John R. Battles, taken September 16, 2004.

2. Attached as Exhibit BB is a true and correct copy of *Rubloff Inc. v. Donahue*, No. 93 C 0457, 1994 WL 161098 (N.D. Ill. April 11, 1994) obtained from Westlaw®.

3. Attached as Exhibit CC are true and correct excerpts from the Deposition of Ronald G. Nickson, taken September 3, 2004.

4. Attached as Exhibit DD are true and correct excerpts from the Deposition of Donald Bellis, taken September 30, 2004.

BOS-746155 v1

5.  Attached as Exhibit EE is a true and correct copy of the copyright registration certificate for the IBC 2000, effective August 18, 2000.

6.  Attached as Exhibit FF is a true and correct copy of *Thron v. HarperCollins Publishers, Inc.*, 64 U.S.P.Q.2d 1221, 1221-22 (S.D.N.Y. 2002) obtained from Westlaw®.

DATED: **April 25, 2005**  _____

Christopher Centurelli

- 2 -

# Exhibit AA

COPY

Page 1

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

-------------------------------x

INTERNATIONAL CODE COUNCIL,               )

INC.; BUILDING CODE OFFICIALS;            )

and CODE ADMINISTRATORS                   )

INTERNATIONAL, INC.,                      )

              Plaintiffs,       )   Case No.

    v.                                    )   02C5610

NATIONAL FIRE PROTECTION                  )

ASSOCIATION, INC.,                        )

             Defendant.        )

-------------------------------x

Videotaped Deposition of

INTERNATIONAL CODE COUNCIL, INC.

By and Through Its Corporate Designee

JOHN R. BATTLES

Washington, D.C.

Thursday, September 16, 2004

9:35 a.m.

Job No.:  22-42131

Pages 1 - 120

Reported By:  Joan V. Cain

Page 22

A   Yes, sir.

Q   What do you mean by that?

A   Active members are the ones that vote on the code change proposals.

Q   Why do active members vote on code change proposals?

A   Say that again, sir.

Q   Why do active members, these code officials, why do they vote on code change proposals?

A   That's what the bylaws say.

Q   Is that how ICC propagates its building codes, in other words, develops them?

A   Could you be more exact on that one.

Q   Sure. Let me just -- this vote by the code officials, the active members of ICC, is that the final say in what goes into the IBC 2000?

A   Yes, sir.

Q   Does the staff have a vote into what goes into the IBC 2000?

A   No, sir.

Q   Did the staff of the Southern -- the SBCCI have a vote into what went into its standard building code?

Page 23

A   No, sir.

MR. CENTURELLI: 126.

(Battles Deposition Exhibit Number 126 was marked for identification and was attached to the deposition transcript.)

BY MR. CENTURELLI:

Q   Sir, I've just handed you what is been marked -- or what has been marked Exhibit 126. I'd like you to take an opportunity to review the document, and let me know when you've had a chance to review it.

A   Okay.

Q   Do you recognize this document?

A   Yes.

Q   What is it?

A   It's the minutes of the steering committee.

Q   Are these a particular -- are these minutes from a particular meeting?

A   One held on June 19, 1996, in Irving, Texas.

Q   To your knowledge, was that the first meeting of the steering committee?

A   I don't know.

Q   Did you attend the June 19, 1996 --

Page 24

A   Yes.

Q   -- meeting?

A   Yes, I did.

Q   And is -- under Section 1.2 you're listed as a guest?

A   Yes, sir.

Q   Why are you listed as a guest?

A   Because I suppose I was a staff -- I'm a staff member for SBCCI, and Rick Vognild, the secretary to this committee, was my boss, and I was there to obtain knowledge.

Q   Assist him?

A   Assist him, right. Yes, sir.

Q   A minute ago when we discussed the five committees involved with the development of the ICC --

A   Mm-hmm.

Q   -- strike that -- the IBC 2000 --

A   Mm-hmm.

Q   -- you identified the occupancy, the means of egress, the structural, the general, and the fire safety committees as the drafting committees.

A   Correct.

Q   You did not identify the steering

Page 25

committee.

A   Correct.

Q   And I was wondering why that was. Strike that.

What is the steering committee?

A   The steering committee was the committee that developed the process of developing the building code.

Q   And when you say developed the process for developing the building code, what do you mean by that?

A   Public hearings, type of public hearings, the committee make-ups, the breakup of the committees, the procedures.

Q   So essentially the ground rules that the five drafting committees you discussed earlier were to follow to develop the IBC 2000?

A   Procedures, yes, sir.

Q   Okay. Did the steering -- was the steering committee involved in actual drafting of the IBC 2000?

A   Of code text?

Q   Of code text.

A   Not that I'm aware of, no, sir.

7 (Pages 22 to 25)

# Exhibit BB

**Westlaw.**

Not Reported in F.Supp.
1994 WL 161098 (N.D.Ill.), 1994 Copr.L.Dec. P 27,326, 31 U.S.P.Q.2d 1046
(Cite as: 1994 WL 161098 (N.D.Ill.))

Page 1

**H**

United States District Court,
N.D. Illinois, Eastern Division.
RUBLOFF INC., Plaintiff,
v.
Mark R. DONAHUE and Commercial Real Estate
Training, Incorporated, Defendants.
**No. 93 C 0457.**

April 11, 1994.

Robert E. Arroyo, Christopher A. Bloom, John A. McDonald, Joan L. Long, Keck, Mahin & Cate, Chicago, IL, for plaintiff.

Jay A. Canel, Stephen D. Davis, William H. Jones, Canel, Davis & King, Chicago, IL, for defendants.

*MEMORANDUM OPINION AND ORDER*

ASPEN, District Judge:

*1 Plaintiff Rubloff, Inc. brings this three count complaint alleging copyright infringement, misappropriation of trade secrets, and breach of contract. Presently before the court are the parties' cross-motions for summary judgment. For the reasons set forth below, plaintiff's motion for summary judgment is denied, and defendants' motion for summary judgment on Count I and to dismiss Counts II and III is granted.

### I. Background

Plaintiff Rubloff, Inc. is a Delaware corporation engaged in the brokerage of real estate. For one year, beginning in June, 1988, Rubloff employed defendant Mark R. Donahue as President of its Corporate Real Estate Services Division. During this time, Donahue was also a member of the Executive Committee and Rubloff's Board of Directors. Under Donahue's direction, Rubloff developed a training manual entitled *Links to Success,* which was designed to standardize the methods used by Rubloff's commercial real estate brokers. Donahue hired Patricia Lynn as Rubloff's National Training Director, and put her in charge of overseeing the development of *Links to Success.* Lynn compiled source materials and prepared chapter outlines, and then retained Jeanne Bear Sleeper and Stephanie Laster as independent contractors to write the actual manual. Specifically, Sleeper wrote drafts of chapters one through nine and chapter twelve, while Laster wrote drafts of chapters ten and eleven. Upon completion, the draft chapters were submitted to Donahue, who then reviewed and edited them. They were also reviewed by Rubloff's chairman, Willard A. Brown, Jr. for suggestions and/or approval. Additional review and grammatical editing was performed by Rubloff employee Patricia McKibbin, and Donahue's secretary, Karen Enk, typed and formatted the text. In total, *Links to Success* consisted of twelve chapters and over five hundred pages. In addition, Donahue wrote a one-and-one-half page statement entitled "A Message From The Chairman" which was used as an introduction to *Links to Success.* In March, 1990, Rubloff received from the Register of Copyrights a Certificate of Registration for *Links to Success,* which identified it as a "work made for hire." Neither Sleeper nor Laster agreed that their work on *Links to Success* would be considered a "work made for hire;" however, in July, 1993, Sleeper and Lynn assigned their interests in *Links to Success* to Rubloff, and Rubloff supplemented its earlier registration to include both Sleeper and Lynn as authors, and noting their assignments to Rubloff. There is no indication, however, that Laster ever assigned any interest she has to Rubloff.

Donahue was terminated in June, 1989. He kept draft copies of *Links to Success,* notwithstanding his representation that he would return all Rubloff materials in his possession. The following month, Donahue formed defendant Commercial Real Estate Training, Inc. ("CRET") for the purpose of conducting seminars on commercial real estate brokerage. [FN1] Beginning in October, 1989, Donahue hired Thomas Stat as an independent contractor to complete a commercial real estate training manual. Donahue and Stats used the chapter drafts of *Links to Success* as a basis for CRET's manual, which was called *A System.* For the most part, Stat merely reorganized and reformatted the material contained in *Links to Success,* in addition to adding some graphics, in creating CRET's manual. This manual was subsequently sold at CRET seminars held throughout the country.

### II. Summary Judgment Standard

*2 Under the Federal Rules of Civil Procedure, summary judgment is appropriate if "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.           Page 2
1994 WL 161098 (N.D.Ill.), 1994 Copr.L.Dec. P 27,326, 31 U.S.P.Q.2d 1046
**(Cite as: 1994 WL 161098 (N.D.Ill.))**

law." Fed.R.Civ.P. 56(c). This standard places the initial burden on the moving party to identify "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Rule 56(c)). Once the moving party has done this, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(c). In deciding a motion for summary judgment, the court must read all facts in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 254 (1986); *Griffin v. Thomas,* 929 F.2d 1210, 1212 (7th Cir.1991).

