**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **INTERNATIONAL CODE COUNCIL, INC., and BUILDING OFFICIALS AND CODE, ADMINISTRATORS INTERNATIONAL, INC.,** ) ) ) ) ) | |
| **Plaintiffs,** ) ) | |
| **v.** ) ) | **No. 02 C 5610** |
| **NATIONAL FIRE PROTECTION ASSOCIATION, INC.,** ) ) ) | **Judge Rebecca R. Pallmeyer** |
| **Defendant.** ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff International Code Council, Inc. (hereinafter, "ICC") and Defendant National Fire Code Protection Association, Inc. (hereinafter, "NFPA") are competitors in the business of preparing and promulgating draft model building codes to be adopted by municipalities and local governments around the country. Each party has drafted its own model code with the assistance and cooperation of public officials (those persons most likely to adopt and administer a model building code) and construction and design professionals (those persons most likely to be bound by the building code once it is adopted as law). ICC's model building code, the International Building Code (hereinafter, "IBC 2000"), pre-dates NFPA's model building code, the NFPA 5000; the two codes use similar or identical language in many of their provisions and tables.

In this action, ICC alleges that the NFPA 5000 infringes Plaintiff's copyright in the IBC 2000. Defendant has moved for summary judgment on three grounds: (1) the allegedly infringed language of the IBC 2000 is not copyrightable, (2) ICC does not own the allegedly infringed language of the IBC 2000, and (3) NFPA did not copy the allegedly infringing language in the NFPA 5000 from the IBC 2000. For the reasons set forth below, NFPA's motion for summary judgment is denied.

## STATEMENT OF FACTS

ICC, a California non-profit corporation whose principal place of business is Virginia,

develops and publishes national model building codes.[1] (Def.'s 56.1 ¶ 1; Pltf.'s 56.1(b)(3)(B) ¶ 1.) Less detailed than a blueprint, a model building code offers generalized guidance to architects, engineers, designers, and contractors concerning the safe and standardized construction of buildings. (Pltf.'s 56.1(b)(3)(B) ¶ 1.) Once a model building code is adopted into law by a local government, the guidelines set out in the code become mandatory for new construction in the jurisdiction.[2]

Like ICC, NFPA, a Massachusetts-based non-profit, is also in the business of developing comprehensive model building codes. (*Id.* at ¶ 6; Def.'s 56.1 ¶ 3.) Although a newcomer to the field of comprehensive model building codes, NFPA has a long history of fire safety and electrical code drafting. (Pltf.'s 56.1(b)(3)(B) ¶ 6.)

---

[1] The facts are presented in the parties' statements pursuant to Local Rule 56.1. Defendant's Statement of Undisputed Material Facts is cited as "Def.'s 56.1 ¶ __"; Plaintiff's Response is cited as "Plaintiff's Response ¶ __"; Plaintiff's Statement of Additional Facts is cited as "Pltf.'s 56.1(b)(3)(B) ¶ __"; and Defendant's Response is cited as "Def.'s Response ¶ __". Where Plaintiff has made no response to paragraphs of Defendant's 56.1 Statement, those paragraphs are deemed admitted. Where Plaintiff has offered support for his denials or for additional statements of fact, its version is credited for the purpose of deciding this motion.

Local Rule 56.1 assists district courts by "'organizing the evidence, identifying undisputed facts, and demonstrating precisely how each side proposed to prove a disputed fact with admissible evidence.'" *Roger Whitmore's Auto. Servs., Inc. v. Lake County*, 424 F.3d 659, 664 n.2 (7th Cir. 2005) (quoting *Bordelon v. Chi. Sch. Reform Bd. of Trs.*, 233 F.3d 524, 527 (7th Cir. 2000)). It is the responsibility of the parties, not the district court, to clearly present material factual disputes in the record, *Roger Whitmore's Auto. Servs.*, 424 F.3d at 664 n.2 ("'Judges are not like pigs, hunting for truffles buried in' the record.") (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)), and as such, denials only of materiality, claims of irrelevance, and general, rather than specific, denials of facts presented by the other party are deemed admissions. *Ammons v. Aramark Unif. Servs., Inc.*, 368 F.3d 809, 817-18 (7th Cir. 2004).

[2] The Fifth Circuit provides a helpful overview of the process by which model building codes become local law. *See Veeck v. S. Bldg. Code Cong. Int'l, Inc.*, 293 F.3d 791, 793-94 (5th Cir. 2002) (holding that local laws based on a model building code are not subject to copyright protection).

**Origin of ICC**

ICC, formed in 1994, is the product of the merger of three predecessor organizations: Building Officials and Code Administrators International, Inc. (hereinafter, "BOCA");[3] International Conference of Building Officials (hereinafter, "ICBO"); and Southern Building Code Congress International, Inc. (hereinafter, "SBCCI"). These organizations, which the parties refer to as the "legacy organizations," had a long history of writing model building codes targeted at different regions of the country. (Def.'s 56.1 ¶ 2; Pltf.'s 56.1(b)(3)(B) ¶ 2.) Each legacy organization had applied for and received copyright registrations for each of the various editions of its respective model building codes. (Pltf.'s 56.1(b)(3)(B) ¶ 29; Legacy Organizations' Copyright Registration Certificates, Pfeiffer Decl., Ex. M.) After existing independently for many years, the legacy organizations formed ICC to facilitate cooperation in the development of a single national model building code.[4] (Pltf.'s 56.1(b)(3)(B) ¶ 3.) Like the legacy organizations that preceded it, ICC has a formal board of directors, but public officials, architects, engineers, and builders are "members" who also participate in the decisions made by the organization. (*Id.* at ¶ 5.) The three legacy organizations have transferred all of their intellectual property rights and interests to ICC. (*Id.* at ¶ 31.) And although BOCA, ICBO, and SBCCI have formally merged their membership in the joint project of ICC, each organization continues to retain an independent existence as well. (*Id.*)

_____

[3]     At an earlier stage of this litigation, BOCA, headquartered in Illinois, was a named plaintiff.

[4]     ICC steering committee member Dominic Sims explained:
As [the legacy organizations] matured over the years – and we're talking decades – the codes and standards they developed became more and more similar. Efforts in the mid-'80s to develop a common code format progressed, and once a common code format was developed which was good for the public, good for industry, because it provided a consistent way of structuring the rules of construction, once the common code format was created, the members and the industry in general began to ask why not have a single national and international model code again to further remove barriers.
(Def.'s 56.1 ¶ 2; Sims Dep., p. 24.)

**Development of the IBC 2000**

Based in substantial part on various versions of the model building codes already published by the legacy organizations, ICC began work on its national model building code, the IBC 2000, in August 1996 and published it in March 2000. (Pltf.'s 56.1(b)(3)(B) ¶¶ 4, 19.) The IBC 2000 is the model building code ICC alleges has been infringed by NFPA. Because NFPA has argued that ICC does not own its code, the parties have devoted considerable attention to the process by which the IBC 2000 was developed. Emphasizing factors identified as important in the Supreme Court's *Reid* test for copyright ownership, *see Community for Creative Non-Violence v. Reid*, 490 U.S. 730 (1989), NFPA notes the substantial role played by independent contributors to the IBC 2000, while Plaintiff focuses on the control over the process exercised by ICC through its steering committee. The process for developing the IBC 2000 is described in detail below, while the *Reid* test will be discussed in greater depth in another section.

**A.      Committees and Staff**

To develop IBC 2000, the ICC Board of Directors formed a steering committee and five technical subcommittees–Fire Safety, Structural, Occupancies, Means of Egress, and General. (Pltf.'s 56.1(b)(3)(B) ¶¶ 7, 8.) According to steering committee member Dominic Sims, the steering committee "would oversee the development effort and provide direction to the [ICC] staff," while "individual technical [sub]committees were appointed to do work." (*Id.* at ¶ 7; Sims Dep., p. 38.) John Battles, an ICC staff liaison, explained that "[t]he steering committee was the committee that developed the process of developing the building code . . . [specifically, as related to p]ublic hearings, type of public hearings, the committee make-ups, [and] the breakup of the committees." (Def.'s Response; ¶ 7; Battles Dep., p. 25.) The steering committee also determined which chapters of the model building code would be drafted by which technical subcommittees and voted

on a timetable for the completion of this drafting work.[5]  (Pltf.'s 56.1(b)(3)(B) ¶¶ 13; 16.)

The technical subcommittees were responsible for "developing" particular chapters of the IBC 2000.  (*Id.* at ¶ 8.)  "Developing" as used by the parties appears to incorporate potentially distinct concepts from the perspective of copyright authorship, including (1) selecting one of a number of competing versions of a passage actually written by someone else; (2) editing an existing provision; and (3) actually drafting a completely new version of a passage.

It is undisputed that the members of the technical subcommittees (and the members of the steering committee, for that matter)  were either public employees responsible for enforcement of building regulations in their jurisdiction or, in some cases, industry representatives.  (Def.'s 56.1 ¶ 7.)  The legacy organizations selected these subcommittee members, subject to ratification by the ICC Board.  (Pltf.'s 56.1(b)(3)(B) ¶ 9.)  In fact, all of the persons chosen for technical subcommittee membership at the beginning of the IBC 2000 drafting process were also members of one of the legacy organizations that nominated them; some were members of those legacy organizations' Boards of Directors, and a large majority were voting members of the legacy organizations.  (*Id.*)  Technical subcommittee members were initially appointed for a one-year term, but many were reappointed and remained in the position "for several years."  (*Id.* at ¶ 10; Pfeiffer Decl., ¶ 7.)  The members of the technical subcommittees were selected, at least in part, for their

---

[5]        There is a purported dispute of fact as to the degree of unity between the ICC Board and the steering committee, at least as to the matter of chapter assignments. Plaintiff asserts that the ICC Board acts "through the steering committee," (Pltf.'s 56.1(b)(3)(B) ¶ 16), citing a 1996 ICC policy statement which observed, "[t]he work of each committee shall be . . . in accordance with any instruction subsequently issued by the ICC Board." (1996 ICC Policy re: Committees and Members, Heilstedt Decl., Ex. A at 4). Defendant disputes this assertion, but cites nothing in the record to rebut it beyond the observation that the steering committee members, like their counterparts on the technical subcommittees, were volunteers. (Def.'s Response ¶ 16.) A 1997 memorandum from ICC to the technical subcommittee chairmen regarding chapter reassignments made by the steering committee reveals that the ICC Board played an extensive role, either indirectly through the steering committee, or directly, in the coordination of the drafting committees' work and the establishment of procedures to guide that process. (Pltf.'s 56.1(b)(3)(B) ¶ 16; Memorandum of January 2, 1997 re: Action Items from October 13 Steering Committee Meeting, Heilstedt Decl., Ex. D.)

expertise in the technical area, their familiarity with the code development process, and their willingness to devote time to the process of drafting the IBC 2000. (Def.'s 56.1 ¶ 11.) These members devoted substantial amounts of time to the project of drafting the IBC 2000, and, according to Plaintiff, being involved with that project carried with it a degree of prestige.[6] (Pltf.'s 56.1(b)(3)(B) ¶ 10; Pfeiffer Decl. ¶ 7.) Although they were reimbursed for expenses incurred, the technical subcommittee members were neither paid a salary for their services nor employed by ICC or one of the legacy organizations. (Pltf.'s 56.1(b)(3)(B) ¶ 19; Def.'s 56.1 ¶¶ 8-10.)

Each of the three legacy organizations also assigned one paid staff liaison to each technical subcommittee. (Pltf.'s 56.1(b)(3)(B) ¶ 12; Def.'s 56.1 ¶ 18.) Of the three staff liaisons assigned to each subcommittee, one was designated the "secretariat" who communicated between the technical subcommittee, ICC, and the legacy organization; the secretariat was also responsible for logistical matters in connection with technical subcommittee meetings.[7] (Pltf.'s 56.1(b)(3)(B) ¶ 12.)

Staff liaisons had several tasks beyond the secretariat role. Because staff liaisons possessed great expertise in the history and development of the legacy organizations' model building codes, the staff liaisons ensured that technical requirements agreed upon by the technical subcommittee members were drafted in a manner consistent with the linguistic requirements of a building code. (*Id.* at ¶¶ 14-15.) Additionally, the ICC Rules of Procedure required staff liaisons, upon the initial establishment of a technical subcommittee by ICC, to:

1. prepare a ["]scope and objectives["] statement for the committee;
2. prepare a suggested list of interests appropriate to be represented on the committee; and

---

[6] Defendant disputes the use of the terms "substantial" and "prestigious" as subjective and irrelevant, but does not contradict these characterizations with citations to the record. (Def. Response ¶ 10.)