### III. Discussion

In order to prevail in a copyright infringement action, a plaintiff must demonstrate that it owns a valid copyright and that the defendant "copied" its work. *See Atari, Inc. v. North Am. Philips Consumer Elecs. Corp.,* 672 F.2d 607, 614 (7th Cir.), *cert. denied,* 459 U.S. 880 (1982). There is apparently little dispute that Donahue "copied" *Links to Success* in creating *A System;* instead, the only issue before us is whether Rubloff's copyright in *Links to Success* is invalid as a matter of law. We initially observe that a certificate of copyright registration is prima facie evidence of the validity of the copyright. 17 U.S.C. § 410(c). However, this presumption in favor of validity is rebuttable; once the certificate has been produced, the burden shifts to the defendant to demonstrate that the copyright is in fact invalid. *Runstadler Studios, Inc. v. MCM Ltd. Partnership,* 768 F.Supp. 1292, 1295 (N.D.Ill.1991). In the present case, Rubloff registered its copyright in *Links to Success* as a "work made for hire." The Copyright Act of 1976 defines "work made for hire" as:

(1) a work prepared by an employee within the scope of his or her employment; or

(2) a work specially ordered or commissioned for use as a contribution to a collective work, as a part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, if the parties expressly agree in written instrument signed by them that the work shall be considered a work made for hire.

17 U.S.C. § 101.

Rubloff has conceded that both Sleeper and Laster were independent contractors rather than employees, and their work therefore does not qualify under the first category of "works made for hire." Instead, Rubloff argues that *Links for Success* falls within the second category listed above. However, it is undisputed that, at the time *Links for Success* was written, there existed no written agreement signed by Rubloff and the authors which expressly provided that the manual would be a "work made for hire," a necessary prerequisite to such a finding. However, Rubloff notes that it obtained assignments from Sleeper and Lynn (though not Laster) in July, 1993, thus remedying any failing in its registration. However, this very claim was rejected in *Schiller & Schmidt, Inc. v. Nordisco Corp.,* 969 F.2d 410 (7th Cir.1992). There, a photographer took photos of office equipment for plaintiff Schiller & Schmidt's catalog in 1979. Defendant Nordisco used eighteen of those photos in its competing catalog, thus prompting a lawsuit by Schiller in 1985. Although Bertel, the photographer, never signed a "work made for hire" agreement with Schiller, in 1988 he did, during the course of the litigation, assign his copyright interest in the photographs to the plaintiff. The defendant challenged the validity of Schiller's copyright, and the court stated:

> *3 Bertel made the 18 photos, but Schiller owned the copyrights in them if they were "works for hire," or if Bertel assigned the copyrights to Schiller. Since no one could suppose after *Community for Creative Non-Violence v. Reid,* 490 U.S. 730 (1989), that Bertel was an employee of Schiller, they were works for hire only if they fell in one or more of the categories of intellectual property enumerated in section 102(2), as they did, and were specially commissioned by Schiller, as they were, and the parties had signed a statement to that effect--which they had not. What is true is that in 1988, long after this suit had begun, Bertel obliging signed a statement in which he "agree[d] that Schiller and Schmidt has owned the copyright [in the photos], and I hereby assign any remaining copyright which I may own in any photographs which I took for Schiller & Schmidt, and any right to maintain actions, now or hereafter existing, for alleged infringement thereof" to Schiller.

*Id.* at 412 (citations omitted).

The court then noted two fatal flaws in Schiller's argument. First, it observed that only Bertel had signed the putative assignment; the statute, however, requires that any such agreement between the parties be "signed by them," and "it means what it says." *Id.* The court also concluded that the *post hoc* nature of the attempt to create a "work made for hire" was fatal to the effort:

> The statement also came too late. The

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

requirement of a written statement regarding the copyright on a specially commissioned work is not merely a statute of frauds, although that is the purpose emphasized by the cases. That is, it is not only designed to protect people against false claims of oral agreements. If it were, then it might not matter when the statement had been made or signed, although there is authority that it must be signed before suit is brought. This is an esoteric question, since ordinarily the absence of the requisite statement will lead to the dismissal of the suit before it can be tendered. We need not try to resolve the question here. For the signed statement requirement in section 101(2) has a second purpose--to make the ownership of property rights in intellectual property clear and definite, so that such property will be readily marketable. The creator of the property is the owner, unless he is an employee creating the property within the scope of his employment or the parties have agreed in a writing signed by both that the person who commissioned the creation of the property is the owner. The writing must precede the creation of the property in order to serve its purpose of identifying the (noncreator) owner unequivocally. It did not precede it here.

*Id.* at 412-13. The assignments in the present case suffer from both of the flaws identified in *Schiller:* they were only signed by one party, and they were not executed until July, 1993, well after this action was filed. [FN2] Accordingly, we find that the documents proffered by Rubloff are insufficient to retroactively make *Links to Success* a "work made for hire." As a result, Rubloff cannot claim that its copyright is valid on that basis.

*4 Perhaps in recognition of the weakness of its "work made for hire" argument, Rubloff contends in its response to defendants' motion for summary judgment that it is at least a "joint author" of *Links to Success.* The Copyright Act provides that a "joint work" is "a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole." 17 U.S.C. § 101. The Seventh Circuit recently set forth a two part test for determining whether the contributors to a work are joint authors: (1) the contributions of each author must be independently copyrightable; and (2) the parties must intend to be joint authors at the time the work is created. *Erickson v. Trinity Theatre, Inc.,* No. 92-3598, 1994 WL 2535, at *10 (7th Cir. Jan. 6, 1994). In applying this test to the various putative authors of *Links to Success,* it is readily apparent that Rubloff is not a joint author of the work.

First Rubloff implies that the contributions of Patricia Lynn, i.e., providing chapter outlines and source materials, are sufficient to make it a joint author. This argument, of course, fails for the same reason that Rubloff's "work made for hire" argument fails. That is, the documents filed with the Copyright Office indicate that Lynn's "contributions" were made as an independent contractor; as a result, she was not an "employee" of Rubloff for the purposes of a "work made for hire." And, as Lynn did not have a written agreement with Rubloff at the time *Links to Success* was written, stating that it was to be a "work made for hire," Rubloff can not claim that it owns Lynn's interest in *Links to Success* as a work made for hire. Accordingly, Rubloff is not an author of the work based upon Lynn's participation. [FN3]

Rubloff next maintains that the contributions of its various employees in preparing the work establish Rubloff as a joint author. Specifically, Rubloff notes that its employees reviewed and edited the draft chapters, suggested changes, formatted and revised the text, and coordinated the production of *Links to Success.* However, it is clear that, as a matter of law, such "contributions" are insufficient to establish joint authorship. In *Erickson,* various actors who had worked with a playwright to develop various plays claimed joint authorship of the finished works. In rejecting their claim, the Seventh Circuit noted:

In order for the plays to be joint works under the Act, Trinity also must show that actors' contributions to Ms. Erickson's work could have been independently copyrighted. Trinity cannot establish this requirement for any of the above works.... Ideas, refinements, and suggestions, standing alone, are not the subjects of copyrights.

*Id.* at *11. In reaching this conclusion, the Seventh Circuit relied upon the Second Circuit's opinion in *Childress v. Taylor,* 945 F.2d 500, 507 (2nd Cir.1991). In *Childress,* the court directly refuted the argument that Rubloff is pressing here:

*5 For example, a writer frequently works with an editor who makes numerous useful revisions to the first draft, some of which will consist of additions of copyrightable expression. Both intend their contributions to be merged into inseparable parts of a unitary whole, yet very few editors and even fewer writers would expect the editor to be accorded the status of a joint author, enjoying an undivided half interest in the copyright in the published works. Similarly, research assistants may on occasion contribute to an author some protectable expression or material as would be

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                 Page 4
1994 WL 161098 (N.D.Ill.), 1994 Copr.L.Dec. P 27,326, 31 U.S.P.Q.2d 1046
(Cite as: 1994 WL 161098 (N.D.Ill.))

entitled to a copyright, yet not to be entitled to be regarded as a joint author of the work in which the contributed material appears. What distinguishes the writer-editor relationship and the writer-researcher relationship from the true joint author relationship is the lack of intent of both participants in the venture to regard themselves as joint authors. *Id.* at 507 (footnote omitted). Thus, whether we focus on the Rubloff employees' failure to contribute copyrightable material, or the parties' lack of intent to work as joint authors, it is apparent that the activities of the various Rubloff employees with respect to *Links to Success* fail to establish joint authorship.