[7] These "logistical matters" included matters as diverse as taking notes, fielding procedural questions from technical subcommittee members, and maintaining the temperature in the meeting rooms, according to the testimony of ICC staff liaison Paul Armstrong. (Def.'s 56.1 ¶ 20; Armstrong Dep., pp. 49-50.)

3.      accumulate all available resource material for committee consideration at its first meeting.

(Def.'s 56.1 ¶ 22; 1998 ICC Policy re: Committees and Members, Sims Dep., Ex. 55 at § 2.2.)

Once staff liaisons accomplished these initial tasks, their remaining duties, according to the ICC Rules of Procedure, were to:

1.      serve in an advisory capacity to each assigned committee and assist the committee to achieve the committee's compliance with [the ICC Rules of Procedure];
2.      on instruction and guidance from the committee, prepare necessary text and recommendations;
3.      coordinate the text of documents for which the assigned committee [would be] responsible with the text of other documents to avoid, insofar as practicable, conflicts and duplication;
4.      be responsible for the editorial treatment of the document's text and recommendations;
5.      attend meetings of the committees when possible;
6.      keep the applicable officer(s) of each committee informed concerning changes in committee personnel, availability of meeting dates and places, and the like;
7.      perform such functions as may be stated in the policy or assigned by the President [of ICC];
8.      prepare each committee report, if any, for publication; and
9.      prepare any comments received on a committee report in a form suitable for committee consideration.

(Def.'s 56.1 ¶ 22; Sims Dep., Ex. 55 at § 3.1.)

There is a dispute as to whether the staff liaisons were responsible, in addition, for ensuring that the technical subcommittees met the timetable established for the completion of their work, a matter relevant to the question of how much control ICC exerted over the activities of the technical subcommittee members.  Plaintiff emphasizes that the liaisons "established" the timetable which was ratified by the steering committee.  (Pltf.'s 56.1(b)(3)(B) ¶ 13.)  Defendant, minimizing the role played by the staff liaisons, emphasizes the 1996 IBC Scope, Objectives and Process Statement, confirmed as accurate by steering committee member Dominic Sims, which states that staff liaisons "serve[] only in a supporting capacity." (Def.'s 56.1 ¶ 23; Sims Dep., p. 63.)  It is undisputed that the staff liaisons were not members of any of the technical subcommittees or even of the steering

committee.  (Def.'s 56.1 ¶ 21.)  Nor did the staff liaisons have a vote in the decision of any of the committees.  (*Id.*)

### B.    A Working Draft

Beginning in August 1996, the technical subcommittee members and the staff liaisons assigned to them held a series of drafting meetings at various locations throughout the country over the course of about nine months.  (Pltf.'s 56.1(b)(3)(B) ¶ 19.)  These meetings usually took place at non-ICC-owned venues, such as hotels, determined through consultation between the technical subcommittee members and the staff liaisons.  (*Id.*; Def.'s 56.1 ¶ 12.) The legacy organizations secured and paid for the space and reimbursed travel-related expenses incurred by technical subcommittee members and staff liaisons in attending these meetings.  (Pltf.'s 56.1(b)(3)(B) ¶ 19.)

In this first stage of the IBC 2000 drafting process, the staff liaisons assigned to the technical subcommittees created a series of matrices setting forth corresponding sections from the legacy organizations' previously-published model building codes.  (*Id.* at ¶ 17.)  Using these matrices, staff liaisons and technical subcommittee members were able to review and compare the relevant text of prior model building code provisions.  (*Id.* at ¶ 18.)  Staff liaisons provided information to technical subcommittee members about the pros and cons of particular legacy code provisions.  (*Id.*; Pfeiffer Decl. ¶ 21.)  The technical subcommittee members then would either: (1) select the "best" language from one of the three preexisting model building codes of the legacy organizations for inclusion in the IBC 2000, (2) modify one of the preexisting provisions for inclusion, or (3) draft an entirely new provision for inclusion.  (*Id.*)  The process of developing matrices, reviewing and comparing code language, and then selecting, modifying, or writing new provisions resulted in a series of preliminary draft chapters.  (*Id.*)

Each of the parties disputes the other's characterizations about the extent of the staff liaisons' involvement in the preparation of these draft chapters.  Plaintiff cites testimony of steering committee member Dominic Sims that "the staff had the ultimate responsibility for pulling a

document together and producing a draft." (*Id.* at ¶ 21; Sims Dep., p. 50.) ICC Vice President Michael Pfeiffer asserted that technical subcommittee members "relied on the expertise of staff" with regard to the question of whether or not to include particular provisions of the legacy codes in draft chapters of the IBC 2000 and that staff liaisons proposed the inclusion of some provisions of the legacy codes to "expedite the subcommittee's consideration of the material." (Pfeiffer Decl. ¶¶ 22-23.) Defendant, on the other hand, emphasizes Sims's statement that the staff in practice served only a supportive function to the technical subcommittee members. (Def.'s 56.1 ¶ 23; Sims Dep., p. 63; 1996 ICC Scope, Objectives and Process Statement, Sims Dep., Ex. 42.) Defendant notes, further, the testimony of ICC staff liaison John Battles that although staff liaisons might have pushed technical committee members to make clarifications, no staff liaison drafted any provision of any chapter. (Def.'s 56.1 ¶ 24; Battles Dep., pp. 67-68.) In the court's view, the record fairly supports a finding that ICC staff acted as knowledgeable and competent editors for the technical subcommittee member drafters with respect to all but a handful of provisions of the IBC 2000.

Specifically, the parties dispute whether ICC staff liaisons played a more extensive role in the drafting of §§ 903.2.2, 903.2.3, 903.2.5, and 903.2.10 of the IBC 2000–provisions related to the installation and use of automatic sprinklers. Defendant emphasizes the declaration of William Koffel, who served on both Plaintiff's and Defendant's drafting committees for the model building codes at issue in this case, that "[n]one of the sections were drafted by ICC staff." (Def.'s 56.1 ¶ 29; Koffel Decl. ¶ 25.) Instead, Defendant observes, these sections owe their origin to one of the legacy codes or to public commentary on the drafts of the IBC 2000. (*Id.*) Plaintiff, on the other hand, cites the declaration of ICC Vice President Michael Pfeiffer. (Plaintiff's Response ¶ 29.) Pfeiffer declares:

> The preliminary draft chapter containing these sections [relating to sprinklers] was the byproduct of a task force of 3 subcommittee members and staff, led by [ICC staff liaison] Mark Chubb. Mr. Chubb created the first draft for the subcommittee's consideration and sent it to the task force under a memo [reading "The attached draft of Chapter 9 was prepared based upon our task group discussions."] . . .

9

[W]hile it is true that these sections were "derived" from legacy codes or public submissions, the drafting process started with Mr. Chubb's first draft, which included his own revisions to legacy code text.[8]

(Pfeiffer Decl. ¶ 27, excerpt quoting Memorandum of December 6, 1996, by Mark Chubb, Pfeiffer Decl., Ex. K.)

A similar factual dispute exists with respect to the question of the role ICC staff liaisons played in the preparation of the height and area table of the IBC 2000–Table 503.[9]  Defendant claims that ICC staff liaisons simply calculated the values for Table 503 using preexisting methodologies not created by ICC.  (Def.'s 56.1 ¶ 28.)  Defendant cites the minutes of three meetings of the occupancy technical subcommittee taking place in late 1996 and early 1997, which indicate that the staff liaisons were to calculate Table 503 using a hybrid of two preexisting methodologies.  (Minutes of the ICC Occupancy Subcommittee for December 13-14, 1996, and February 28-March 1, 1997, Koffel Decl., Exs. 2 at 5, 4 at 4.)  Plaintiff believes that Defendant's view of the facts is incomplete and again emphasizes Pfeiffer's assertion that the "staff was called upon to make necessary judgments" in order to implement the directive of the Occupancy technical

---

[8]    From this passage alone, the court is unable to determine whether ICC staff liaison Chubb's first draft was an editorial compilation of the task group discussions or something that involved an independent act of authorship. For reasons explained later on in the decision, the court will not resolve this factual dispute, but notes that it might be sufficient to defeat summary judgment on the issue of copyright authorship with respect to the four subsections of Chapter 903 of the IBC 2000.

[9]    The record is not overly illuminating on this technical aspect of building construction, but as the court understands it, the larger a building in terms of volume, the greater fire hazard that building poses either to itself or surrounding buildings. (Pfeiffer Decl. ¶ 26.) Fire-resistant materials can be used to construct a building, but are costly. A height and area table attempts to strike a balance between the reduction of fire risk by adding more fire-resistant material as a building increases in volume and the cost of adding that material by requiring only enough fire-resistant material to meet some designated threshold of safety. (*Id.*)

ICC and NFPA committee member William Koffel testified that a user of a model building code in the United States would expect to find a height and area table. (Koffel Dep., p. 157-58.) To the extent that the other provisions of a model building code are directed at the protection of life and property, the height and area table is "fundamental to the risk associated with the building." (*Id.*) If certain building code provisions may fairly be deemed critical components to a useful code, a height and area table, perhaps, is among them.

subcommittee with regard to calculating the values for Table 503. (Pfeiffer Decl. ¶ 25.)

In May 1997, using the draft chapters prepared by each technical subcommittee, ICC published the Working Draft of the IBC 2000. (Pltf.'s 56.1(b)(3)(B) ¶ 19; Def.'s 56.1 ¶ 15.) On December 8, 1997, ICC applied for and received copyright registration for the Working Draft. (Pltf.'s 56.1(b)(3)(B) ¶ 30; ICC's Copyright Registration Certificates, Pfeiffer Decl., Ex. N at 1-2.) The Copyright Registration lists BOCA, ICBO, and SBCCI as authors of the entire work with transfer by agreement as the sole basis of ICC's claim of ownership. (*Id.*)

There is no indication in the record that any technical subcommittee member has attempted to claim copyright ownership over any code language he or she may have drafted. Nor does it appear, based on examination of the standard application for technical subcommittee membership, that any technical subcommittee member formally assigned his or her copyright in any language he or she may have drafted to ICC. (Def.'s 56.1 ¶ 13; Plaintiff's Response ¶ 13; ICC Application for Membership, Centurelli Decl., Ex. H.)[10] Further, apart from three members of the fire safety technical subcommittee, there is no evidence that any technical subcommittee members entered into "work-for-hire" contracts to draft the code language.[11] (*Id.*)

_____

[10] The Centurelli Declaration is made by Christopher Centurelli, an attorney at the law firm representing Defendant in this action. The court notes its concerns about both parties' practice of furnishing the declarations of attorneys about matters of which they do not appear to have first-hand knowledge. *See Wyler v. United States*, 725 F.2d 156, 160 (2d Cir. 1983) ("An affidavit of [an] . . . attorney which . . . is not based on first-hand knowledge is not entitled to any weight."). As both parties here have engaged in this practice, however, the court concludes that neither side objects to the other's submissions.

[11] Defendant notes that technical subcommittee members William R. Bryant, Michael McReynolds, and Donald R. Mercer are "possible exception[s]." (Def.'s 56.1 ¶ 13.) These three gentlemen entered into work-for-hire agreements with BOCA for their service on the Fire Safety technical subcommittee dated June 23, 1997; June 25, 1997; and June 25, 1997, respectively. (Work for Hire Agreements for Members Representing BOCA, Centurelli Decl., Ex. G.)
     While the parties agree on the general absence of copyright assignments and work-for-hire contracts, there is a dispute as to whether technical subcommittee members gave ICC nonexclusive licenses to any code language they might have drafted. Plaintiff cites the declaration of ICC Vice President Michael Pfeiffer that technical "[s]ubcommittee members did not sign agreements
(continued...)