Rubloff, however, points to "A Message From The Chairman," which Donahue admittedly wrote while an employee of Rubloff. Rubloff maintains that it owns this portion of *Links to Success* as a work made for hire, and is thus a joint author of the entire work. It is clear, however, that the "Message" does not even meet the basic test for creation of a "joint work;" that is, it was clearly not intended to "be merged [with the text of *Links to Success* ] into inseparable or interdependent parts of a unitary whole." 17 U.S.C. § 101. It is simply inconceivable that an individual who writes a preface or introduction to a work by another author can legitimately claim to be a joint author of the work. The court in *Eckert v. Hurley Chicago Co., 638 F.Supp. 699 (N.D.Ill.1986)* reached the same conclusion in an analogous situation. There the plaintiff used one of the defendant's pictures of a water filter in an eleven page brochure. The defendant maintained that the inclusion of the picture made the defendant a joint author of the brochure. The court disagreed:

> Basically, the only contribution [the defendant] made was a picture of the product, the water filter: he provided Eckert either a photograph or a drawing of a cross-section of the filter.... The brochure is eleven pages long. The first ten pages explain why someone should buy a water filter. The last page shows the particular water filter the author of the brochure wants the reader (or the reader's customers) to buy. The components of that product, that is, the picture, trademark and slogan, do not involve creative additions to the brochure itself. The creative and original aspect of the brochure lies in the arrangement of facts which encourage the reader to buy a water filter. [Defendant's] admitted contribution involves merely the simple display of the filter which the reader is encouraged to buy. That display is not an inseparable or interdependent part of the whole of the brochure.

*6 *Id.* at 704 (citation omitted). The same is true here. The "Message" is not even remotely part of the manuscript of *Links to Success;* instead it is a promotional message, touting Rubloff as a whole, and Rubloff's training program in particular. We are simply unwilling to find that tacking a one-and-one-half page statement on the front of a 546-page professional manual is sufficient to vest the drafter of the statement with a copyright interest in the work as a whole. Accordingly, we conclude that, as a matter of law, Rubloff is not a joint author of *Links to Success,* and its 1990 copyright registration for *Links to Success,* upon which its claim is based, is invalid.

In a last ditch effort to save its dying lawsuit, Rubloff maintains that even if *Links to Success* is not a work made for hire, and even if Rubloff is not a joint author, the assignments it has received allow it to bring actions for infringement. In the abstract, Rubloff is correct. That is, a copyright owner may assign the copyrights to another, thus permitting the other to register the copyrights and sue for infringement of those copyrights. *See Schiller, 969 F.2d at 413* (citation omitted). However, even in such a case, a valid copyright registration is a prerequisite to suit. 17 U.S.C. § 411(a). In the present case, Rubloff registered its copyright in *Links to Success* as a work made for hire on March 7, 1990. As noted above, that registration is invalid. In July, 1993, Rubloff obtained assignments from Sleeper and Lynn. [FN4] Then, in August, 1993, rather than obtaining a valid copyright registration for *Links to Success* on the basis of the assignments, Rubloff merely supplemented its earlier invalid registration, indicating that Sleeper and Lynn were "co-authors." However, supplementary registration "is not appropriate ... [a]s an amplification, to reflect the ... transfer of rights in a work, whether at the time basic registration was made or thereafter." 37 C.F.R. § 201.5(b)(2)(iii). Accordingly, although Rubloff submitted copies of the assignments executed by Sleeper and Lynn to the Copyright Office, Rubloff's original registration was never effectively altered or supplanted to indicate the true state of affairs. As a result, the fact remains that Rubloff's 1990 registration, upon which it relies here, is invalid. Because Rubloff can not demonstrate a valid copyright for *Links to Success,* defendants are entitled to summary judgment on Rubloff's copyright infringement claim.

The remaining claims are grounded in state law, having arrived here by supplemental jurisdiction. Because we have eliminated the sole federal cause of action, there is little basis for keeping the state claims here. As the Supreme Court noted in *United Mine*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                      Page 5
1994 WL 161098 (N.D.Ill.), 1994 Copr.L.Dec. P 27,326, 31 U.S.P.Q.2d 1046
**(Cite as: 1994 WL 161098 (N.D.Ill.))**

*Workers of America v. Gibbs,* 383 U.S. 715 (1966):

> Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.

*7 *Id.* at 726.    We will therefore exercise our discretion and dismiss the remaining counts of Rubloff's complaint.

### IV. Conclusion

For the reasons set forth above, defendants' motion for summary judgment with respect to Count I and to dismiss Counts II and III is granted.   It is so ordered.

> FN1. As Donahue is the sole officer, director, and shareholder of CRET, "Donahue" and "CRET" will be used interchangeably in this opinion.

> FN2. And, of course, there exists no assignment whatsoever by Laster.

> FN3. In any event, like the contributions of the Rubloff employees discussed below, Lynn's contributions were not independently copyrightable, and thus could not suffice to make Lynn a joint author. *See Erickson,* 1994 WL 2535, at *11 ("Ideas, refinements, and suggestions, standing alone, are not the subjects of copyrights.").

> FN4. As noted above, it is highly unlikely that Lynn had any copyright interest in *Links to Success* to assign.

1994 WL 161098 (N.D.Ill.), 1994 Copr.L.Dec. P 27,326, 31 U.S.P.Q.2d 1046

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit CC

Ronald G. Nickson                                               September 3, 2004
                        Washington, DC                                    COPY

1

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

INTERNATIONAL CODE COUNCIL, INC.,    }

          Plaintiff,                 }

     v.                              }Case No.

                                     }02C 5610

                                     }

NATIONAL FIRE PROTECTION             }

ASSOCIATION, INC.                    }

                                     }

          Defendant.                 }

                    Washington, D.C.

                    Friday, September 3, 2004

The deposition of

          RONALD G. NICKSON,

called for oral examination by Counsel for the

Plaintiffs, pursuant to notice, held in the law

offices of Swidler Berlin Shereff Friedman, LLP,

3000 K Street, NW, Washington, D.C., beginning at

10:00 a.m., before Carol J. Robinson, Registered

Professional Reporter and a Notary Public in and

for the State of Maryland, when were present:

Ronald G. Nickson

September 3, 2004

Washington, DC

**6**

ask you a series of questions and we need for you to answer out loud because the court reporter is taking down everything we say. Okay?

A  Uh-huh.

Q  Try to avoid "uh-huh" and "uh-uh"s because they don't come out well on a transcript, and try to avoid nodding, actually giving a oral response, and try not to speak over me and I'll try to do the same because it is difficult for the court reporter to take down two people talking at the same time okay?

That could be difficult because sometimes you can anticipate exactly what I am going to ask, but it helps if you let me finish the question and then you do your answer. Okay?

A  All right.

Q  You can take a break at any time. Just let us know. Can you tell me who you are currently employed by?

A  The National Multi Housing Council.

Q  And what is your position with them?

A  Vice president of building codes.

**7**

Q  How long have you had that position?

A  12 years.

Q  What is your education after high school?

A  I have a degree in industrial construction management from Colorado State University.

Q  Are you a member of NFPA?

A  Yes.

Q  How long have you been a member of NFPA?

A  I am going to guess at that, but I would say ten years.

Q  Are you an individual member of are you a member through NMHC?

A  I'm a member through NMHC.

Q  Are you a member of the International Code Council?

A  Yes.

Q  How long have you been a member of ICC?

A  About 12 years.

**8**

Q  That includes membership into the three legacy entities?

A  Yes. However, I was a membership (sic) of ICC prior to that when I worked for the Homebuilders.

Q  Okay. Is Homebuilders who you worked for prior to NMHC?

A  Yes.

Q  What was your position with them?

A  Director of home environment.

Q  How long did you hold that position?

A  I had that position for about a year and a half. I was there for a total of three years.

Q  What was your title with them prior to director of home environment?

A  I was just one of the code engineers.

Q  What has your experience been in participating in the development of model codes?

A  Experience?

Q  How long have you been participating in the development of model codes?

**9**

A  My first involvement was probably about -- I have to back up here to when I first got involved. About 1965, '66.

Q  What was that early involvement?

A  I worked for the Brick Institute of America and was their code representative.

Q  What codes did you work on?

A  I worked with all three of the legacy codes at that time.

Q  When you refer to legacy codes, you mean the BOCA, SBCCI and the BOMA codes?

A  Yes.

Q  Have you participated in development of model codes on an ongoing basis since 1965?

A  I worked as a builder for 22 years in Northern Virginia and I was on the Builders' Local Code Committee. So, I was not in the development of model codes but I did work in the code arena at that time.

Q  Other than in 1965, '66 when you worked on the development of model codes, when did you reenter, if you did reenter that forum?

Ronald G. Nickson

September 3, 2004

Washington, DC

23 (Pages 86 to 89)

**86**

BY MR. CENTURELLI:

Q Did you indeed write this article --

A This is the UNITS Magazine which is the NAA magazine.

Q The what magazine?

A The UNITS Magazine which is published by the National Apartment Association. I didn't see it on the front page.

Q Did you write this article?

A I did.

Q I'd like to turn your attention to the second page of the article, page 74 of the UNITS Magazine, the first full paragraph, it says, "In the ICC government consensus process, public building and fire officials from local communities control the final votes across the country."

Is that what you were just testifying about earlier about who has the final vote with respect to the IBC 2000?

A Yes.