## C. Public Hearings

After the publication of the Working Draft, ICC solicited written comments and/or proposed changes from members of the public and industry groups. (Pltf.'s 56.1(b)(3)(B) ¶ 22; Def.'s 56.1 ¶ 15.) When members of the public and industry groups submitted proposed language, they did not assign any copyright in the language to ICC; instead, by using the comment submission form, they granted ICC a nonexclusive license to use the proposed language in its model building code.[12] (Def.'s 56.1 ¶ 16; ICC Proposed Code Change Submission Forms, Centurelli Decl., Exs. K, L.) Staff liaisons compiled these comments into five monographs that served as the agenda for a Public Comment Forum convened by the legacy organizations in August 1997 (the location of this forum is not identified in the record). (Pltf.'s 56.1(b)(3)(B) ¶ 22.) With the advice and recommendations of the CEOs of the legacy organizations, the ICC Board selected the location and time for this and all subsequent public hearings and meetings. (*Id.* at ¶ 28.) The ICC Board also approved procedures to ensure a uniform format under which these comments and proposals could

---

[11](...continued)
providing ICC with non-exclusive licenses for the IBC 2000 text contributed by them." (emphasis in original) (Pltf.'s 56.1(b)(3)(B) ¶ 11; Pfeiffer Decl. ¶ 7.) Defendant, on the other hand, points to language that appears just above the signature line on several blank, 2001 ICC membership application forms that are in the record, stating: "I agree that ICC shall have a nonexclusive, royalty-free license to use any material that I may provide to or develop for the Committee. I hereby grant ICC a nonexclusive, royalty-free license to all rights in copyright that I may have as an author of the material produced by an ICC Committee." (Def.'s 56.1 ¶ 13; ICC Application for Membership, May 31, 2001, Centurelli Decl., Ex. H.) As noted, no signed versions of this form appear in the record and it is therefore unclear what use, if any, Plaintiff may have made of them. Defendant asserts that the fact that Plaintiff drafted this language for use in membership forms (even if there is no evidence that the form was ever used prior to the March 2000 completion of the IBC 2000) demonstrates Plaintiff's recognition that it did not own the language asserted in this action. The court declines to read any significance into language that Plaintiff may have drafted, but apparently never used

[12]    A footnote to the signature line reads, in relevant part, "I hereby grant the International Code Council the nonexclusive, royalty-free rights, including nonexclusive, royalty-free rights in copyright, in this proposal and I understand that I acquire no rights in any publication of the International Code Council in which this proposal in this or another similar analogous form is used. I hereby attest that I have the authority and I am empowered to grant this copyright release." (Def.'s 56.1 ¶ 16;  ICC Proposed Code Change Submission Forms, Centurelli Decl., Exs. K, L.)

be debated and either accepted or rejected by the five technical subcommittees. (*Id.* at ¶ 22; Def.'s 56.1 ¶ 15.) Plaintiff contends that technical subcommittee members were required to attend these meetings, but does not explain, how, if at all, the requirement was enforced. (Pltf.'s 56.1(b)(3)(B) ¶ 28; Pfeiffer Decl. ¶ 19.) Defendant notes that attendance was not a requirement of any written employment or work-for-hire contract. (Def.'s 56.1 ¶¶ 8-10, 13.)

In November 1997, following the Public Comment Forum, the legacy code organizations published the First Draft of the IBC 2000. (*Id.* at ¶ 15; Pltf.'s 56.1(b)(3)(B) ¶ 23.) ICC applied for and received a separate copyright registration for the First Draft. (Pltf.'s 56.1(b)(3)(B) ¶ 30; Pfeiffer Decl., Ex. N at 3-4.) As before, the application identifies BOCA, ICBO, and SBCCI as authors of the entire work and ICC as the copyright claimant based solely on transfers by agreement. (*Id.*) ICC made the draft available to anyone who requested it and solicited a second round of public commentary. (Pltf.'s 56.1(b)(3)(B) ¶ 23.) (The record does not reveal whether the draft contained a copyright notice.) ICC staff liaisons worked with members of the public who submitted written proposed changes to conform the submissions to the linguistic requirements of the IBC 2000.[13] (*Id.*) Again the staff liaisons compiled the proposed language changes arising out of public commentary on the First Draft into a monograph. (*Id.*) In April 1998, ICC conducted a second public hearing, at which ICC procedures governed the taking of testimony, the classification of proposals, the voting rights of technical subcommittee members and other, unspecified members of the assembled body, and the future action to be taken on each proposal. (*Id.*) During the April 1998 meeting, the technical committees either adopted or rejected the proposed changes to the

---

[13] These linguistic requirements include the replacement of permissive language, such as "the wall *may be* two inches thick" with the mandatory language more commonly used in model codes, such as "the wall *must be* two inches thick." (Def.'s 56.1 ¶ 44.) Additionally, the "staff would assist proponents in the re-wording of their submittal in order to make sure . . . that it . . . correlated with other sections of the code." (Pfeiffer Decl. ¶ 28.)

The record does not reflect whether or not the assistance of staff liaisons to commenting members of the public was in person, via telephone, email, fax, mail, or some combination of each.

First Draft.  (*Id.*)

In July 1998, the revised code text was published as the IBC 2000 Final Draft.  (*Id.* at ¶ 25; Def.'s 56.1 ¶ 15.)  Once again, ICC applied for and received copyright registration for this Final Draft, listing BOCA, ICBO, and SBCCI as authors of the entire work and ICC as the copyright claimant based solely on transfers by agreement.  (Pltf.'s 56.1(b)(3)(B) ¶ 30; Pfeiffer Decl., Ex. N at 5-6.)  ICC again made the draft available for the submission of written comments by members of the interested public.  (Pltf.'s 56.1(b)(3)(B) ¶ 25.)  The staff liaisons compiled these proposals into a monograph that became the subject of yet another public hearing, itself also governed by ICC procedures, in March 1999.  (*Id.*)  The technical subcommittee members again voted on whether to accept or reject this newest round of public proposals.  (Def.'s 56.1 ¶ 15.)  Following this public hearing, staff liaisons prepared a document containing the actions taken by the technical subcommittees on the proposed changes to the Final Draft and the reasons for those actions. (Pltf.'s 56.1(b)(3)(B) ¶ 26.)  On a date not specified in the record, ICC published and distributed this document for a final round of public commentary.  (*Id.*)  The staff liaisons then compiled these comments and published, along with the original proposals, the technical subcommittee actions, the reasons for those actions, and a list of technical subcommittee actions upon which no public commentary had been given.  (*Id.* at ¶¶ 26, 27.)  ICC issued this volume, entitled the Final Action Agenda, in August 1999.  (*Id.*)

In September 1999, all eligible voting members of the three legacy organizations met.  (*Id.* at ¶ 27.)  Following additional testimony, those members of the legacy organizations who were also public officials (presumably a smaller group than "all eligible voting members") voted to accept or reject the remaining proposed changes to the model building code.[14]  (*Id.*)  Staff liaisons compiled these final actions, and ICC published the First Edition of the IBC 2000 in March 2000.  (*Id.*)  On

---

[14]      The record does not reveal who gave this "additional testimony." (Pfeiffer Decl. ¶ 18.)

July 21, 2000, ICC applied for a copyright registration for its model building code. (*Id.* at ¶ 30; IBC 2000 Copyright Registration Certificate, Pfeiffer Decl., Ex. O.) Like the previous drafts, the registration listed BOCA, ICBO, and SBCCI as authors of the entire work, and ICC claimed copyright solely based on a transfer by agreement. (*Id.*) ICC's registration became effective on August 18, 2000. (*Id.*)

**Development of the NFPA 5000**

As Defendant emphasizes, ICC was not the first attempt at collaboration between the legacy organizations. Rather, throughout the late 1970s, 1980s and early 1990s, Defendant NFPA and the three legacy organizations that would eventually form ICC had attempted to harmonize provisions of their respective model codes, sending representatives to meetings of a joint venture called the Board for the Coordination of Model Codes (hereinafter, "BCMC"). (Def.'s 56.1 ¶ 17; The Impact of BCMC on the Model Codes,[15] Centurelli Decl., Ex. N.) According to Defendant, BCMC prepared reports recommending model code provisions for all four organizations and agreed "to waive copyright protections for the benefit of the other participating organizations with respect to any code language developed from a code or standard copyright by such participating organization." (Def.'s 56.1 ¶ 17; Plaintiff's Response ¶ 17.) When BOCA, ICBO, SBCCI, and NFPA decided to end their efforts after twenty years of collaboration on October 12, 1995, ICC was the next step for BOCA, ICBO, and SBCCI. (Centurelli Decl., Ex. N.) NFPA struck out on its own and released its own comprehensive national model building code, the NFPA 5000, in July 2002. (Def.'s 56.1 ¶ 39.) It is this document that Plaintiff alleges infringes on the IBC 2000.

Although NFPA published the NFPA 5000 in July 2002, it is undisputed that its development began in 1999, before ICC published the First Edition of the IBC 2000, but well after working drafts

---

[15] The record does not identify this source, but the court infers from an examination of the exhibit that it may be an article from a trade magazine or brochure called *Code Forum* (Jan.-Feb. 1996 ed.). The article is co-authored by Michael Pfeiffer, Paul Armstrong, John Battles, and Walter Sterling.

of that document were already in circulation. (*Id.* at ¶¶ 32-33; Pltf.'s 56.1(b)(3)(B) ¶ 32.) Sometime in 1999, NFPA hired a consultant, Wayne "Chip" Carson, to prepare the first draft of a new comprehensive national model building code. (Def.'s 56.1 ¶ 33; Pltf.'s 56.1(b)(3)(B) ¶ 32.) Carson finished his first draft in January 2000 and a second draft in February 2000. (Def.'s 56.1 ¶ 35; Pltf.'s 56.1(b)(3)(B) ¶ 33.) Carson based these drafts on existing NFPA model code materials as well as the EPCOT model building code.[16] (Def.'s 56.1 ¶ 34; Pltf.'s 56.1(b)(3)(B) ¶ 32.) It is undisputed that in creating his draft, Carson did not copy any provision of the IBC 2000 or any of the legacy organization's model building codes. (Def.'s 56.1 ¶ 34; Plaintiff's Response ¶ 34.)

After Carson turned over his second draft to NFPA, NFPA began its formal process of developing and ratifying the NFPA 5000 in the spring of 2000. (Def.'s 56.1 ¶ 36; Pltf.'s 56.1(b)(3)(B) ¶ 32.) This process entailed setting up sixteen technical committees to develop model building code provisions as well as a technical correlating committee to oversee the technical committees and ensure consistency across committees.[17] (Def.'s 56.1 ¶ 37; Koffel Decl. ¶ 12.) The approximately 300 NFPA committee members included some of the same code officials who served on the ICC's committees, as well as numerous other government officials, special experts, insurers, manufacturers, and other interested parties. (*Id.*)

---

[16]     The record reveals very little about the EPCOT Code aside from the fact that NFPA had a license to use it. (Agreement of License of Copyright between Reedy Creek Improvement District and NFPA, Centurelli Decl., Ex. V.) It appears from the court's own research that the EPCOT Code dates back to the 1970s and is in fact the building code used by Disney for its amusement parks and resorts. http://www.rcid.org/Dept_Building_Safety.cfm; *see also* Nickson Dep., p. 21 ("We were told that the source was the code from Disneyland.").

[17]     The record is far less developed with regard to the process that led to the publication of the NFPA 5000. For instance, the court found no information in the record about the size of the technical correlating committee's membership or information about how NFPA selected those members. From the cursory description of the process set out in Defendant's uncontested 56.1 Statement, however, it appears that the process by which NFPA developed the NFPA 5000 is roughly similar to the process described above chronicling ICC's development of the IBC 2000. Without suggesting that the process by which Defendant developed its model code is relevant to the resolution of this case, the court notes that there is no indication in the record whether NFPA secured work-for-hire agreements or formal copyright assignments from its committee members.

In June 2000, the technical correlating committee held its first meeting in Cincinnati, Ohio. (Pltf.'s 56.1(b)(3)(B) ¶ 33.) Carson's draft was circulated at this meeting. (*Id.*) There is some evidence that committee members were uneasy about how much more work it would take to turn this draft into a complete model building code. Ronald Nickson, a member of the technical correlating committee, and Lawrence Perry, the chair of one of the NFPA technical committees, both expressed the view that NFPA could not rely solely on its own previously-authored documents and codes to draft a comprehensive model code. Instead, as Carson had done with his draft, NFPA would have to incorporate non-NFPA material to fill in the gaps. (*Id.* at ¶ 34; Nickson Dep., p. 21; Perry Dep., pp. 16-17.) Moreover, the minutes of the June 2000 meeting state, "[s]everal committee members and guests voiced concern that the timetable is too aggressive a schedule for the development of a complete set of codes." (Nickson Dep., p. 34.) Nickson called the timetable "[c]ompletely inadequate" at his deposition. (*Id.*) Nonetheless, it is undisputed that NFPA was able to stay on schedule and publish the NFPA 5000 in July 2002. (Pltf.'s 56.1(b)(3)(B) ¶ 35; Def.'s 56.1 ¶ 39.)