Q The next sentence says, "As impartial officials, they have no invested interest in any

**87**

specific building product. The primary concern is to identify the minimum standards necessary to safeguard the public's health, safety and general welfare."

Do you agree with that statement?

A Definitely so.

Q Do you agree with all the statements you made in this article?

A At the time I wrote the article, I agreed with all of them. I would have to read it at this particular time to see if everything is the same. My guess is that it is.

Q Why don't you take a moment to just review the article.

(Pause.)

A Yes. I stand by it.

(Deposition Exhibit No. 91, a Nickson article dated May 1, 2000, was marked for identification.)

BY MR. CENTURELLI:

Q I would like to show you what has been marked Exhibit 91.

**88**

A Okay.

Q Do you recognize this document?

A Yes.

Q What is it?

A It is another article I wrote.

Q When did you write this article?

A Well, it is dated May 1, 2000. So it would be just prior to that.

Q Why did you write it?

A Let me see what this particular one says. This was in the early stages of when the codes were coming out as explanation of the code process to our members, the NAA members of what is going on in the code throughout the process.

Q Why don't you take a moment to read the whole article over. It is about a page and a half.

A Okay.

Q And let us know if you stand by your statements in this article.

A Okay.

(Pause.)

**89**

Yes. I still stand behind that. The only difference in here is the cost for the sprinkler system.

Q What is that difference?

A Well, there is a statement down here that the sprinkler systems cost about a thousand dollars per unit. It is more like $2,000 per unit at current prices.

Q But other than that you agree with your statements in this article?

A Yes.

Q Was this article ever published? Let me direct your attention to the bottom of the second page.

A Yes. I don't know which one of our documents it was published in but this did go out to the industry as a published document, yes.

Q Why did you send this out to the industry?

A Again, it was an educational thing for our members in the coded document process. National Multi Housing Council does not have any

**Page 90**

local affiliates. Our local affiliates are to the National Apartment Association in a contractual agreement. And they're the ones that lobby at the local level for or against whatever is adopted at the local level. This is to tell them what is going on so they know which way to lobby at the local level.

Q Are you a salaried employee?

A Yes.

Q So you get an annual salary from the National Multi Housing Association?

A Correct.

Q Do you receive any additional monies for consulting?

A No.

Q Let me direct your attention to the first full paragraph under the section heading "Practical Applications."

A Uh-huh.

Q The second sentence, "By actively participating in the five-year development process, the National Multi Housing Council (NMHC)

**Page 91**

and the National Apartment Association (NAA) were able to secure many favorable provisions in the codes and the associations defeated several more that would have adversely affected the industry." Do you see that sentence?

A Uh-huh.

Q Do you agree with that sentence?

A Definitely.

Q National Multi Housing Council and the National Apartment Association, those are your employers?

A Yes.

Q Do they split your salary?

A No. What happens is the National Apartment Association pays an annual fee to the National Multi Housing Council to represent them on legislative and code issues.

Q And the codes that are discussed in that sentence that I just read, the code you are referring to there are the ICC codes?

A Correct.

Q Including the IBC 2000?

**Page 92**

A Correct.

Q The next sentence of that paragraph says, the end results -- excuse me. Strike that.

It says that "the end result is that I codes as they are commonly called are very response to the apartment industry's needs and concerns."

A Yes.

Q Do you see that?

A Yes.

Q Do you agree with that?

A I definitely do.

Q I would like to turn your attention to the second page.

A Okay.

Q The first full paragraph on that second page.

A Uh-huh.

Q Do you see the sentence that says, "second, the proposed alternative codes are more restrictive than the ICC codes."

A Yes.

**Page 93**

Q Did I read that correctly?

A Yes.

Q What are the proposed alternative codes that you are referring to there?

A The set of codes that NFPA was putting together in their coalition which included the NFPA 5000 and the, they had a contractual agreement with the -- I want to get the union name right, the publishers of the uniform plumbing code and uniform mechanical code to provide the plumbing and mechanical code to go with their set. That entire set has provisions in it that are more restrictive than the provisions that comparable codes in the I codes have.

Q Including the NFPA 5000?

A Yes.

Q If a jurisdiction adopted the international building code as its building code and that was the code that was enforced and in effect in that municipality, could you use the NFPA 5000 to determine whether or not you are in compliance with the laws of that jurisdiction?

# Exhibit DD

UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF

ILLINOIS EASTERN DIVISION



CASE NO. 02C 5610

INTERNATIONAL CODE COUNCIL, INC., AND BUILDING CODE
OFFICIALS AND CODE ADMINISTRATORS INTERNATIONAL, INC.,
PLAINTIFFS,

vs.

NATIONAL FIRE PROTECTION ASSOCIATION, INC.,

DEFENDANT.

_____/

NASHVILLE INTERNATIONAL AIRPORT
ONE TERMINAL DRIVE
NASHVILLE, TN 37214
THURSDAY, 10:00-3:30 A.M.
SEPTEMBER 30TH, 2004

DEPOSITION

OF

DONALD BELLES

taken pursuant to NOTICE OF TAKING DEPOSITION.

# CASHNER & ASSOCIATES, INC.

An Association of Professional Court Reporters
1123 Lischey Avenue
Nashville, TN 37207
Office 615-618-0353   Fax 615-262-0075

A P P E A R A N C E S

WARREN ANTHONY FITCH, ESQ.
3000 K STREET, N.W., SUITE 300
WASHINGTON, D.C. 20007

PLAINTIFFS,

CHRISTOPHER CENTURELLI, ESQ.
75 STATE STREET
BOSTON, MA 02109

DEFENDANT.

COURT REPORTER: RICHARD A. MCGLADDERY, N.P.

---

E X H I B I T S

EXHIBIT 191      PG. 32
Bates Number KOFFEL 0337.

EXHIBIT 192      PG. 36.
Bates Number KOFFEL 0329-30.

EXHIBIT 193      PG. 52.
Bates Number KOFFEL 0327-28.

EXHIBIT 194      PG. 54.
Proposed NFPA 5000 Building Code May 2000.

EXHIBIT 195      PG. 55.
Proposed NFPA 5000 Building Code June 2000.

EXHIBIT 196      PG. 55.
Bates Number KOFFEL 0321-22-23.

EXHIBIT 197      PG. 58.
NFPA Building Code TC minutes August 24-25, 2000.

EXHIBIIT 198      PG. 61.
Bates Number KOFFEL 0318-19.

EXHIBIT 199      PG. 71.
Bates Number KOFFEL 0397.

EXHIBIT 200      PG. 75.
NFPA Building Code TC minutes December 3-4, 2000.

EXHIBIT 201      PG. 77.
NFPA Building Code Memorandum November, 27, 2001.

EXHIBIT 202      PG. 79.
May 2002, Building Code Committee ROP on NFPA 5000, Building Code.

---

EXHIBIT 203      PG. 87.
May 2002, Building Code Committee ROC on NFPA 5000, Building Code.

EXHIBIT 204      PG.98.
Bates Number KOFFFEL 0153-54.

EXHIBIT 205      PG.101.
Proposed NFPA 5000 NFPA Building Code May 24, 2000.

EXHIBIT 206      PG. 101.
Proposed NFPA 5000 NFPA Building Code June 30, 2000.

EXHIBIT 207      PG. 103.
Bates Number KOFFEL 0306.

EXHIBIT 208      PG. 105.
Attachment D.

EXHIBIT 209      PG. 120.
Bates Number NFPA-CR 011768.

EXHIBIT 210      PG. 123.
Bates Number NFPA-CR 025485.

EXHIBIT 211      PG. 125.
Building Code Committee ROP on NFPA 5000, Building Code May 2002.

EXHIBIT 212      PG. 127.
Building Code Committee ROC on NFPA 5000, Building Code May 2002.

---

Thereupon:

DONALD BELLES

a witness herein, being of lawful age and having first been duly sworn in the above-entitled cause, testified on his oath as follows:

DIRECT EXAMINATION

BY MR. FITCH:

Q    Good morning, Mr. Belles.  Am I pronouncing your last name correctly?

A    Yes, you are.

Q    Okay.  I appreciate you being here today. Let me ask you, you're appearing here pursuant to a subpoena, and a notice of deposition that was served upon you; is that correct?

A    Yes, sir.

Q    Okay.  What's your address?

A    2203 C-A-S-T-E-L-O-W Road, Greenbrier, Tennessee 37073.

Q    And what's your full name?

A    Donald William Belles.

Q    Let me ask you a few questions and talk with you for a minute about this deposition process. Do you understand that the oath that you just took

132

Q    Of course.

A    If I were working with -- I met twice a year with the Glazing Industry Codes Committee as a full group.

Q    Uh-huh?

A    And when we met we would -- I would sometimes get direction to draft something, and between those meetings I had a Steering Committee that I worked with. If we had drafted a change that we intended to submit but had not yet had the opportunity to submit it because of the deadlines --

Q    Of the IBC?

A    -- of the IBC, I would have incorporated that kind of a change in here anticipating that I'm going to submit it when the opportunity presents itself there.

Q    Okay.

A    So, the only -- with that proviso then it would had to have been one of those options. Either it was a change I intended to submit but hadn't had the opportunity to do so, or a change that had been submitted.