Rather than "re-invent[ing] the wheel," as an NFPA slide presentation[18] cautioned the drafting committees against, NFPA supplemented its preexisting codes, which had generally been limited to fire safety and electrical issues, with parts of other preexisting codes to create the comprehensive NFPA 5000. (Pltf.'s 56.1(b)(3)(B) ¶ 36; NFPA Slide Presentation, McGraw Decl., Ex. K.)[19] In preparing its motion for summary judgment, NFPA asked its expert witness William

---

[18] Plaintiff presents this slide show in the record without any information about where, when, or to whom it was shown. (Pltf.'s 56.1(b)(3)(B) ¶ 36; NFPA Slide Presentation, McGraw Decl., Ex. K.) Even with such details, the slide show itself is hardly evidence of copying, especially because this same slide show presents the EPCOT Code and a preexisting NFPA-authored code, NFPA 101 Life Safety Code, as the foundation of the NFPA 5000 and makes no reference to the IBC 2000 or any of the legacy codes whatsoever. (McGraw Decl., Ex. K.)

[19] The McGraw Declaration is made by Wendy McGraw, an attorney at the law firm representing Plaintiff. Again, the court notes its doubt that counsel for the opposing party has any

(continued...)

Koffel, the chair of one of its technical committees who also served as a member of one of ICC's technical subcommittees, to determine which preexisting documents NFPA used to draft the disputed provisions of the NFPA 5000. (Koffel Decl. ¶ 17.) According to Koffel, NFPA used nine sources: "(i) the Code of Federal Regulations, (ii) preexisting NFPA codes and standards, (iii) ASCE 7 (a third party standards document), (iv) the EPCOT Building Code, (v) other industry standards, (vi) the Uniform Fire Code, (vii) the BCMC Reports, (viii) public proposals and comments, and (ix) proposals from NFPA committee members." (*Id.* at ¶ 19; Def.'s 56.1 ¶ 43.)

Plaintiff, however, points to evidence in the record that suggests the IBC 2000 might also have been one of the preexisting documents used by NFPA in drafting the NFPA 5000. For instance, Ronald Nickson, a member of NFPA's technical correlating committee, testified that he could not remember whether NFPA had provided any instructions to committee members about the propriety of copying the IBC 2000. (Pltf.'s 56.1(b)(3)(B) ¶ 37; Nickson Dep., pp. 39-40, 42.) Nor did Nickson recall any instruction that committee members should reject proposed language that appeared to be cribbed from the IBC 2000. (*Id.*) According to Nickson, members of the technical correlating committee did discuss the matter because they recognized that "a lot" of the material needed to create a comprehensive building code could be found in the IBC 2000. (Pltf.'s 56.1(b)(3)(B) ¶ 37; Nickson Dep., pp. 40-41.) Nickson recalled that the technical correlating committee decided, "[g]enerally, [when] proposals came forward . . . that were identified in some cases as being taken directly from the IBC [2000], or documents of that type, they were processed through . . . the NFPA procedure,"–that is, the committee would vote on whether to include or reject them as it would with any other proposed language. (Nickson Dep., pp. 41-42.) Nickson further believed that some proposed language, either in the form of a committee draft provision or a public comment, taken directly from the IBC 2000 had been voted into the NFPA 5000, although he stated

[19](...continued)
first-hand knowledge of this matter. *Supra* n.10.

that he would have to look back into his records to be sure and did not identify which provisions of the NFPA 5000 in particular these might be. (*Id.* at 42-43.)

Plaintiff also presents a public comment by Hugh Patrick Toner proposing revision of § 8.5.6 of the NFPA 5000 and an appeal to the NFPA Standards Council by John V. Loscheider.[20] (Pltf.'s 56.1(b)(3)(B) ¶¶ 40-41.) The Toner comment states in bold typeface, "This is not original material; its reference/source is as follows: Consistent with UBC, SBC, NBC, IBC."[21] (*Id.* at ¶ 41; Toner Comment, McGraw Decl., Ex. M.) The record does not reflect when or where this comment was submitted, nor does it reflect whether or not NFPA ultimately adopted Mr. Toner's proposed language as part of the NFPA 5000, although the Toner comment appears to have been provisionally accepted pending review by the technical correlating committee.[22] (McGraw Decl., Ex. M.)

The Loscheider appeal was made to the NFPA Standards Council on behalf of the Structural Engineers Association of Washington on July 13, 2002, and proposes the addition of a definition for the term "balcony, exterior" and a definition for the term "deck" to Chapter 37 of NFPA 5000. (Loscheider Appeal, McGraw Decl., Ex. L.) In justifying the need for this addition, the Loscheider appeal states:

> These definitions are required for the application of the floor live load . . . which is extracted from *ASCE 7*. These terms are not defined in *ASCE 7* or in *NFPA 5000*. The proposed definitions match the definitions in the *International Building Code*,

---

[20] The record does not define what an appeal is, but the court presumes based on the appearance of the document that an appeal is for all purposes relevant to this case the same as a public comment. (Loscheider Appeal, McGraw Decl., Ex. L.)

[21] The record does not contain any information about what "UBC," "SBC," or "NBC" are in this context, although the court presumes that these are the initials of legacy codes. The record does not indicate whether the relevant provision of the IBC 2000 is similar or identical to the analogous provisions of these other model building codes.

[22] The words "Accept in Principle" are typed across the top of the Toner Comment itself, but the record does not reflect when or by whom these words were typed. (Toner Comment, McGraw Decl., Ex. M.)

which uses the same floor live loads for both balconies and decks.

(emphasis in original) (*Id.*)  In Plaintiff's view, the word "match" should be deemed an admission that the IBC 2000 was the source of the definitions.  (Pltf.'s 56.1(b)(3)(B) ¶ 40.)  The record does not reflect what action NFPA took on the Loscheider appeal, but the definitions of "balcony, exterior" and "deck" that are proposed in the Loscheider appeal do appear in the NFPA 5000.

Plaintiff notes, in addition, the March 20, 2003 statements of William Koffel, who served on both ICC and NFPA drafting committees, at a meeting of the City of Phoenix Development Advisory Board.[23]  In the minutes of that meeting, Koffel observes that NFPA wanted to develop its own methodology for regulating a building's height and area.  (Minutes of March 20, 2003 Meeting of the City of Phoenix Development Advisory Board, McGraw Decl., Ex. O.)  Accordingly, the NFPA drafting committee on which Koffel served rejected any proposal that introduced "an International Code Council height and area table, a BCMC height and area table, [or] a UVC height and area table."  (*Id.*)  Koffel states that at one of the last meetings of the NFPA drafting committee, the committee nevertheless decided that it could not produce a new methodology and instead "chose the public comment that basically took the IBC height and area table and . . . voted to insert that in the NFPA 5000 with some modifications."  (*Id.*)  The record does not reflect the extent of those modifications, but Koffel explains that they were dictated by different height limits in the preexisting NFPA-authored codes used to draft the NFPA 5000.[24]  (*Id.*)

The record reflects that NFPA did accept another proposal whose origin Plaintiff believes

---

[23]     The record provides no information about why Koffel attended a meeting of the City of Phoenix Development Advisory Board or whether there is any relationship between this board and the parties or their model building codes.

[24]     As noted above, the court is uncertain whether Plaintiff is accusing Defendant of copying its height and area table itself or of using Plaintiff's methodology for calculating its height and area table. Koffel's statements as recorded in the minutes of the City of Phoenix Development Advisory Board Meeting are evidence that Defendant copied Plaintiff's methodology, but not necessarily evidence that Defendant copied Plaintiff's table.

is the IBC 2000. As reflected in a May 2002 NFPA Report on Proposals, NFPA accepted a revision to Chapter 45 of the NFPA 5000, a chapter dedicated to glass and glazing. (Pltf.'s 56.1(b)(3)(B) ¶ 42; May 2002 NFPA Report on Proposals, McGraw Decl., Ex. N.) Donald Belles of Koffel Associates, Inc.[25] submitted the proposal and although the report does not identify the source of the proposed language, it states:

> This proposal revises the draft of the NFPA 5000 to bring it into agreement with the International Building Code and provisions for allowable loads on glass, sloped glazing, safety glazing, glass used in handrails and guards, glass floor loads and glazing in athletic facilities. . . . Chapter 45 in the proposed draft of NFPA 5000 contains archaic provisions. . . . The proposed new charts . . . and associated text take into account aspect ratio, aging characteristics of glass, load duration and adjusts laminated glass strength factors. The new charts were developed using data from approximately 1000 tests of new and aged glass plus thousands of computer calculations.

(McGraw Decl., Ex. N.) Belles testified that he had originally made the same glass and glazing-related proposal to ICC as a public comment subject to a nonexclusive license. (Belles Dep., pp.139-42.)

**Comparing Provisions of the NFPA 5000 and the IBC 2000**

Of more than 5,000 provisions of the IBC 2000, Plaintiff has identified just 300 sections and 20 tables (approximately 6 percent of the Plaintiff's model code) that it believes are infringed by the NFPA 5000. (Def.'s 56.1 ¶¶ 40-41; Plaintiff's Response ¶¶ 40-41.) The parties have submitted extensive exhibits that present side-by-side comparisons of various allegedly infringed and infringing provisions of the IBC 2000 and the NFPA 5000. In the court's view, some of the NFPA 5000 provisions at issue do appear to be identical, or nearly so, to the corresponding IBC 2000 provisions. Others, however, are noticeably different. For the sake of brevity, only a few such comparisons of the disputed provisions are included here, as illustrative examples of similarity and dissimilarity between the codes:

---

[25] This appears to be a company owned by William Koffel who, as noted earlier, served as a member of both NFPA's and ICC's drafting committees.

- Section 307.2 of the IBC 2000 defines an open system as:

    The use of a solid or liquid hazardous material involving a vessel or system that is continuously open to the atmosphere during normal operations and where vapors are liberated, or the product is exposed to the atmosphere during normal operations. Examples of open systems for solids and liquids include dispensing from or into open beakers or containers, dip tanks and plating tank operations.

(Comparison of Allegedly Infringed Provisions of the IBC 2000 and Allegedly Infringing Provisions of the NFPA 5000, Pfeiffer Decl., Ex. L.) Section 3.3.560.1.2 of the NFPA 5000 defines an open system almost identically:

    Use of a solid or liquid hazardous material in a vessel or system that is continuously open to the atmosphere during normal operations and where vapors are liberated, or the product is exposed to the atmosphere during normal operations.

And continues in § A.3.3.560.1.2,[26] with:

    Examples of open systems for solids and liquids include dispensing from or into open beakers or containers, dip tank operations, and plating tank operations.

(*Id.*)

- Section 1602.1 of the IBC 2000 defines an exterior balcony as:

    An exterior floor projecting from and supported by a structure without additional independent supports.

(*Id.*) NFPA § 3.3.43 uses identical language, but adds two commas:

    An exterior floor projecting from, and supported by, a structure without additional independent supports.

(*Id.*)

- The insulation requirement set out in § 718.3.1 of the IBC 2000 reads in relevant part:

    Exposed insulation materials installed on attic floors shall have a critical radiant flux of not less than 0.12 watt per square centimeter when tested in accordance with

---

[26] Because the exhibits giving side-by-side comparisons of allegedly infringed provisions of the IBC 2000 and allegedly infringing provisions of the NFPA 5000 do not present the provisions in the same order that they appear in their respective model building codes, the court cannot determine the significance of the letter "A" in the section designation above.

ASTM E 970.

(*Id*.)  The equivalent provision of the NFPA 5000, § 8.16.3.2.1, is functionally identical:

Exposed insulation materials installed on attic floors shall have a critical radiant flux of not less than 0.12 W/cm$^2$ when tested in accordance with ASTM E 970, *Standard Test Method for Critical Radiant Flux of Exposed Attic Floor Insulation Using a Radiant Heat Energy Source.*

(*Id*.)

Other provisions convey similar content with greater variation in the language used.  For example:

• Section 903.2.10 of the IBC 2000 reads:

An automatic sprinkler system shall be provided throughout all buildings where the fire area containing a Group S-1 occupancy exceeds 12,000 square feet (1115 m$^2$), or where more than three stories in height, or where the combined fire area on all floors, including the mezzanines, exceed 24,000 square feet (2230 m$^2$).

(*Id*.)  Section 30.3.5.1 of the NFPA 5000, on the other hand, states:

Storage occupancies, other than low hazard storage occupancies, shall be protected by an approved, supervised automatic sprinkler system in accordance with Section 55.3 and 55.3.2 in the following:
    (1)    Throughout all storage occupancies three or more stories in height.
    (2)    Throughout all storage occupancies exceeding 12,000 ft$^2$ (1115 m$^2$) in fire area
    (3)    Where the total area of all floors, including mezzanines, exceeds 24,000 ft2 (2230 m$^2$)

(*Id*.)