Q    Pending, or it was in the IBC. One of those three; correct?

A    Exactly, yes.

---

133

Q    Okay.

MR. FITCH:  Well, let's take a break.

(Thereupon, a short break was had.)

(Thereupon, the deposition was resumed.)

MR. FITCH:  Mr. Belles, I have no further questions for you.

THE WITNESS:  Okay. Thank you.

CROSS EXAMINATION

BY MR. CENTURELLI:

Q    Good afternoon, Mr. Belles.

A    Good afternoon.

Q    How long have you been involved -- strike that. This morning you testified that you had been involved in the development of Model Codes for nearly 30 years; is that correct?

A    That's correct.

Q    Okay. When did you first start your involvement in the development of Model Codes?

A    I started with my employment by the State of Tennessee as the State Fire Protection Engineer.

---

134

As part of my responsibilities I was responsible for the adoption and enforcement interpretation of state building and fire codes, and as an enforcement official I had a keen interest the development of the documents that I was being asked to enforce. And so, I was employed by the State of Tennessee in June of 1969, and from that time forward while I was employed by the state I took an interest in the Model Codes. I attended Model Code hearings, principally of the Southern group, and then as I went into private practice in January of 1972 I took an even greater interest in the Model Code development process because as time went on I developed a clientele that relied upon me to look after their interests.

Q    Who were the Model Code groups?

A    There was the Southern Building Code Congress, BOCA, Building Officials and Code Administrators International, and the ICBO, International Conference of Building Officials.

Q    And did each of those organizations have their own Model Codes?

A    Yes.

Q    Okay. What was Southern's Model Code?

A    It was originally the Southern Standard

---

135

Building Code, later changed to Standard Building Code.

Q    And did BOCA have a Building Code?

A    It was originally Basic Building Code, later changed to National Building Code.

Q    And ICBO have a Building Code?

A    Uniform Building Code.

Q    How did Southern develop the Standard Building Code?

MR. FITCH:  Objection to the form.

THE WITNESS:  They developed the Standard Building -- they developed their Building Code using a legislative process similar to the other two Model Code Groups. There was an opportunity annually to submit code change proposals. The code change proposals were acted upon at a public hearing by a committee. The committee formulated a recommendation to the membership on the disposition of the change. The membership met in the Fall of each year and acted upon the committee recommendations. At the full membership meeting code change submitters were offered the opportunity if they disagreed with a committee action to appeal to the membership to overturn

the committee.

BY MR. CENTURELLI:

Q   Did you ever submit code changes, or code proposals to these Model Code Groups?

A   Yes.

Q   Which ones?

A   All of them.

Q   And you submitted these code changes while you were a representative from the State of Tennessee?

A   I can't remember whether I simply observed the process in those years, or whether I was actually the submitter of code changes.

Q   Okay.  How many code change proposals do you think you -- Strike that.  How many code change proposals do you think you made over the years to these three code organizations?

A   Many hundreds.

Q   Many hundreds?

A   Perhaps thousands.

Q   How many do you think were adopted into code?

A   As a general rule of thumb, I was successful about 50 percent of the time.

Q   When you were making these proposals to

---

the code organizations, were you employed by the code organizations?

A   No.

Q   Who were you making these submissions on behalf of?

A   In some cases on behalf of myself as a fire protection engineer, and a person concerned with public safety from fire.  In other instances I represented special interests, like the Carpet and Rug Institute, or some of the other organizations that were identified earlier today.

Q   And was this common practice how the three Model Code Organizations developed their group?  In other words, were the codes developed by proposals from people such as yourself?

A   Yes, and many others.  There were individual manufacturers would sometimes submit changes.  Architects would frequently submit proposals.  Anyone is entitled to submit a proposal.

Q   Now, if you made a submission to, say the Southern Organization, would you take that same submission and make it to one of the other organizations?

A   Oh, yes, absolutely.  One of the principal objectives as a representative of a special interest

---

was to keep the requirements among the model codes the same, and then that way a manufacturer producing a product for a national market would not faced with differing requirements depending upon where their product ended up.

Q   And did you think there was anything wrong with making a submission to one Model Group, and then making that same submission to another one?

A   No, I didn't see anything wrong with it.  It seemed to me that it had a lot of beneficial aspects to it.

Q   Did the Model Code Groups ever instruct you not to make submissions to their competitors?

A   No, this was common.  I mean, this was -- if you attended code hearings, it was very common for a person to get up in the days where there the three Model Groups and say I've made this proposal to ICBO, and it was adopted last Fall.  It's now going to be in the next edition of the Uniform Building Code, and I would propose to put it into the Standard Building Code so that the requirements are the same in the Southeast as they are in the West Coast, and people commonly used that as an explanation to, in part at least, justify their code change.

---

Q   In making your submissions to these Model Code Groups, did you feel that you had the right to make the submissions to other people, as well?  Strike that.  In making your submission to one of these Model Code Groups, did you feel it was your right to make that same submission to another Model Code Group?

MR. FITCH:  Objection to the form.

THE WITNESS:  Yes.

BY MR. CENTURELLI:

Q   How did you make your submissions to the Model Code Groups was there a form?

A   Yes.

Q   Do you recall if this form provided the Model Code Groups a non-exclusive license?

A   I don't know what that means.  I remember that there was some language near the bottom of the form -- or was that on the NFPA's form?  I can't even remember.  I remember that there was some language at the bottom of the form, and frankly I don't know what it means.

Q   Okay.  Did you make submissions -- Strike that.  Did you make code submissions to the ICC in the development of the IBC 2000?

A   Yes.

Q What provisions did you propose to the ICC for adoption for the IBC 2000?

A Well, there were changes in the Glass and Glazing sections that were evolving that I was proposing on behalf of the Glazing Industry Code Committee. The problem is that I had difficulty recalling at which phase in the process I proposed changes. Like, I proposed changes to make the carpet flammability requirements consistent with the model codes and I submitted that at some point. I don't know whether it was adopted in the working draft phase, or whether it was adopted later as a result of public hearing in a public comment period.

Q Okay.

A And that's also true in a number of areas because I was active in Glass and Glazing, Foam Plastics, the Aluminum Composite Materials. If I didn't say so, the Carpet. Requirements for fire doors and fire windows, and there may have been other areas but that's certainly illustrative of the types of interests that I had.

Q Let's try it at a different tact, all right. Let me direct your attention to Exhibit 192, which is a letter that you testified about earlier today that you wrote to Mr. Lee Fry --

---

A Yes.

Q -- of Mitsubishi Chemical America. This concerned the Aluminum Composite section; right?

A Yes.

Q And I'd like you to direct your attention to the last paragraph. In the language, "It is almost certain that we will be required to draft revisions for the NFPA Building Code to address the ACM." Do you see that?

A Yes.

Q And you wrote that sentence?

A Yes.

Q What's the ACM?

A Aluminum Composite Material.

Q Okay. "Obviously we will want the provisions within the NFPA Code to mimic the requirements of the IBC." Do you see that?

A Yes.

Q Okay. Who wrote the provisions of the IBC with respect to ACM?

MR. FITCH: Objection to the form.

THE WITNESS: The provisions in the IBC were drafted by Rick Thornberry, and myself on behalf of our clients Mitsubishi and I don't know how you say it Aluswiss. It's a Swiss

---

company that makes an Aluminum Composite Material. There may have been -- there was at one time a third company, Reynolds, that was involved in the process, but then they participated part of the time, and part of the time they didn't. They didn't get their way, and they decided to go off at one point on their own. So, I can't remember whether or not they were involved in the actual drafting of the IBC or not.

BY MR. CENTURELLI:

Q Uh-huh?

A But Rick Thornberry, and I certainly were, and then as I recall I believe I acted as Secretary of the group and pressed forward on the draft to try to get agreement among our groups so that we could go ahead and submit the changes to the IBC.

Q Okay. And is that Chapter 1407 of the IBC?

A Section.

Q Section 1407 of the IBC?

A Yes. What I can't recall on that is whether or not -- it was right at the end of the process when the Model Code Groups suspended their code change cycles --

---

Q Uh-huh?

A -- that we were drafting this material, and I think that we submitted a draft to one of the Model Code Groups, and I can't remember whether it was adopted or not, but in any case that process was suspended and then we started on the IBC, and we did whatever we had to, to bring that material into a consistent format with the IBC, and then submitted it for consideration to the IBC.

Q Who is Rick Thornberry?

A He's an independent consultant who operates out of Napa, California. His organization is the Code Consortium.

Q Is he employed by the ICC?

A No, no, he's an independent fire protection engineer in private practice who spends a lot of time in the code development field.

Q Okay. So, you and Mr. Thornberry drafted Section 1407 in the IBC 2000?

MR. FITCH: Object to the form of the question.

THE WITNESS: Yes, we prepared the draft, and I know it was debated before a committee, and I just can't recall at what point in the cycle whether -- it had to be after the working

164

Q And through your submissions to the ICC, for the IBC 2000?

A Yes.