• Section 712.1 of the IBC 2000 reads:

Joints installed in or between fire-resistance-rated walls, floor or floor/ceiling assemblies and roofs or roof/ceiling assemblies shall be protected by an approved fire-resistant joint system designed to resist the passage of fire for a time period not less than the required fire-resistance rating of the wall, floor or roof in or between which it is installed. Fire-resistant joint systems shall be tested in accordance with Section 712.3. The void created at the intersection of a floor/ceiling assembly and an exterior curtain wall assembly shall be protected in accordance with Section 712.4.

(*Id*.)  On the other hand, § 8.9.2 of the NFPA 5000 reads:

Joints made within or between fire resistance-rated assemblies shall be protected

with a joint system that is designed and tested to prevent the spread of fire for a time period equal to that of the assembly in which the joint is located. Such materials, systems, or devices shall be tested as part of the assembly in accordance with the requirement of ASTM E 1966, *Standard Test Method for Fire-Resistive Joint Systems*, or ANSI/UL 2079, *Standard for Tests for Fire Resistance of Building Joint Systems.*

(*Id.*)

- And finally, § 2504.1.1 of the IBC 2000 reads:

Wood supports for lath or gypsum board shall not be less than 2 inches (51 mm) nominal thickness in the least dimension. Wood stripping or furring shall not be less than 2 inches (51 mm) nominal thickness in the least dimension. **Exception**: The minimum nominal dimension of furring strips installed over solid backing shall not be less than 1 inch by 2 inches (25 mm by 51 mm).

(*Id.*) Section 47.2.1.5.2 of NFPA 5000, in contrast, provides:

Wood support materials shall be not less than 2 in. nominal (38 mm) in their least dimension. Wood furring strips installed over solid backing shall not be less than 1 in. x 2 in. nominal (19 mm x 38 mm) in dimension.[27]

(*Id.*)

## PROCEDURAL POSTURE

On August 7, 2002, Plaintiff ICC filed a complaint against Defendant NFPA alleging copyright infringement. On February 11, 2003, Defendant filed a counterclaim seeking a declaratory judgment that its model building code does not infringe upon any valid copyright of Plaintiff in plaintiff's model building code. After substantial discovery, Defendant moved for summary judgment on February 28, 2005.

Summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A fact is

---

[27]     The court notes that ICC characterizes 2 inches as equivalent to 51 millimeters while NFPA calculates that measurement as equivalent to 38 millimeters. It appears that ICC is correct. *See* http://www.engineeringtoolbox.com/inches-mm-conversion-d_751.html.

"material" only where "disputes over facts . . . might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is "genuine" only "if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Id.*  In applying this standard, a court must be mindful of moving and nonmoving party's burdens of proof at trial:

> The judge must ask [her]self not whether [s]he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Id.* at 252. That said, the court will "'construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in favor of that party.'" *Pivot Point Int'l, Inc. v. Charlene Prods., Inc.*, 372 F.3d 913, 918 (7th Cir. 2004) (quoting *Bellaver v. Quanex Corp.,* 200 F.3d 485, 491-92 (7th Cir.2000)).

## DISCUSSION

Defendant moves for summary judgment, asserting that Plaintiff cannot prove any of the elements of copyright infringement.  "To establish copyright infringement, a plaintiff must prove '(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.'" *Incredible Techs., Inc. v. Virtual Techs., Inc.*, 400 F.3d 1007, 1011 (7th Cir. 2005) (quoting *Feist Publ'ns., Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991)).  Defendant argues that the court should grant summary judgment on any of three grounds: (1) the allegedly infringed provision of the IBC 2000 are not copyrightable; (2) Plaintiff does not own the IBC 2000 language it claims Defendant infringed upon by publishing the NFPA 5000; and (3) in developing the NFPA 5000, Defendant did not actually copy the IBC 2000.  The court addresses these arguments in turn.

### A.    Copyrightability of the IBC 2000

Defendant would be entitled to summary judgment on Plaintiff's infringement claim if this court finds that the provisions at issue are not protectable subject matter under the Copyright Act.

That determination, at least in this circuit, is a question of law.[28] *Gaimain v. McFarlane*, 360 F.3d 644, 648 (7th Cir. 2004); *Pivot Point Int'l, Inc. v. Charlene Prods., Inc.,* 932 F. Supp. 220, 225 (N.D. Ill. 1996) (Easterbrook, J., sitting by designation) ("Whether [items] are copyrightable is a question of law, which the court will decide. . . . A jury has nothing to do with this subject."); *Eagle Servs. Corp. v. H20 Indus. Servs., Inc.*, No. 02-36, 2005 WL 2406041, *4 (N.D. Ind. Sept. 28, 2005) ("[D]eterminations of copyrightability in all instances" are always reserved to the judge and are therefore appropriate for summary judgment.) (citing M. Nimmer & D. Nimmer, NIMMER ON COPYRIGHT § 12.10[B], at 3-12 (2005)).

In decisions not cited by the parties, Courts of Appeals in two other circuits have commented tangentially on the copyrightability of model building codes. In *Veeck v. S. Bldg. Code Cong. Int'l, Inc.*, the Fifth Circuit *en banc* addressed the question of whether a model building code, once adopted into law by a municipality, could be infringed. 293 F.3d 791, 793 (5th Cir. 2002). The First Circuit addressed a similar question in dissolving a preliminary injunction that barred republication of the Massachusetts building code, itself based on a copyrighted model building code. *Building Officials & Code Admin. v. Code Tech., Inc.*, 628 F.2d 730, 734 (1st Cir. 1980). The *Veeck* court explained that, once a building code is the law of a municipality, it enters the public domain and is no longer protected by the Copyright Act. 293 F.3d at 796. Accordingly, there is no infringement where a third party copies provisions of the model building code that have been adopted as law. *Id.* In reaching this decision, the Fifth Circuit stated in dicta that "[a]s model codes, however, the organization's work *retain* their protected status," and, "model building codes . . . qua model building codes, are facially copyright-protected." *Id.* at 793, 800 (emphasis added). The *BOCA* court reached a similar resolution, but without making any comment on the copyrightability

---

[28]     The Second and Ninth Circuits hold that "copyrightability is a mixed question of law and fact, at least when it depends (as it usually does) on originality." *Gaimain v. McFarlane*, 360 F.3d 644, 648 (7th Cir. 2004) (citing *Matthew Bender & Co. v. West Publ'g Co.,* 158 F.3d 674, 681 (2d Cir.1998); *North Coast Indus. v. Jason Maxwell, Inc.,* 972 F.2d 1031, 1035 (9th Cir.1992)).

of *model* building codes. 628 F.2d at 735 (a copyright holder's right to refuse to publish or allow anyone else to publish copyrighted material is incompatible with a citizen's due process right to notice of the law). The only two federal cases dealing with building codes in the copyright context, thus, both assume that it is *enactment into law* and not the *per se* uncopyrightability of model building codes that governed the resolution of those disputes.

Defendant, of course, does not argue that all model building code provisions are uncopyrightable.[29] Instead, NFPA asserts that the particular provisions of the IBC 2000 in dispute here are of the sort that cannot receive copyright protection. Defendant urges that, based on a side-by-side comparison of the disputed provisions of the IBC 2000 and the NFPA 5000, "the only possible language in common in these sections are numerical limits expressed in the proscriptive style of code phrasing." (Reply in Support of Defendant's Motion for Summary Judgment (hereinafter, "Def.'s Reply"), p. 24.) The record reflects that this is clearly not the case. For example, Plaintiff alleges that the NFPA 5000's definition of an exterior balcony infringes on its definition of the same term in the IBC 2000. Neither definition includes a numerical limit or proscriptive phrasing, but both § 1602.1 of the IBC 2000 and § 3.3.43 of the NFPA 5000 read, "An exterior floor projecting from and supported by a structure without additional independent supports," with the addition of commas offsetting the phrase "and supported by" in the Defendant's version. (Pfeiffer Decl., Ex. L.)

Nonetheless, the thrust of Defendant's argument is that there is no copyright protection for any ideas or judgments that went into the creation of the disputed provisions of the IBC 2000. Defendant relies on the "merger doctrine"–the principle that when there is only one way to express an idea, its expression cannot be covered by copyright. (Memorandum in Support of Defendant's Motion for Summary Judgment (hereinafter, "Def.'s Mem."), pp. 23-25.) The mandatory or

---

[29]     After all, prevailing on such a broad argument would put NFPA in the awkward position of stripping the language in its own model building code of copyright protection.

proscriptive phrasing conventionally used in model code drafting eliminates the possibility of using any other language without altering the underlying idea expressed in the provision, Defendant insists. (*Id.* at 23-24.)

In support, Defendant cites *Publications Int'l, Ltd. v. Meredith Corp.*, (Def.'s Mem., p.24), in which the Seventh Circuit vacated a preliminary injunction against the further publication of a recipe allegedly copied from another cookbook because the *PIL* court concluded "that the recipes involved in this case are not protectable under copyright law." 88 F.3d 473, 475 (7th Cir. 1996). The yogurt snack recipes at issue consisted of a list of required ingredients and directions for combining them without "expressive elaboration upon either of these functional components." *Id.* at 480. The *PIL* court observed that "[t]he identification of ingredients necessary for the preparation of each dish is a statement of facts," devoid of any protectable expressive element. *Id.* (citing *Harper & Row Publishers, Inc. v. Nat'l Enters.*, 471 U.S. 539, 547 (1985) ("[N]o author may copyright facts or ideas.")). The directions for combining these ingredients, in the *PIL* court's view, "fall squarely within the class of subject matter specifically excluded from copyright protection by 17 U.S.C. § 102(b)." 88 F.3d at 480. The Copyright Act specifically excludes from its scope "any idea, procedure, process, system, method of operation, concept, principle, or discovery." 17 U.S.C. § 102(b). The *PIL* court observed that the dictionary defines "recipe" as just such a procedure. 88 F.3d at 481 (citing Webster's Third New International Dictionary 1895 (Merriam-Webster 1986)).

The instant case is distinguishable. The model building codes at issue here are not expressionless "recipes" for creating a particular building, but instead carefully-drafted minimum standards for building construction. The expressions in each provision are not a conclusion dictated by the end product in mind, as a list of ingredients for a particular yogurt snack might be. Instead the record reflects that the IBC 2000 was the product of extensive collaboration among code officials, commentators, and professional staff people, who weighed the pros and cons of

including or not including any given language.  True, the idea of what a "deck" is exists in the public domain and cannot be copyrighted, but Plaintiff chose to express this idea in § 1602.1 of the IBC 2000 as "[a]n exterior floor supported on at least two opposing sides by an adjacent structure, and/or posts, piers or other independent supports," (Pfeiffer Decl., Ex. L), rather than as "a flat-floored roofless area adjoining a building," as the dictionary does, MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 299 (Merriam-Webster 10th ed. 1997)).  This choice suggests that Plaintiff's expression is sufficiently original and creative to be the proper subject matter of copyright protection.  *See Feist Publ'ns., Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 345 (1991) ("Original, as the term is used in copyright, means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity. . . . To be sure, the requisite level of creativity is extremely low; even a slight amount will suffice.").

The merger doctrine applies when "there is only one way in which to express an idea . . . then form and idea merge, and in that case since an idea cannot be copyrighted the copying of the form is not an infringement." *Assessment Techs. of WI, LLC v. WIREData*, 350 F.3d 640, 643 (7th Cir. 2003) (citing *Ets-Hokin v. Skyy Spirits, Inc.*, 225 F.3d 1068, 1082 (9th Cir. 2000); *Kregos v. Associated Press*, 937 F.2d 700, 705-07 (2d Cir. 1991)).  The mandatory or proscriptive language commonly employed in model codes arguably *reduces* the number of potential expressions for any idea contained in a copyrighted code.  The court is, nevertheless, not prepared to conclude, as a matter of law, that these conventions leave only *one* possible way of expressing any of the ideas needed to draft a given provision of a model building code–the expression employed by Plaintiff in the disputed provisions of the IBC 2000.

The Seventh Circuit's decision in *American Dental Ass'n. v. Delta Dental Plans Ass'n*, 126 F.3d 977 (7th Cir. 1997), is instructive in this regard.  In that case, Judge Easterbrook observed that potential linguistic variation exists even in short and mundane provisions of a dental taxonomy:

Number 04267 reads "guided tissue regeneration–nonresorable barrier, per site,

per tooth" but could have read "regeneration of tissue, guided by nonresorbable barrier, one site and tooth per entry". Or "use of barrier to guide regeneration of tissue, without regard to the number of sites per tooth and whether or not the barrier is resorbable". The first variation is linguistic, the second substantive; in each case the decision to use the actual description is original to the ADA, not knuckling under to an order imposed on language by some "fact" about dental procedures. Blood is shed in the ADA's committees about which description is preferable.