Q I'd like to direct your attention to Exhibit 204, which is a letter from you to Mr. Bob Spindler dated August 15th, 2000.

A Yes.

Q I'd like to direct your attention to the last paragraph on the first page of the Exhibit.

A Okay.

Q "At the meeting of the Committee on Materials I intend to propose the adoption of a new chapter on Glass and Glazing, which is consistent with the current requirements of the International Building Code?

A Yes.

Q Is that correct?

A Yes.

Q "The draft of the chapter on glass and glazing is an agenda item for our upcoming GICC meeting in Baltimore."

A Yes.

Q What's the GICC meeting?

A Glazing Industry Code Committee.

Q And who participated in the Glazing

165

Industry Code Committee?

A It was a fairly broad consortium of glass producers, laminators, temperers, installers. I hope I haven't left anybody out, but it was a pretty broad group of glass interests.

Q In the glass chapter -- the new chapter on glass and glazing that you're referring to in that letter, is that attached as Attachment D, which is Exhibit 208? Strike that. Let me rephrase the question. The glass chapter that you're referring to in Exhibit 204, your letter to Mr. Spindler, is that Exhibit 208?

A I believe it was.

Q And did you write the glass chapter, Exhibit 208?

A Yes, I prepared it.

Q How did you prepare it? How did you draft it?

A You mean using a computer, or --

Q Okay. No, no.

A Let me try again to speed this along. The NFPA produced a draft document for public review and comment in the first stage --

Q Uh-huh?

A -- and the document that they produced

166

involved a somewhat revised version of the EPCOT Building Code. So, this draft takes the NFPA's first draft, which was the EPCOT Building Code and uses an underline-and-strikeout-format to prepare the chapter that completely substitutes for the chapter in the NFPA draft.

Q I understand. And what did you use as -- Strike that. And what did you use as your sources for developing this draft chapter, Chapter 45: Glass and Glazing?

A Well, I would have gone to the IBC as it existed at that time, and then I would have incorporated any changes that were either pending, that is that had been submitted to revise the IBC, or that the GICC intended to submit but had not done so yet, and they would have been incorporated in this chapter so that it would remain -- so that it would be consistent with the IBC as we expected the IBC to be revised in the future.

Q In which chapter in the IBC is referenced Glass and Glazing?

A (Witness reviews documents.) It's Chapter 24.

Q Okay. And are you the source of Chapter 24 of the --

167

A Well --

MR. FITCH: Objection to the form.

BY MR. CENTURELLI:

Q I'll rephrase. How was Chapter 24 of the IBC 2000 developed?

A The IBC formed as a series of working committees. One of which was a Structural Committee. The Structural Committee had the responsibility for the Glass and Glazing Chapter. One of the members of the Structural Committee, Ron something from -- a code official from St. Louis. A member of the Structural Committee was given the responsibility for drafting the chapter on glass. I volunteered to assist Ron on behalf of the Glazing Industry Code Committee, and I produced a hard copy of the chapter, an electronic version, and even a lengthy explanation of the provisions in the draft as to where they came from, and some cases how they were to be applied.

Q Uh-huh.

A And I gave all of that over to Ron. Ron then took the draft and he massaged it some himself. I remember he had a couple changes that he wanted to submit, and then he offered it to the committee, and then I can't remember whether the committee adopted

168

Ron's proposals or not. Out of respect for him and cooperation, I didn't argue for or against his changes, but I -- and I can't remember. It seems to me the committee may have rejected his changes. But in any case, he had the draft now. It was before the committee. The committee then recommended that, that draft be incorporated in the -- what was the -- became the first draft of the International Building Code, which was then released for public review and comment. Then at that, and several stages in the IBC development process I proposed changes to that working draft on behalf of the GICC to modify it further.

Q    Okay. As you're starting point for your proposed Chapter 5 of the NFPA 5000, did you take the actual IBC 2000 itself, or did you take your submission to the IBC, or -- Strike that. Your submission to the ICC as the starting point?

A    Oh, no, I used the electronic version of the submission that I -- the material that I gave to Ron, I had an electronic version so that was easy to amend.

Q    Okay.

A    And so I started with the electronic version that I created to help Ron on the Structural

169

Committee of the ICC, and then I modified that to produce the draft that we're looking at here in Exhibit 208.

Q    Okay. So, is my understanding correct that you drafted a proposal for the Glass and Glazing chapter for the IBC 2000?

A    Well, directly --

MR. FITCH: Objection to the form.

THE WITNESS: -- I drafted it. I gave it to Ron. Ron then took it. It was his responsibility to put it before the committee. In other words, the committee was not soliciting public input at that stage in the process, but Ron was stuck with this assignment, and I tried to faithfully reproduce what was in the Model Codes at that time in the most current editions. See, the codes -- these three Model Codes as they existed, they weren't always on the same cycle. You might get a change in Southern this year, and then it would be a year or two later by the time you got it into one of the other Models, and then they discontinued their revision cycles at different times. And so there were revisions in some of the codes that hadn't made their way into

170

others, and what I tried to do is take the most current set of requirements that existed in the Model Codes that were thought to be technically correct --

BY MR. CENTURELLI:

Q    Uh-huh?

A    -- and supported by the ASTM document that underlies these loads, and load factors, and produce a draft of that material that would cover the areas that the Model Codes covered, and I handed that off to Ron and said, okay, Ron here's the best that I think I can do.

Q    Okay. And then Ron did with that what he did?

A    Then he took it -- he put it before the committee. He proposed a couple changes -- I'm pretty sure he proposed a couple relatively modes changes that fit areas of his special interests. I can't remember whether the committee adopted them or not --

Q    Uh-huh?

A    -- because there was no public input at that time. Whatever the committee did, they did.

Q    Uh-huh?

A    And if they changed something I would have

171

made not of that. Then I would have gone back to the NFPA to propose a revision later to it to keep them together.

Q    And so let me understand this. The basis for your Chapter 45 to the NFPA, which eventually became Chapter 46 in the NFPA, your basis was the material that you put together for Ron?

A    Right.

Q    Which Ron used in the IBC development process?

A    Yes.

Q    Okay.

A    You're able to phrase it much more simply than I.

MR. CENTURELLI: Let's take a break for a minute.

(Thereupon, a short break was had.)

(Thereupon, the deposition was resumed.)

MR. CENTURELLI: Mr. Belles, that's all the questions that I have for you today.

THE WITNESS: All right, sir. Thank you.

REDIRECT EXAMINATION

BY MR. FITCH:

Q   A couple of quick question, Mr. Belles. When you did your draft for NFPA that appeared as Attachment D to the 8/25 minutes, and is our Exhibit 208 --

A   Okay.

Q   -- did you draft that document to include the most current provisions of the IBC provisions on Glass and Glazing?

A   Yes, in addition to any --

Q   Anything pending, or about to be pending?

A   Yes, sir.

Q   Okay. So, you went to the actual IBC 2000, Chapter 24 to make sure that your Attachment D draft was consistent with the current IBC?

A   Yeah, best that I can recall.

Q   When you submitted a proposal for consideration by the ICC regarding Exterior Walls -- after you submitted a proposal what happened to that proposal, how was it processed?

A   On foam plastics?

Q   On ACM?

A   It would have -- well, it depends on what point in the cycle that change went in. I can't

recall, but I don't think that the ACM change went into the working draft. I think it was a subsequent submittal that was heard by the committee and adopted because I recall the debate. Greg Rebels from Virginia didn't like the definition, and that was in a public hearing format. So, it had to be at one of those review stages after the working draft was published.

Q   So, it was considered by the appropriate IBC committee in public hearings; correct?

A   Yes.

Q   And then eventually it was submitted to the membership for their up or down vote; right?

A   Yes.

Q   And with respect to the foam plastics provisions, the same was true, was it not?

A   Well --

Q   Let me ask the question this way. Once you submitted the foam plastics provision, it went through the normal standard process that ICC had for consideration of proposed revisions for the IBC; correct?

A   Yeah. The problem that I'm having is I'm having more, and more difficulty trying to recall the exact sequencing of these changes, and the Foam

Plastics Chapter got rewritten. I remember the room when -- with the committee producing the working draft, and the version -- the first version -- my recollection is the first version of the IBC that got published, that first draft, incorporated, I think, most of the changes that I was urging. I think that there were, in the subsequent revision cycles, a few refinement changes, I think that I submitted, but I'm not even certain about that anymore, but they were as I recall relatively, in my mind, minor changes that were sort of editorial fixes. That's my best recollection.

Q   And so it's correct, isn't it, that your Foam-Plastic-related-proposals in the exterior wall context, once they were submitted, went through the standard remaining process for the IBC of committee consideration, committee hearings, committee recommendations, and adoption, and membership considerations for resolution; correct?

A   Yes, and the only thing I'm trying to differentiate is between the relatively-minor-editorial-fixes that came along later compared to the original major draft of the chapter, which occurred earlier.

Q   Okay.

MR. FITCH: I have nothing further.

RE-CROSS EXAMINATION

BY MR. CENTURELLI:

Q   I just need a point of clarification with respect to additional sections that may have appeared in the IBC, with respect to Glass and Glazing. Who would have made those proposals for those? Who would have -- who were the sources of those sections?