*Id.* at 979.  The *American Dental* court went on to hold that the dental taxonomy is the proper subject matter of copyright protection.  *Id.*

Here, similarly, there may be a limit to the number of ways a particular construction standard may be expressed.  The court is, nevertheless, unconvinced that Defendant has shown that the code drafting conventions leave its options so limited as to declare all the challenged building code provisions uncopyrightable as a matter of law.

## B.     Ownership of the IBC 2000 Language

As the second basis for its motion, Defendant contends that Plaintiff is not the owner of the language in the provisions at issue and as such does not have a valid copyright infringement claim against Defendant.  (Def.'s Mem., p. 1.)  Plaintiff asserts, in response, that it holds valid copyright registrations in the IBC 2000 and as such presumptively owns the disputed language of the IBC 2000.  (Opposition of International Code Council, Inc. to NFPA's Motion for Summary Judgment (hereinafter, "Pltf.'s Mem."), p. 16.)  Plaintiff also argues that it owns the language at issue under the work-for-hire doctrine.  (*Id.* at 17.)

Plaintiff's first argument requires only brief discussion.  A certificate of registration constitutes only *prima facie* evidence of the validity of a copyright.  17 U.S.C. § 410(c).  Where unchallenged, the presumption raised by a valid copyright registration will carry the day, *see e.g.*, *Wildlife Express Corp. v. Carol Wright Sales, Inc.*, 18 F.3d 502, 507 (7th Cir. 1994), but the presumption may be rebutted.  And where, as in this case, it has been challenged, "'the burden of proof in the sense of the risk of nonpersuasion . . . remains . . . upon the party on whom it was originally cast.'"  *Mid America Title Co. v. Kirk*, 59 F.3d 719, 721 (7th Cir. 1995) (quoting FED. R.

EVID. 301).

The question of ownership under the work-for-hire doctrine requires more analysis. Copyright initially vests in the author of a work. 17 U.S.C. § 201(a). The 1976 Copyright Act does not explicitly define the term "author," but it is generally accepted that an author is the person who originates or creates the copyrightable work. *See, e.g.*, *Childress v. Taylor*, 945 F.2d 500, 506-07 (2d Cir. 1991). Where an organization such as ICC or NFPA produces a work, the organization earns authorship rights by becoming the assignee of the individuals who did the drafting. In the absence of an assignment, an organization can also earn copyright ownership rights by operation of the work-for-hire doctrine. *See* 17 U.S.C. § 201(b) ("In the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author for purposes of this title, and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright.").

A work is "made for hire" in one of two ways. First, courts presume the acts of authorship of an employee are made for hire, with copyright ownership attaching to the organization that employed the author rather than the employee-author himself or herself. 17 U.S.C. § 101(1) ("work prepared by an employee within the scope of his or her employment"). Second, courts may consider the acts of authorship by non-employees to be "made for hire" under certain circumstances. Specifically, the work must be made for a special order. *See* 17 U.S.C. § 101(2) (limiting availability to "a work specially ordered or commissioned for use as a contribution to a collective work, as part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas.") In addition, the author and organization must observe certain formalities, including a written agreement. *See id.* (requiring "the parties to expressly agree in a written instrument signed by them that the work shall be considered made for hire."); *Schiller & Schmidt, Inc. v. Nordisco Corp.*, 969 F.2d 410, 412 (7th Cir. 1992) (requiring that work-for-hire contracts be

signed in advance of the act of authorship to be valid).

Plaintiff does not contend that its relationship with the authors of the language embodied in the IBC 2000 conforms to this second route. (Pltf.'s Mem., p. 19 n.5.) Indeed, Plaintiff concedes that it is largely without the written work-for-hire agreements required to avail itself of § 101(2) of the Copyright Act.[30] (Plaintiff's Response ¶ 13.) Rather, Plaintiff argues that its relationship with the authors of the language embodied in the IBC 2000 is that of an employee such that ICC can be deemed the owner of that language without written work-for-hire agreements under § 101(1) of the Copyright Act. (Pltf.'s Mem., pp. 19-28.)

Plaintiff is correct that in considering employer-employee relationships in the context of § 101(1) works made for hire, the term "employee" is not limited to "formal, salaried employees." *See Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 742 n.8 (1989); *Gaiman v. McFarlane*, 360 F.3d 644, 650 (7th Cir. 2004) ("The work for hire concept isn't limited to formal employment."). Instead in *Reid*, the Supreme Court considered the principles of the general common law of agency. 490 U.S. at 750-51. In determining whether an author is an employee or non-employee for the application of the work-for-hire doctrine, the Supreme Court provides a nonexhaustive list of factors to consider, including:

> (1) the hiring party's right to control the manner and means by which the product is accomplished . . . (2) the skill required; (3) the source of the instrumentalities and tools; (4) the location of the work; (5) the duration of the relationship between the parties; (6) whether the hiring party has the right to assign additional projects to the hired party; (7) the extent of the hired party's discretion over when and how long to work; (8) the method of payment; (9) the hired party's role in hiring and paying assistants; (10) whether the work was part of the regular business of the hiring party; (11) whether the hiring party is in business; (12) the provision of employee benefits; and (13) the tax treatment of the hired party.

*Reid*, 490 U.S. at 751-52 (citations omitted; numbering added).

---

[30]     Because without written work-for-hire agreements Plaintiff can only claim ownership of the language embodied in the IBC 2000 under § 101(1) of the Copyright Act, the court's reference to the work-for-hire doctrine are, unless otherwise stated, references to the doctrine under that section alone.

Plaintiff asserts that both ICC staff liaisons and technical subcommittee members authored the disputed provisions of the IBC 2000 under circumstances that exhibit that Plaintiff can claim ownership of these provisions without formal work-for-hire agreements. (Pltf.'s Mem., p. 27.) Defendant insists that only the technical subcommittee members and commenting members of the public are the true authors of the disputed provisions, and that ICC has no rights to their contributions here, where there are no formal work-for-hire agreements.[31] (Def.'s Mem., p. 14.) In the court's view, there are three potential authors of the disputed provisions of the IBC 2000:[32] ICC staff; members of the technical subcommittees; and members of the public. The court now turns to the questions of (1) whether or not each is an author for the purpose of copyright protection and (2) whether or not each potential author can be deemed an employee of Plaintiff in the broad sense that the term is used in *Reid*.[33]

---

[31]    This statement does not call into question the parties' agreement that three members of the ICC Fire Safety technical subcommittee may have signed work-for-hire agreements. (Def.'s 56.1 ¶ 13; Plaintiff's Response ¶ 13.) Very little information concerning these agreements appears in the record, but in any case Plaintiff is not resting any part of its claim of ownership over the disputed provisions on these three agreements.

[32]    Neither party has given any indication that Plaintiff used a different process to generate the 6 percent of the IBC 2000's provisions that are in dispute in this case than the process Plaintiff used to generate the 94 percent of that code's provisions that are not at issue here. In some sense then, Defendant, in attacking Plaintiff's ownership of the disputed provisions of the IBC 2000 under the work-for-hire doctrine, is attacking Plaintiff's ownership of all of the provisions of the IBC 2000.

[33]    Before addressing the parties' arguments about whether the IBC 2000 constitutes a "work for hire," the court notes that the individuals and groups identified by NFPA as the "real" authors of ICC's code have not themselves challenged ICC's title to it. There may be some doubt, as a policy matter, about the wisdom of permitting a non-author to challenge the copyright holder's right to enforce its copyright. ICC has not challenged NFPA's standing to voice this challenge, however, and the court need not address it at length beyond noting that the case law does appear to recognize an alleged infringer's right to mount such a challenge. *See, e.g.*, *M.G.B. Homes, Inc. v. Ameron Homes, Inc.*, 903 F.2d 1486, 1490 (11th Cir. 1990) (allowing the work-for-hire issue to be raised by a third-party infringer in defense against the plaintiff's copyright infringement claim); *In re Napster, Inc. Copyright Litig.*, 191 F. Supp. 2d 1087, 1097 (N.D. Cal. 2002) (finding the third-party standing doctrine, which bars a third-party challenge when the plaintiff claims ownership by assignment, does not preclude third parties from challenging the presumption of ownership by

(continued...)

### 1.     Staff Liaisons as Authors

Beginning with the putative author most closely associated with ICC, the ICC staff liaisons are clearly Plaintiff's employees. Indeed, Defendant has not contested the staff liaisons' status as ICC employees. The problem here is that, with the exception of a handful of provisions, staff liaisons are not authors of the IBC 2000. Plaintiff disputes Defendant's assertion that the staff liaisons did not write any of the provisions of the IBC 2000, (Pltf.'s Mem., pp. 21, 25-27), but the evidence in support of the staff liaisons' authorship is limited to the editorial assistance they provided to the technical subcommittee members and commenting members of the public. Drawing all inferences in favor of Plaintiff, it appears that staff liaisons assisted the technical subcommittee members by compiling the matrices of preexisting code provisions; advised the technical subcommittee members and commentators on the language conventions of model building codes; compiled drafts and proposals into useable formats; and, perhaps, set the timetable for drafting the IBC 2000. None of these activities amounts to actual authorship of any of the disputed provisions, however. Such editorial assistance, no matter how essential to the drafting process, cannot earn the staff liaisons (and by operation of the work-for-hire doctrine, Plaintiff) authorship rights. *See Gaiman*, 360 F.3d at 658 (observing that if making preliminary suggestions or editorial changes were sufficient, "almost every expressive work would be a jointly authored work, and copyright would explode.")

The only exceptions to this conclusion are the five provisions of the IBC 2000: Table 503

---

[33](...continued)
authorship); *cf. Law Enforcement Training and Research Assocs. v. City and County of San Francisco*, Nos. 90-15482, 90-15638, 1991 WL 172416, *1 (9th Cir. Sept. 4, 1991) ("The district court should give careful consideration where, as here, the work for hire doctrine is invoked solely as a third party defense and the asserted copyright holder has knowingly acquiesced to the plaintiff's commercial use of the work.")

and four sub-sections of § 903.2.[34]  As described earlier, the record with respect to these provisions at least raises the possibility that staff liaisons went beyond mere editorial assistance.

### 2.    Technical Subcommittee Members as Authors

More extensive analysis is required for the technical subcommittee members.  The parties agree that technical subcommittee members made one of three contributions: (1) they selected language from preexisting model building codes or from a public commentary or proposal; (2) they modified preexisting language; or (3) they drafted entirely new language.  This court concludes that the technical subcommittee members are not authors of any provision that found its way into the IBC 2000 via the first route.  *See Feist Publ'ns., Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 359-60 (1991) ("'The copyright in a compilation . . . extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work, and does not imply any exclusive right in the preexisting material.'") (quoting 17 U.S.C. § 103(b)).  Plaintiff might, nonetheless, assert a compilation copyright in technical subcommittee members' *selection* of any preexisting language if such a selection is original,[35] *Feist*, 499 U.S. at 350-51, and if the act of

_____

[34]    Even if Plaintiff owns the disputed sub-sections of § 903.2 by operation of the work-for-hire doctrine, Defendant still argues that it did not copy these provisions. (Def. Mem., pp. 21-22.) Although material disputes of fact exist on the question of copying with respect to other provisions of the model codes at issue, the court agrees with Defendant that §§ 903.2.2, 903.2.10 of the IBC 2000 use different language and phrasing than the allegedly infringing §§ 17.3.5.1, 17.3.5.4, 30.3.5.1 of the NFPA 5000. (Pfeiffer Decl., Ex. L.)

[35]    Defendant argues that Plaintiff cannot assert a compilation copyright in this infringement action because ICC did not register the IBC 2000 as a compilation. (Def.'s Reply, p. 23.)  The court, however, finds Plaintiff's completion of item six (entitled "Derivative Work or Compilation") of the IBC 2000 copyright registration sufficient to preserve Plaintiff's ability to bring an action for infringement based on any compilation copyright it might hold in its model building code. *Cf. Eagle Servs. Corp. v. H20 Indus. Serv., Inc.*, No. 02-36, 2006 WL 449210, *11 (N.D. Ind. Feb. 22, 2006) (finding that absent proof of intentional or purposeful concealment, a party could assert a compilation copyright even where it had left item six of the copyright registration blank).
    The legacy organizations transferred their copyrights in the preexisting material from which technical subcommittee members made selections and modifications. The validity of these transfers is not directly contested in this motion, but the parties have stipulated that the process used by the legacy organizations to create this preexisting material is the same as the process used by Plaintiff

(continued...)

selection by the technical subcommittee members can be attributed to Plaintiff (an issue discussed in more detail below). More importantly, the technical subcommittee members are authors of any language that found its way into the IBC 2000 via the second or third route.[36] *Id.* Whether Plaintiff can claim ownership over the provisions of the IBC 2000 authored by the technical subcommittee members depends on whether the relationship between Plaintiff and its technical subcommittee members bears the indicia of a principal-agent relationship as outlined in the multi-factor *Reid* test. *Reid*, 490 U.S. at 752 (recognizing that "[n]o one . . . factor is determinative"); *see also Aymes v. Bonelli*, 980 F.2d 857, 861 (2d Cir. 1992) (recognizing that not all *Reid* factors are equally important in every situation).