MR. FITCH: Objection to the form of the question. Do you want to know who made the proposals, or who were the sources?

BY MR. CENTURELLI:

Q   Who were the sources?

MR. FITCH: Objection to the form.

THE WITNESS: Most of the changes for the Glass and Glazing Chapter were proposed by the Glazing Industry Code Committee. The expertise, and the support obviously came from the members of the GICC. There were a few other individuals who did propose changes, like my friend Ron from St. Louis. I'm embarrassed I can't remember his last name. He proposed

changes. I don't think they were adopted, but I remember he proposed changes. There was an company by the name of O'Keece out of San Francisco, they proposed changes. So, there were others, but the principal revisions to that section came from the Glazing Industry Code Committee.

BY MR. CENTURELLI:

Q And who would have been the people, the proponents of those?

A Well, I acted as their principal spokesman at the hearings. With sometimes assistance from Chris Berry, or a fellow like Bill Lignell at the one meeting. Sometimes Valerie Block, who has long experience in the glass field. Harry Miles, who was in the glass business for 30 years. So, I would bring special expertise when I needed it.

MR. CENTURELLI: Thank you, very much.

MR. FITCH: I have no further questions.

(Thereupon, the witness waived the reading and signing of the deposition, and the taking of the deposition was concluded at 3:30 p.m.)

---

STIPULATION

It is hereby stipulated by and between counsel for the respective parties and/or the witness that the reading and signing of the foregoing deposition are hereby waived.

AND FURTHER DEPONENT SAITH NOT.

-- -- -- -- --

---

CERTIFICATE OF OATH

STATE OF TENNESSEE)
COUNTY OF DAVIDSON)

I, Richard A. McGladdery, Notary Public in and for the State of Tennessee at Large, certify that the witness, DON BELLES, personally appeared before me and was duly sworn.

WITNESS my hand and official seal this 19TH day of NOVEMBER, 2004.

*Richard A. McGladdery, N.P.*
Richard A McGladdery, Notary
Public, State of Tennessee

Expires May 27th, 2006

REPORTER'S DEPOSITION CERTIFICATE

STATE OF TENNESSEE)
COUNTY OF DAVIDSON)
I, Richard A. McGladdery, A Court Reporter, certify that I stenographically reported the deposition of DON BELLES, the witness herein; that said witness was first duly sworn by me; and that the foregoing pages numbered from 1 to 177 inclusive, constitute a true and correct transcript of my shorthand notes and/or audio recording device; and that this computer-assisted transcript was prepared by me and/or under my supervision.
I further certify that I am not a relative, employee, attorney or counsel for any of the parties in this cause nor related to nor employed by any attorney or counsel herein nor financially interested in the outcome of this action.

Dated this 19TH day of NOVEMBER, 2004.

*Richard A. McGladdery, N.P.*
Richard A. McGladdery, N.P.

My Commission Expires Oct 27, 2008

# Exhibit EE

06/05/2002  14:59    7087994919                    BOCA                              PAGE   02

**CERTIFICATE OF REGISTRATION**        SEP 2 0 2000

For a N: ndramatic Literary Work
**UNITED STATES COPYRIGHT OFFICE**

REGISTRATION NUMBER

**TX 5-156-896**

This Certificate issued under the seal of the Copyright Office in accordance with title 17, United States Code, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Marybeth Peters*

REGISTER OF COPYRIGHTS
United States of America

**EFFECTIVE DATE OF REGISTRATION**

8     18     00
Month   Day   Year

OFFICIAL SEAL

**1**  **TITLE OF THIS WORK ▼**

International Building Code - 2000

**PREVIOUS OR ALTERNATIVE TITLES ▼**

**PUBLICATION AS A CONTRIBUTION** If this work was published as a contribution to a periodical, serial, or collection, give information about the collective work in which the contribution appeared.    **Title of Collective Work ▼**

If published in a periodical or serial give: **Volume ▼**    **Number ▼**    **Issue Date ▼**    **On Pages ▼**

**2**

**NOTE**

Under the law, the "author" of a "work made for hire" is generally the employer, not the employee (see instructions). For any part of this work that was "made for hire" check "Yes" in the space provided, give the employer (or other person for whom the work was prepared) as "Author" of that part, and leave the space for dates of birth and death blank.

**a** **NAME OF AUTHOR ▼**
Southern Building Code Congress International, Inc. (SBCCI)

**DATES OF BIRTH AND DEATH**
Year Born ▼    Year Died ▼

Was this contribution to the work a "work made for hire"?    XX Yes    ☐ No

**AUTHOR'S NATIONALITY OR DOMICILE**
Name of Country
OR { Citizen of ▶ USA
{ Domiciled in ▶

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK**
Anonymous?    ☐ Yes  XX No
Pseudonymous?   ☐ Yes  XX No
If the answer to either of these questions is "Yes," see detailed instructions.

**NATURE OF AUTHORSHIP** Briefly describe nature of material created by this author in which copyright is claimed. ▼
All new textual matter other than Pre-Existing work

**b** **NAME OF AUTHOR ▼**
Building Officials and Code Administrators Int'l, Inc.

**DATES OF BIRTH AND DEATH**
Year Born ▼    Year Died ▼

Was this contribution to the work a "work made for hire"?    XX Yes    ☐ No

**AUTHOR'S NATIONALITY OR DOMICILE**
Name of Country
OR { Citizen of ▶ USA
{ Domiciled in ▶

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK**
Anonymous?    ☐ Yes  XX No
Pseudonymous?   ☐ Yes  XX No
If the answer to either of these questions is "Yes," see detailed instructions.

**NATURE OF AUTHORSHIP** Briefly describe nature of material created by this author in which copyright is claimed. ▼
All new textual matter other than pre-existing work.

**c** **NAME OF AUTHOR ▼**
International Confernece of Building Officials

**DATES OF BIRTH AND DEATH**
Year Born ▼    Year Died ▼

Was this contribution to the work a "work made for hire"?    XX Yes    ☐ No

**AUTHOR'S NATIONALITY OR DOMICILE**
Name of Country
OR { Citizen of ▶ USA
{ Domiciled in ▶

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK**
Anonymous?    ☐ Yes  XX No
Pseudonymous?   ☐ Yes  XX No
If the answer to either of these questions is "Yes," see detailed instructions.

**NATURE OF AUTHORSHIP** Briefly describe nature of material created by this author in which copyright is claimed. ▼
All new textual matter other than pre-existing work.

**3**  **a** **YEAR IN WHICH CREATION OF THIS WORK WAS COMPLETED** This information must be given in all cases.
2000  ◀ Year

**b** **DATE AND NATION OF FIRST PUBLICATION OF THIS PARTICULAR WORK** Complete this information ONLY if this work has been published.
Month ▶ May    Day ▶ 9    Year ▶ 2000   ◀ Nation

**4**

See instructions before completing this space.

**COPYRIGHT CLAIMANT(S)** Name and address must be given even if the claimant is the same as the author given in space 2. ▼
International Code Council
5203 Leesburg Pike, Suite 708
Falls Church, Virginia 22041

**TRANSFER** If the claimant(s) named here in space 4 is (are) different from the author(s) named in space 2, give a brief statement of how the claimant(s) obtained ownership of the copyright. ▼

By agreement

APPLICATION RECEIVED
7-21-00
ONE DEPOSIT RECEIVED

TWO DEPOSITS RECEIVED
7-21-00
FUNDS RECEIVED

funds received 8/18/00

**MORE ON BACK ▶**  • Complete all applicable spaces (numbers 5-9) on the reverse side of this page.
• See detailed instructions.    • Sign the form at line 8.

DO NOT WRITE HERE
Page 1 of 2 pages

02/05/2002  14:59    7087994919                    BOCA                              PAGE  03

EXAMINED BY

CHECKED BY

☐ CORRESPONDENCE
☐ Yes

FOR
COPYRIGHT
OFFICE
USE
ONLY

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

**PREVIOUS REGISTRATION** Has registration for this work, or for an earlier version of this work, already been made in the Copyright Office?

☐ Yes ☒ No  If your answer is "Yes," why is another registration being sought? (Check appropriate box.) ▼

a. ☐ This is the first published edition of a work previously registered in unpublished form.

b. ☐ This is the first application submitted by this author as copyright claimant.

c. ☐ This is a changed version of the work, as shown by space 6 on this application.

If your answer is "Yes," give: Previous Registration Number ▶              Year of Registration ▶

**5**

**DERIVATIVE WORK OR COMPILATION**
Preexisting Material Identify any preexisting work or works that this work is based on or incorporates ▼  IBC Final Draft November 1997,
IBC Working Draft May 1997, IBC Final Draft July 1998, 1997 Standard Buildi
Code, BOCA National Building Code and the ICBO Uniform Building Code.

See instructions
before completing
this space.