The first factor, the right to control the manner and the means of production, is the most challenging. Plaintiff emphasizes that ICC directly formed the technical subcommittees and determined how the committees would be staffed. (Pltf.'s Mem., p. 21.) Plaintiff also notes that ICC through its staff liaisons provided the initial working documents to the technical subcommittees; through the steering committee, Plaintiff says ICC set the procedures the technical subcommittees would use, designated the chapters each technical subcommittee would complete, decided when drafts would be published and circulated for comment, and determined how the technical subcommittees would act on these proposals. (*Id.*) Defendant contests these assertions only by challenging Plaintiff's contention that by "acting through" the steering committee, ICC can claim

---

[35](...continued)
to create the IBC 2000. (Docket No. 61.) Thus the copyrights in the preexisting materials transferred to Plaintiff are only as good as Plaintiff's copyright in the IBC 2000. The record, as it stands, does not allow the court to determine whether legacy organization staff, drafting committee member, or public commentator drafted any given provision of any given legacy code. As noted earlier, however, *supra* n.32, on this motion Defendant *de facto* argues that, as a matter of law, ICC is not entitled to copyright in any part of the IBC 2000.

[36]    The technical subcommittee members under the second route would only be authors to the extent of their modification of preexisting language and could only claim copyright in the modified portion of the provision, not the preexisting portion. *Feist Publ'ns., Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 350-51 (1991).

credit for establishing the drafting process of the IBC 2000. (Def.'s Mem., p. 16.) Defendant also points out that ICC staff liaisons themselves did not have a vote on any steering committee or technical subcommittee decisions. (*Id.*)

A conclusion in favor of ICC on the issue of its right to control the technical subcommittee members would not, by itself, require a finding that ICC is the owner of the technical subcommittee's work. *See Harris Custom Builders, Inc. v. Hoffmeyer*, 92 F.3d 517, 519 (7th Cir. 1996) (finding that after *Reid*, the right to supervise and control the author of a work is insufficient to bring the work within the ambit of presumptive ownership by the commissioning party). It may well be that a determination to the contrary–that ICC does not control the subcommittee members' efforts–would be sufficient to defeat ICC's claim under the work-for-hire doctrine. At least in non-copyright cases, the Seventh Circuit has given the strong indication that the absence of the right to control would preclude the finding of a master-servant relations. *See, e.g., Schmidt v. Ottawa Medical Center, P.C.*, 322 F.3d 461, 466 (7th Cir. 2003). The court concludes here, at a minimum that ICC was responsible for bringing the technical subcommittee member authors together and facilitating public comment on their work, but beyond that, the degree to which ICC controlled the efforts of the subcommittee members is disputed.

With regard to the second factor, the level of skill required, Defendant points out that the technical subcommittee members were all highly skilled code officials in their respective state and local governments. (Def.'s Mem., p. 16.) Plaintiff downplays the skill of the technical subcommittee members, instead emphasizing the expertise of the ICC staff liaisons. (Pltf.'s Mem., p. 25.) Plaintiff notes, too, that technical subcommittee members needed to consult these liaisons on matters of code drafting conventions and the particular merits of legacy code provisions. (*Id.*) In the court's view, while technical subcommittee members certainly needed the assistance of ICC staff, the members themselves had a difficult, technical task, and the legacy organizations appointed them for their ability to complete that task. Plaintiff's suggestion that technical subcommittee members

were unfamiliar with the legacy codes on which much of the IBC 2000 was based, (*id.* at 25-26), appears inconsistent with Plaintiff's assertion that technical subcommittee members were selected because of their roles in the legacy organizations. (*Id.* at 17). To the extent that this factor is important, it militates against a finding that the technical subcommittee members were Plaintiff's employees for the purpose of determining copyright ownership.[37] *See Natkin v. Winfrey*, 111 F. Supp. 2d 1003, 1008 (N.D. Ill. 2000) (finding highly-skilled photographers were not employees of a television show).

The third factor–the source of the instrumentalities and tools–points in the opposite direction. Defendant argues that no instrumentalities or tools were used in the drafting process. (Def.'s Mem., p. 17.) As Plaintiff observes, however, ICC provided technical subcommittee members with the two primary ingredients–aside from their own wits–used to draft the IBC 2000: the legacy codes (in the form of the ICC staff-authored matrices) and public commentary (by circulating drafts of the IBC 2000 and holding public forums). (Pltf.'s Mem., p. 22.)

The fourth factor–the location of the work–also weighs in favor of "employee" status for the technical subcommittee members. Although Defendant emphasizes the fact that technical subcommittees met in hotels and conference centers rather than ICC's headquarters, (Def.'s

---

[37]    Again, this factor is not by itself controlling here. In presenting this factor, the *Reid* court cited two labor cases. 490 U.S. at 751 n.18. In the first case, *Hilton Int'l Co. v. NLRB*, the Second Circuit used the high level of skill of the individuals at issue to distinguish them from the employer's other employees and support its finding that the individuals were therefore not employees. 690 F.2d 318, 322 (2d Cir. 1982) (observing that a group of musicians performing at a hotel are highly skilled members of "clearly distinct occupation" and not hotel employees). In the second case, *NLRB v. Maine Caterers, Inc.*, the First Circuit used the fact that the employer had to provide constant training to individuals as evidence that they should be classified as employees. 654 F.2d 131, 133 (1st Cir. 1981) ("[The employer] shows [the salesman-drivers] 'exact procedures' for running a Maine catering truck."). In the instant case, no matter how highly-skilled the technical subcommittee members are, their activities were not dramatically different than those of ICC or its staff liaisons–all were engaged in the business of pulling together a model building code. And, in contrast to *Maine Caterers*, any assistance ICC staff liaisons may have provided to the technical subcommittee members here was not so extensive as to put the subcommittee members squarely in the employee category.

Reply, pp. 8-9), Plaintiff notes that ICC paid for these hotels and conference centers and reimbursed technical subcommittee members' travel-related expenses. (Pltf.'s Mem., pp. 22-23). At least in this sense, ICC did provide technical subcommittee members with a workplace.

Again, the fifth factor–the duration of the relationship–weighs in favor of Plaintiff. The legacy organizations appointed technical subcommittee members for one-year terms and frequently reappointed them repeatedly throughout the entire three-and-a-half year drafting process. (*Id.* at 23.) Defendant is correct that the technical subcommittee members "continued to work for their government employers while serving on the committees," (Def.'s Mem., p. 17), but the case on which Defendant relies is not helpful: In *Aymes v. Bonelli*, a computer programmer brought a copyright infringement action against a business for whom he had created a computer program while doing "occasional work for others at the same time." 980 F.2d at 864. Although the *Aymes* court ultimately decided that the programmer was not an employee, it noted that the two-year period during which the programmer worked for the company militated against that conclusion. *Id.*

Defendant also cites *Respect, Inc. v. Comm. on Status of Women*, in which a publisher was not entitled to copyright under the § 101(1) work-for-hire doctrine where the author had self-published, continued to self-publish, and published with other publishers throughout the time the author was preparing the materials at issue. 815 F. Supp. 1112, 1118 (N.D. Ill. 1993). *Respect*, too, is distinguishable. While it is true that technical committee members continued to work for other employers throughout the IBC 2000 drafting process, the technical subcommittee members here were not engaged in the same acts of authorship at some other party's behest. That is to say, they were not drafting model building codes for some other organization, but were instead administering enacted building codes for their state and local jurisdictions. Some ICC technical subcommittee members did assist with the NFPA 5000 drafting process, but Defendant's formal drafting process began at or near the time the IBC 2000 drafting process was completed.

The sixth factor–the hiring party's right to assign additional projects–is inconclusive.

Defendant notes that because technical subcommittee members were volunteers, ICC could not compel them to take on any additional assignments. (Def.'s Reply, p. 9.) Plaintiff points out that the steering committee could and did change chapter assignments for the technical subcommittees. (Pltf.'s Mem., pp. 23-24.) There is a genuine dispute about the extent to which the ICC Board controlled the actions of the steering committee, which was itself composed of volunteers; Defendant does not dispute that ICC set up the committees, including the steering committee. (Pltf.'s 56.1(b)(3)(B) ¶ 16; Def.'s Response ¶ 16.) Defendant's view of the record is that after the ICC set up the committees, the ICC Board sat back and let the public officials on the steering committee run things, while Plaintiff asserts that the ICC Board's right to "ratify" (an unfortunately imprecise term) steering committee actions is significant. (*Id.*)

The court finds similar disputes of fact prevent a clear determination on the seventh factor, Plaintiff's discretion over when and how long the technical subcommittee members performed their work. Defendant notes that technical subcommittee members were volunteers "under no contractual obligation to complete any assignment" and thus "always retained 'discretion' over whether and when to work." (Def.'s Reply, p. 10.) Defendant asserts further that it was the steering committee, not the ICC staff or Board, who made the real decisions about the timetable for the IBC 2000 drafting process. (*Id.*) As noted above, however, the ICC Board's control over the steering committee's decisions and activities is disputed.

Of the six remaining factors identified in *Reid*, three favor Plaintiff and three favor Defendant. With respect to the method of payment (factor eight), the fact that technical subcommittee members served as volunteers militates against concluding that they were Plaintiff's employees, even in the broad *Reid* sense. For the same reason, the fact that Plaintiff neither provided any employee benefits, nor withheld taxes from the code "drafters" (factors twelve and thirteen) argue for the same conclusion. The ninth, tenth, and eleventh factors weigh in favor of Plaintiff. Plaintiff correctly observes that it was ICC, not the technical subcommittee members themselves, who hired and paid

for the ICC staff liaisons who assisted the technical subcommittee members (factor nine). (Pltf.'s Mem., p. 25.) In addition, the parties agree that ICC is a business (factor eleven) and that the subcommittee members were engaged in work that constitutes ICC's regular business (factor ten). (*Id.*; Def.'s Mem., p. 10.)

Whether or not the technical subcommittee members are "employees" for the purpose of the work-for-hire copyright analysis is a question of law, but only where the facts are settled. *Kirk v. Harter*, 188 F.3d 1005, 1007 (8th Cir. 1999); *Langman Fabrics v. Gaff Californiawear, Inc.*, 160 F.3d 106, 111 (2d Cir. 1998); *see also Motta v. Samuel Weisser, Inc.*, 768 F.2d 481, 484 (1st Cir. 1985) (citing Nimmer, 3 THE LAW OF COPYRIGHT § 13.01[A] (1984)). The Seventh Circuit has commented with respect to other mixed questions of law and fact that "a dispute concerning some facts relevant [to the mixed question of law and fact] will not preclude a finding [of summary judgment] so long as the finding survives after adopting the plaintiff's version of the disputed facts for which there is some support in the record." *Cervantes v. Jones*, 188 F.3d 805, 811 (7th Cir. 1999) (discussing a finding of probable cause), *overruled on other grounds*, *Newsome v. McCabe*, 256 F.3d 747, 751 (7th Cir. 2001).

This court concludes that material disputes of fact preclude a grant of summary judgment for either side on the issue of ownership of the technical subcommittee members' acts of authorship.[38] Namely, so long as the relationship between the ICC Board and the ICC steering committee remains an open question, a reasonable trier of facts could resolve the *Reid* multifactor analysis in either party's favor. Without resolution of the disputes of fact surrounding this relationship, the court cannot determine the correct characterization of Plaintiff's right to control the manner and means by which the technical subcommittee members drafted the IBC 2000; Plaintiff's

---

[38] Although Plaintiff has not filed a cross-motion for summary judgment, Plaintiff has argued that it is entitled to judgment as a matter of law on the issue of copyright ownership. (Pltf.'s Mem., p. 20 n.19.)

right to assign additional projects to the technical subcommittee members; and Plaintiff's discretion over when and how long the technical subcommittee members would work.