Material Added to This Work  Give a brief general statement of the material that has been added to this work and in which copyright is claimed. ▼
All new textual material other than pre-existing works

**6**
b

**DEPOSIT ACCOUNT** If the registration fee is to be charged to a Deposit Account established in the Copyright Office, give name and number of Account.
Name ▼                                                Account Number ▼

**7**
a

**CORRESPONDENCE** Give name and address to which correspondence about this application should be sent.  Name/Address/Apt/City/State/ZIP ▼

William B. Ware
900 Montclair Road
Birmingham, Alabama 35213-1206
Area code and daytime telephone number ▶ (205)591-1853          Fax number ▶ (205)591-0775
Email ▶

b

**CERTIFICATION*** I, the undersigned, hereby certify that I am the
                                          Check only one ▶
☐ author
☐ other copyright claimant
☐ owner of exclusive right(s)
☐ authorized agent of  International Code Council
Name of author or other copyright claimant, or owner of exclusive right(s) ▲

of the work identified in this application and that the statements made
by me in this application are correct to the best of my knowledge.

**8**

Typed or printed name and date ▼ If this application gives a date of publication in space 3, do not sign and submit it before that date.
William J. Tangye, CEO                                   Date ▶ 7/18/2000

Handwritten signature (X) ▼

X _____

Certificate
will be
mailed in
window
envelope
to this
address:

Name ▼
International Code Council
Number/Street/Apt ▼
5203 Leesburg Pike, Suite 708
City/State/ZIP ▼
Falls Church, VA 22041

• Complete all necessary spaces
• Sign your application in space 8

1. Application form
2. Nonrefundable filing fee in check or money order
   payable to Register of Copyrights
3. Deposit material

Library of Congress
Copyright Office
101 Independence Avenue, S.E.
Washington, D.C. 20559-6000

**9**

*17 U.S.C. § 506(e): Any person who knowingly makes a false representation of a material fact in the application for copyright registration provided for by section 409, or in any written statement filed in connection
with the application, shall be fined not more than $2,500.

June 1999—200,000
WEB REV June 1999                                        ☆U.S. GOVERNMENT PRINTING OFFICE: 1999-454-879/49

# Exhibit FF

Westlaw.

64 U.S.P.Q.2D 1221
2002 WL 1733640 (S.D.N.Y.), 64 U.S.P.Q.2d 1221, 30 Media L. Rep. 2279
**(Cite as: 64 U.S.P.Q.2d 1221)**

Page 1

Thron
v.
HarperCollins Publishers Inc.

U.S. District Court Southern District of New York

No. 01 Civ. 5437 (JSR)

Decided July 24, 2002

## COPYRIGHTS

**[1] Notice, deposit, and registration -- Registration -- Procedure (§ 207.0705)**

**Rights in copyright; infringement -- Ownership of copyright -- Compilations (§ 213.0308)**

Plaintiff's registration of allegedly infringed photographs was defective, since plaintiff relies on purported "group" registration of 57 photographs, including two photographs at issue, that was filed more than two years before relevant regulations permitting group registration of photographs took effect, and since registration cannot be construed as registration of "compilation," insofar as plaintiff left blank that section of registration form entitled "Derivative Work or Compilation," and did not assert, in his complaint or in deposition or other discovery documents, that his copyright derived from compilation.

**[2] Protectability of computer products -- Infringement (§ 225.07)**

Defendants' efforts to publicize, on Internet, book containing plaintiff's allegedly infringed photographs did not violate Digital Millennium Copyright Act, which prohibits, in relevant part, intentional removal or alteration of any copyright management information without authority of copyright owner or law, since plaintiff's claim is based on allegation that one photograph was impermissibly altered to remove certain unspecified information relating to plaintiff's purported copyright registration, but registration in question is invalid, and information relating thereto does not constitute "copyright management information" as defined in DMCA, and since, even if "copyright management information" could include references to invalid copyrights, plaintiff failed to offer competent, admissible evidence to support finding that defendants removed or altered such information "intentionally."

*1221 Action by Doug Thron against HarperCollins Publishers Inc. and HarperSanFrancisco for copyright infringement and violation of Digital Millennium Copyright Act, 17 U.S.C. § 1201 et seq. On parties' cross-motions for summary judgment. Defendants' motion granted.

Steven A. Weingrad, of Weingrad & Weingrad, New York, N.Y., for plaintiff.

Slade R. Metcalf and Brian H. Rubenstein, of Hogan & Hartson, New York, for defendants.

Rakoff, J.

On March 7, 2002, the Court telephonically advised counsel for the parties that defendants' motion for summary judgment would be granted in its entirety and that plaintiff's cross-motion for summary judgment would be denied. This Memorandum Order will serve to formally confirm that determination and to briefly state the reasons therefor.

Plaintiff alleges that the defendant publishers misappropriated two of his purportedly copyrighted photographs for use in a book entitled *The Legacy of Luna*, the publication of which thereby infringed his copyrights in violation of 17 U.S.C. § 401, *et seq.* Plaintiff further contends that defendants' subsequent efforts to publicize the book through the internet involved digital alterations to the photographs that thereby violated the Digital Millennium Copyright Act. 17 U.S.C. § 1201, *et seq.* [FN1]

[1] In order to bring a copyright claim, a claimant, with exceptions not here relevant, must first demonstrate that he holds a valid and proper copyright registration. *See* 17 U.S.C. 411(a); Whimsicality, Inc. v. Rubie's Costume Co., Inc. , 891 F.2d 452, 453 [ 13 USPQ2d 1296] (2d Cir. 1989). Here, plaintiff relies on copyright registration VA 962-763 filed March 23, 1999 (the "Registration"), *see* Ex. 2 to the Complaint, which sought to register 57 photographs (including the two here in issue) contained in a book entitled *From the Redwood Forest* that was written (and separately copyrighted) by Joan Dunning. *See* Ex. 3 to the Complaint. This purported registration, however, was defective, because the relevant regulations permitting the group registration of photographs did not take effect until August 16, 2001 -- more than two years after plaintiff's attempted group registration. *See* 66 Fed. Reg.

COPR. © 2005 The Bureau of National Affairs, Inc.

64 U.S.P.Q.2D 1221
2002 WL 1733640 (S.D.N.Y.), 64 U.S.P.Q.2d 1221, 30 Media L. Rep. 2279
**(Cite as: 64 U.S.P.Q.2d 1221)**

Page 2

37142; 37 C.F.R. § 202.

Nor, as plaintiff belatedly contends, can the Registration be construed as the registration of *1222 a "compilation" consisting of his photographs and Ms. Dunning's text. In his registration application, plaintiff, like Ms. Dunning in her separate but contemporaneous copyright application, left entirely blank the section of the application form entitled "Derivative Work or Compilation." *See* Ex. 2 to the Complaint; Reply Affidavit of Slade Metcalf, Ex. A (Copyright Application of Joan Dunning). Likewise, plaintiff neither asserted in the Complaint that his copyright derived from a compilation nor in his deposition or other discovery proffered on this motion offered any evidence thereof. *See* Complaint, 99-10; Affidavit of Slade Metcalf, Ex. E (Thron deposition) at 60. Thus, his new-found theory is not only belated but without evidentiary support. Accordingly, plaintiff's copyright infringement claim must be dismissed. *See, e.g.,* Morris v. Business Concepts, Inc. , 259 F.3d 65, 72 [ 59 USPQ2d 1581] (2d Cir. 2001). [FN2]

[2] Plaintiff's claim under the Digital Millennium Copyright Act is equally without merit. The applicable section of the Act, 17 U.S.C. § 1202(b), states, in relevant part, that "[n]o person shall, without authority of the copyright owner or the law -- (1) intentionally remove or alter any copyright management information . . .." 17 U.S.C. § 1202(b). Plaintiff contends, *see* Complaint ¶ ¶ 12-15, that defendants, in connection with the internet sale of *The Legacy of Luna,* provided Amazon.com with a digital image of one of the photographs in issue that was allegedly impermissibly altered to remove certain unspecified information relating to his purported copyright registration, *see* Complaint at ¶ ¶ 12-15. But since the copyright registration was invalid, the information relating thereto did not constitute "copyright management information" as defined in 17 U.S.C. 1202(c). Moreover, even if "copyright management information" included references to invalid copyrights (a highly dubious assertion), plaintiff has offered no competent, admissible evidence to support any finding that defendants removed or altered this information "intentionally," as required by the statute.

Accordingly, for the reasons stated herein, defendants' motion for summary judgment is hereby granted, plaintiff's cross-motion for summary judgment is denied, and plaintiff's Complaint is dismissed with prejudice. Clerk to enter judgment.

SO ORDERED.

FN1. Plaintiff's additional claim for unjust enrichment was dismissed on consent at oral argument on February 1, 2002. *See transcript.*

FN2. Although plaintiff, following oral argument of this motion and one day before the Court ruled telephonically, attempted to amend the record with a subsequently-obtained supplementary registration, any such registration could not cure the initial registration's failure to place the public on notice of a valid copyright to the two photos here in issue, the fact fatal to plaintiff's infringement claim here. Consequently, the application was denied.

S.D.N.Y.

64 U.S.P.Q.2D 1221

END OF DOCUMENT

COPR. © 2005 The Bureau of National Affairs, Inc.