### 3. Public Commentators as Authors

Finally, the court considers the authorship status of those members of the public and interested parties who offered commentary and proposals that were adopted by the technical subcommittees into the IBC 2000. These commentators qualify as authors, but the court concludes they are not so closely associated with ICC that ICC can claim their acts of authorship as its own under the work-for-hire doctrine absent formal work-for-hire agreements. Just as the staff liaisons were clearly employees under *Reid*, these authors equally clearly are not. As set forth in 17 U.S.C. § 101(2), Plaintiff can only own their contribution under the work-for-hire doctrine if the public commentators signed a work-for-hire agreement. So far as this record shows, no public commentator did so.[39]

This court must conclude that Plaintiff does not own any language it adopted without modification from public commentary into the IBC 2000. There are important qualifications on this conclusion, however. To the extent that technical subcommittee members modified a proposal before adopting it, that modified language may be authored by the technical subcommittee members. Depending on the ultimate resolution of genuine material disputes of fact as to the technical subcommittee members' work-for-hire status, ICC may ultimately own these modifications. Furthermore, to the extent that *selection* of commentary language is an original act of authorship attributable to the technical subcommittee members, ICC may also ultimately be able to show that

---

[39]     Outside of the work-for-hire doctrine, Plaintiff might still claim ownership over the contribution of the public commentators if it had received an assignment from them; here no such assignments were made. Instead, Plaintiff holds only a nonexclusive license in this language. Such a license "'does not transfer ownership of the copyright to the licensee. The copyright owner simply permits the use of a copyrighted work in a particular manner.'" *ITOFCA, Inc. v. MegaTrans Logistics, Inc.*, 322 F.3d 928, 940 (7th Cir. 2003) (quoting *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 775 (7th Cir. 1996)); *see also* Paul Goldstein, 1 COPYRIGHT: PRINCIPLES, LAW AND PRACTICE § 4.4.1.1 (a person holding only a nonexclusive license has no standing to sue for copyright infringement).

it owns a compilation copyright in the IBC 2000.  *Feist*, 499 U.S. at 350-51 ("A factual compilation is eligible for copyright if it features an original selection or arrangement of facts, but the copyright is limited to the particular selection or arrangement.")

In conclusion, genuine material disputes of fact exist as to whether Plaintiff owns, by operation of the work-for-hire doctrine with respect to the acts of authorship by the technical subcommittee members or ICC staff liaisons, many of the allegedly infringed provisions in the IBC 2000.  Two issues can be resolved at this point, however.  Plaintiff does not own by operation of the work-for-hire doctrine the language of any provision that was adopted, unmodified, from a public commentary or proposal, although it may ultimately have a copyright in the selection of these provisions.  Similarly, because the parties have stipulated that the process used to create the IBC 2000 is the same process used by the legacy organizations to create the legacy codes, Plaintiff does not own any provision that was adopted unmodified from a public commentary into a legacy code provision that was itself adopted unmodified into a provision of the IBC 2000.  Once again, however, the legacy organizations may have transferred a compilation copyright to Plaintiff.  The court cannot conclude that Plaintiff might not have some ownership interest in each provision of its model building code that is in dispute.

## C.    Actual Copying of the IBC 2000

Even without disputes of fact as to which provisions of the IBC 2000 Plaintiff owns, Defendant would still be entitled to summary judgment if the record does not present a material dispute of fact on the question of whether Defendant actually copied provisions of the IBC 2000 in creating the NFPA 5000.  *See Feist Publ'ns., Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991).  For the reasons explained here, the court concludes there is a genuine and material dispute concerning this issue, as well.

Plaintiff notes a number of circumstances it characterizes as evidence of copying.  (Pltf.'s Mem., pp. 29-31.)  Three of these are insufficient, in the court's view, to preclude summary

judgment in favor of Defendant. First, Plaintiff notes a slide presentation directing NFPA technical subcommittee members not to "reinvent the wheel," (*Id.* at 29), but Plaintiff has not presented the context of this quotation, nor has Plaintiff established who put together the slide show, when it was shown, or to whom. (Def.'s Reply, pp. 18-19.) In the context of its accompanying slides, it is clear that NFPA technical subcommittee members were in fact being directed to fill in any gaps in NFPA's preexisting materials with provisions from several other listed model codes; the IBC 2000 is not among them. Plaintiff also points to the Toner Comment, which states that it "is not original material" and is "[c]onsistent with . . . IBC," (Pltf.'s Mem., p. 30), but the record does not reflect whether or not Defendant ever incorporated the Toner Comment into the NFPA 5000. Last, Plaintiff points to Belles' proposal, accepted by NFPA, revising Chapter 37 of the NFPA 5000 "to bring it into agreement with the International Building Code." (*Id.* at 30-31.) Defendant, however, asserts that to the degree the NFPA 5000 and IBC 2000 provisions at issue here are the same, it is because Belles submitted the same public comment to both organizations on a nonexclusive basis. (Def.'s Reply, p. 20 n.13; Belles Dep., pp. 139-42.)

Other pieces of evidence do create a genuine issue of fact on the matter of copying, however. Although Plaintiff does not provide any evidence on the ultimate resolution of the Loscheider appeal whose definitions of "deck" and "exterior balcony" "match the definitions in the *International Building Code*," the record reveals that the NFPA 5000's definitions for "deck" and "exterior balcony" are nearly identical to those in the Loscheider Appeal. (Pfeiffer Decl., Ex. L.) In addition, Plaintiff points to the statement made by NFPA and ICC technical committee member William Koffel recorded in the minutes of the City of Phoenix Development Advisory Board meeting that the origin of NFPA's height and area table is the IBC 2000's Table 503. (Pltf.'s Mem., p. 30.) Defendant suggests that both tables owe a common origin to the BCMC Reports, (Def.'s Mem., p. 20; Koffel Decl. ¶ 23), but Plaintiff denies this, citing Pfeiffer's assertion that "Table 503 . . . is . . . not just direct extractions from one of the legacy codes or the BCMC." (Pfeiffer Decl. ¶ 25).

44

Finally, although Technical Correlating Committee member Ronald Nickson failed to identify any particular provisions, he did testify that NFPA adopted some draft provisions taken directly from the IBC 2000. (Pltf.'s Mem., pp. 29-30.) Defendant asserts that Nickson was motivated by his industry association to oppose the NFPA 5000 and that his current opposition to NFPA in this action is an outgrowth of that broader opposition to NFPA's code.[40] (Def.'s Reply, p. 19 & n.11.) Defendant also emphasizes ICC and NFPA technical subcommittee member William Koffel's provision-by-provision analysis of the origin of each disputed provision of the NFPA 5000, none of which he credits to the IBC 2000. It remains the role of the trier of facts, not this court, to resolve these disputes, however. Defendant has not shown it is entitled to summary judgment on the issue of copying.

Indeed, even without direct evidence in the record, Plaintiff might well have survived summary judgment on this issue. Copying will be inferred "where the 'defendant has access to the copyrighted work and the accused work is substantially similar to the copyrighted work.'" *Incredible Techs., Inc. v. Virtual Techs., Inc.*, 400 F.3d 1007, 1011 (7th Cir. 2005) (quoting *Atari, Inc. v. N. Am. Philips Consumer Elecs. Corp.*, 672 F.2d 607, 614 (7th Cir. 1982)).

Defendant's access to the IBC 2000 is undisputed. *See Wildlife Express Corp. v. Carol Wright Sales, Inc.*, 18 F.3d 502, 508 n.5 (7th Cir. 1994) ("Access can be found to exist when the defendant had an opportunity to view the protected item.") (citing M. Nimmer, 3 NIMMER ON COPYRIGHT § 13.02[A], at 13-16 (1993)). The remaining question is "whether . . . [it] used [its] access to copy." *Ty, Inc. v. GMA Accessories, Inc.*, 132 F.3d 1167, 1170 (7th Cir. 1997). Quoting *Stillman v. Leo Burnett Co.*, 720 F. Supp. 1353, 1357 (N.D. Ill. 1989), Defendant asserts that it did

_____

[40] The evidence in support of Nickson's claimed bias is thin. Defendant asserts: "Mr. Nickson ultimately became an opponent of NFPA 5000, and was one of just two NFPA members who voted against its adoption, presumably because certain of its provisions were less favorable to his industry group than the IBC 2000." (Def.'s Reply, p. 19.) The only evidence Defendant cites is Nickson's deposition in which he acknowledges that the NFPA 5000's more onerous sprinkler requirements were adverse to his employer's interests. (Nickson Dep., pp. 88-93.)

not use the IBC 2000 "as a starting point for" for its own code, but does not explain the significance of this observation.  (Def.'s Mem., p. 22.)  It is undisputed that the Carson Draft was not based on the IBC 2000, but Plaintiff notes evidence suggesting that the Carson Draft and the materials available to Defendant, including the EPCOT Code and preexisting NFPA codes, were not a sufficient basis for a comprehensive model building code.  (Pltf.'s Mem., pp. 31-32.) More important than initial similarities in this case, however, are final similarities between the published versions of the NFPA 5000 and the IBC 2000.  Although some of the disputed provisions are quite dissimilar in final form, (Pfeiffer Decl., Ex. L), the record also reflects that others are identical or nearly so.  (Pltf.'s Mem., p. 31.)  For example, aside from a dropped definite article, the distribution of a noun over compound adjectives, and the substitution of "in" for "involved," the definitions of "open systems" in the IBC 2000 and the NFPA 5000 are exactly the same.  (Pfeiffer Decl., Ex. L.)

Judge Posner has observed that such "identity can be powerful evidence of copying."  *Ty*, 132 F.3d at 1170 (citing *Gaste v. Kaiserman*, 863 F.2d 1061, 1069 (2d Cir. 1988); *Ferguson v. Nat'l Broad. Co.*, 584 F.2d 111 (5th Cir. 1978)).  The probative value of striking similarity between two works of authorship, of course, is diminished to the extent that both works are similar to some third work that is already in the public domain or to which both parties had access.  *See Ty*, 132 F.3d at 1170 ("The more a work is both like an already copyrighted work *and*–for this is equally important–unlike anything that is in the public domain, the less likely it is to be an independent creation.").  In *Selle v. Gibb*, 741 F.2d 896 (7th Cir. 1984), the Seventh Circuit affirmed a judgment for defendant notwithstanding the verdict where the plaintiff was able to prove that his musical composition was very similar to the defendant's subsequent musical composition (right down to notes chosen and their arrangement), but failed to show that defendant's work was not similar to compositions by other popular performers, prior compositions by the defendant himself, and songs that pre-dated both the plaintiff's and the defendant's work.  741 F.2d at 899, 905.  The Seventh Circuit imposed the obligation of proving "striking similarity"–"similarity which reasonably precludes

the possibility of any explanation other than that of copying"–because the *Selle* plaintiff's case for access was so speculative. *Id.* While access to the IBC 2000 is undisputed in this case, this court is unwilling to ignore evidence in the record attributing the origin of some of the disputed provisions of the NFPA 5000 to common sources to which both parties had access, such as the BCMC Reports. (Def.'s Mem., p. 22.)

Because the record includes disputed questions of fact with respect to both the direct and circumstantial evidence that Defendant copied Plaintiff's model building code, Defendant's motion for summary judgment on this ground is denied. Defendant emphasizes that Plaintiff has alleged that Defendant copied less than 6 percent of its model building code. (Def.'s Mem., p. 21.) Even of those, not all of the provisions Plaintiff has targeted within NFPA 5000 are so similar to the corresponding IBC 2000 provisions as to suggest infringement. The court declines to address the question of whether Defendant copied enough of the IBC 2000 to constitute an improper appropriation without further development of this issue. In some contexts, of course, the amount of text copied will not control the determination of whether infringement has occurred; infringement can happen even where a handful of words are copied from a lengthy book. *See, e.g., Harper & Row Publishers, Inc. v. Nat'l. Enters.*, 471 U.S. 539, 565 (1985) (the improper appropriation inquiry asks not how much material was copied, but instead focuses on the "qualitative value of the copied material, both to the originator and to the plagiarist"). That principle may well have less salience in this context, however, where each code is a collection of literally thousands of individual provisions. The court is not prepared to conclude that any single provision (or handful of provisions) will have the kind of significance that the key scene in a novel might have. Although NFPA has suggested that the number of code provisions challenged here are *de minimis*, neither party has addressed the question whether the provisions at issue here are of greater significance than others and how, if at all, that significance might support ICC's claims here. On a more fully-developed record, the court might well reconsider its grant of summary judgment on this issue.

47

## <u>CONCLUSION</u>

Defendant's motion for summary judgment (74) is denied.  Defendant has not shown that the disputed provisions of Plaintiff's model building code are not copyrightable as a matter of law. Furthermore, material disputes of fact prevent a finding in Defendant's favor with respect to Plaintiff's ownership interest in the disputed provisions.  Finally, material disputes of fact exist on the question of whether Defendant copied the disputed provisions of Plaintiff's model building code.

ENTER:

Dated: March 27, 2006

_____
REBECCA R. PALLMEYER
United States District Judge